**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELIZABETH SINES, SETH WISPELWEY, MARISSA BLAIR, APRIL MUÑIZ, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, JOHN DOE, and THOMAS BAKER,<br><br>               Movants,<br><br><br><br>v.<br><br>MILO YIANNOPOULOS,<br>               Respondent. | Misc. Case. No. 20-241<br><br>Related to Civil Action No. 3:17-cv-00072-NKM, pending in the United States District Court for the Western District of Virginia, Charlottesville Division |

**MOVANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO COMPEL MILO YIANNOPOULOS TO COMPLY WITH SUBPEONA**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ........................................................................................................ 1

     I.    The Movants Sue the Organizers of the Unite the Right Rally in
          Charlottesville, VA Under the Ku Klux Klan Act, and the Defendants—
          Including Acquaintances of Yiannopoulos—Resist Compliance with
          Discovery ...................................................................................................... 1

     II.   Amidst Discovery in the Underlying Litigation, Milo Yiannopoulos
          Publicly Releases Evidence Highly Relevant to the Plaintiffs' Claims and
          the Plaintiffs Issued Him a Subpoena ......................................................... 6

     III.  Yiannopoulos Initially Claims He Was Eager to Comply with the
          Subpoena, and Confirms that He Has Responsive Material, but
          Subsequently—Months After His Production Deadline—Abruptly
          Reverses Course and Announces That He Will Not Comply ....................... 7

     IV.  After Representing to the Plaintiffs on February 12, 2020 That He Has No
          Responsive Materials, Yiannopoulos Publicly Releases Responsive
          Material on April 6, 2020 and Promises More. ......................................... 11

ARGUMENT ............................................................................................................ 13

     I.    Yiannopoulos Has Waived Any Objection to the Subpoena ................................ 13

     II.   Yiannopoulos' (Untimely) Excuses for Non-Compliance Are Meritless .............. 14

         a.   Yiannopoulos Has Responsive Materials ................................................... 14

         b.   Yiannopoulos Cannot Hide Behind a "Journalistic Privilege" ................. 15

             i.   Yiannopoulos Failed to Comply with the Federal Rules as to
                Claims of Privilege ...................................................................... 15

             ii.  New York's "Shield Law" Offers No Protection to
                Yiannopoulos ................................................................................. 16

             iii.  The First Amendment/Common Law Journalist's Privilege
                Also Offers No Protection to Yiannopoulos ................................. 22

          c.   Yiannopoulos Cannot Use His Supposed Interaction with Law
              Enforcement as a Shield Against Production ............................................. 24

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

<u>Cases</u>

*Am. Savings Bank, FSB v. UBS Painwebber, Inc.*,
No. M8-85, 2002 WL 31833223, (S.D.N.Y. Dec. 16, 2002)....................................................16

*Carbajal v. Village of Hempstead*,
No. 02-cv-4270, 2003 WL 23138447 (E.D.N.Y. Dec. 22, 2003)...........................................25

*Chevron Corp. v. Berlinger*,
629 F.3d 297 (2d Cir. 2011)...............................................................................15, 16, 22, 23

*Gonzales v. Nat'l Broad. Co.*,
194 F.3d 29 (2d Cir. 1999)....................................................................................23, 24

*Holmes v. Winter*,
3 N.E.3d 694  (N.Y. 2013)....................................................................................17

*In re McCray, Richardson, Santana, Wise, and Salaam Litig.*,
928 F. Supp. 2d 748 (S.D.N.Y. 2013)...................................................................22

*Elizabeth Sines, et al. v. Jason Kessler, et al.*
324 F. Supp. 3d 765 (W.D. Va. 2018) ............................................................. *passim*

*Mazzella v. Phila. Newspapers, Inc.*,
479 F. Supp. 523 (E.D.N.Y. Nov. 2, 1979) .........................................................17

*PPM Am., Inc. v. Marriott Corp.*,
152 F.R.D. 32 (S.D.N.Y. 1993) ....................................................................16, 18

*Persky v. Yeshiva Univ.*,
No. 01-cv-5278, 2002 WL 31769704 (S.D.N.Y. Dec. 10, 2002) ...........................18

*People v. Bonie*,
35 N.Y.S.3d 53 (1st Dep't 2016) ........................................................................20

*People v. Le Grand*,
415 N.Y.S.2d 252 (2d Dep't 1979)......................................................................18

*Pugh v. Avis Rent A Car System, Inc.*,
No. M8-85, 1997 WL 669876 (S.D.N.Y. Oct. 28, 1997) .....................................17

*Schoolcraft v. City of New York*,
No. 10-cv-6005, 2014 WL 1621480 (S.D.N.Y. Apr. 22, 2014) ............................22

*Schweizer v. Mulvehill*,
93 F. Supp. 2d 376 (S.D.N.Y. 2000)...................................................................13

*Stephens v. Am. Home Assur. Co.*,
 No. 91-cv-2898, 1995 WL 230333 (S.D.N.Y. Apr. 17, 1995) ................................................17

*Torah Soft Ltd. v. Drosnin*,
 No. 00-cv-0676, 2001 WL 1425381 (S.D.N.Y. Nov. 14, 2001)..............................................18

*Too Much Media, LLC v. Hale*,
 20 A.3d 364 (N.J. 2011)......................................................................................................19

*Trussell-Slutsky v. McIlmurray*,
 No. 031137/2017, 2018 WL 7569367 (Sup. Ct. N.Y. Cnty. Oct. 11, 2018) ....................16, 18

*U.S. v. Painting Known as "Le Marche"*,
 No. 06-cv-12994, 2008 WL 2600659 (S.D.N.Y. June 25, 2008) ......................................24, 25

*U.S. v. Reynolds*,
 345 U.S. 1 (1953)................................................................................................................25

## **Statutes**

42 U.S.C. § 1985................................................................................................................................3

N.Y. Civ. Rights Law § 79-h ........................................................................................... *passim*

## **Rules**

Fed. R. Civ. P. 12(b)(6)......................................................................................................................3

Fed. R. Civ. P. 45(d) ...............................................................................................................1, 6, 13

Fed. R. Civ. P. 45(e)(2)..................................................................................................................15,16

Movants move pursuant to Rule 45(d)[1] of the Federal Rules of Civil Procedure to compel Respondent Milo Yiannopoulos to produce documents responsive to a November 5, 2019 subpoena issued in connection with the pending action of *Elizabeth Sines et al. v. Jason Kessler, et al.*, No. 3:17-cv-00072 (W.D. Va.) (NKM).

## PRELIMINARY STATEMENT

Milo Yiannopoulos is openly defying a duly issued subpoena issued to him in connection with a significant civil rights litigation that is shortly heading to trial in the Western District of Virginia. Specifically, last November, Yiannopoulos received a subpoena seeking materials in his possession that are relevant to claims being litigated against the white supremacists and neo-Nazis that ravaged Charlottesville, VA during the "Unite the Right" rally in August 2017. Yiannopoulos had at one point been considered "on the same team" as certain of the organizers of the Charlottesville event, but they subsequently had a falling out, and amidst discovery in the Virginia litigation, Yiannopoulos publicly and proudly released highly relevant material to the plaintiffs' claims. Shortly thereafter, the plaintiffs issued Yiannopoulos a non-party Rule 45 subpoena, and Yiannopoulos boasted the same day that he would be "delighted to supply everything in [his] vault," and that he would "be in touch soon." He later confirmed to the plaintiffs' counsel that he "had just looked into the basis for the lawsuit and I think I can help you more than you might realize. We can discuss when I see you."

---

[1] Rule 45(d)(2)(B)(i) provides that where the recipient of a Rule 45 subpoena makes an objection, "[a]t any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection." A motion under this rule is proper even where, as here, the recipient of the subpoena made no formal objections that complied with Rule 45(d)(2)(B). *See U.S. ex rel. Ortiz v. Mt. Sinai Hosp.*, 169 F. Supp. 3d 538, 543-44 (S.D.N.Y. 2016). The Movants provided Yiannopoulos advance notice of this motion on June 24, 2020. *See* Declaration of Michael L. Bloch ("Bloch Decl.," filed contemporaneously herewith) ¶ 21. To the extent the Court would prefer to construe this motion as one for sanctions for non-compliance under Rule 45(g), *see Jalayer v. Santiago*, No. 10-cv-2285, 2016 WL 5477600, at *2-3 (E.D.N.Y. Sept. 29, 2016), Movants have no objection.

Yiannopoulos made similar representations in person to the plaintiffs' counsel, describing in specific detail the materials he uniquely possessed that were directly relevant to certain of the defendants and their roles in planning the Charlottesville attacks.  But Yiannopoulos' production date came and went, and he produced nothing, even though the plaintiffs narrowed the scope of the subpoena and voluntarily extended the production deadline twice.  The day before Yiannopoulos' third and final deadline, he abruptly changed tune.  Despite bragging publicly and privately for months about the responsive material he possessed, Yiannopoulos now claimed he was not in possession of a *single* document responsive to the subpoena.  He then made half-hearted references to supposed privileges that have no applicability here.  Months later, Yiannopoulos released on YouTube another video from his "vault" that was plainly responsive to the subpoena, and bragged that there is "much, much more to come," a representation he again confirmed just last week, squarely undermining his representation that he possessed no such material.

## BACKGROUND

I.  **The Movants Sue the Organizers of the Unite the Right Rally in Charlottesville, VA Under the Ku Klux Klan Act, and the Defendants—Including Acquaintances of Yiannopoulos—Resist Compliance with Discovery**

The underlying litigation relevant to this motion concerns the Unite the Right rally in Charlottesville, VA on August 11 and 12, 2017 ("UTR").  UTR was planned and operationalized by the defendants—white supremacists and their respective organizations—ostensibly to protest the removal of a statue of Robert E. Lee and to display the supposed strength and unity of the white supremacist movement.  But, as the plaintiffs in the underlying litigation have alleged, and as discovery has borne out, the defendants' principal goal was to engage in acts of violence based on animus towards specific protected classes.  In this, the defendants succeeded.  UTR was a weekend full of racially motivated violence by the defendants, meticulously planned on various social media platforms.  On August 11, defendant Richard Spencer—one of the key ideological and operational

2

leaders of UTR—led a procession of torch-wielding white supremacists chanting anti-Semitic slogans such as "Jews will not replace us" through the campus of the University of Virginia to encircle a group of students and counter-protesters, who the white supremacists attacked with torches and caustic chemicals.  On August 12, the defendants unleashed a wave of violence on the City of Charlottesville, culminating in the most prominent act of terror by defendant James Alex Fields Jr., who drove his car into a crowd of counter-protesters, killing Heather Heyer and injuring many others, including several of the plaintiffs.  Defendant Fields is now serving a life-sentence following convictions for first-degree murder and federal hate crime charges.

On October 11, 2017, the plaintiffs (Movants here)—individuals injured at UTR—filed suit against the principal organizers of UTR. The plaintiffs alleged that the defendants conspired to violate the plaintiffs' civil rights in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1985(3), also known as the Third Ku Klux Klan Act (the "KKK Act").  As the district court noted, the KKK Act requires the plaintiffs to establish the following elements:

> (1) A conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff[s] of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff[s] as (5) a consequence of an overt act committed by the defendants in connection  with the conspiracy.

*Sines v. Kessler*, 324 F. Supp. 3d 765, 780 (W.D. Va. 2018) (quotation marks omitted).

The defendants have contended, generally speaking, that their actions at UTR did not amount to a conspiracy against the plaintiffs' civil rights, and that their statements were protected speech under the First Amendment.  But at the Rule 12(b)(6) stage, the district court broadly rejected both arguments as to all but one defendant.  Specifically, the "Court conclude[d] [that] Plaintiffs have, for the most part, adequately alleged that Defendants formed a conspiracy to hurt

black and Jewish individuals, and their supporters because of their race at the August 11th and 12th events." *Id.* at 797-98.

Following the motion to dismiss decision, the case proceeded to discovery, which is scheduled to end on July 24, 2020, three months ahead of the currently scheduled trial date of October 26, 2020.  The discovery process has been lengthy and challenging, characterized by staunch resistance and widescale destruction of evidence by many of the defendants.  Indeed, three defendants, Elliott Kline, Matthew Heimbach, and Vanguard America, "did nothing" in response to the plaintiffs' discovery requests and "disobeyed not one, but four 'court orders compelling production of the same material in [their] control'" over the course of "eighteen months."  No. 17-cv-00072, Dkt. No. 539, 2019 WL 3767475 at *13 (W.D. Va. Aug. 9, 2019).  This pattern of refusal forced the court to sanction the defendants and to subsequently imprison defendant Kline for contempt.  *See* No. 17-cv-00072, Dkt. No. 610 (Aug. 9, 2019).

## II.   Amidst Discovery in the Underlying Litigation, Milo Yiannopoulos Publicly Releases Evidence Highly Relevant to the Plaintiffs' Claims and the Plaintiffs Issue Him a Subpoena

Respondent Milo Yiannopoulos is a provocative, far-right commentator and public speaker who has been viewed by the "alt-right" as sympathetic to its movement.[2] [3]  For example, while

---

[2] As made plain throughout the operative complaint in the underlying litigation, "alt-right" is a term used by the defendants—including those who organized UTR—to discuss their movement.  For example:  (i) defendant Spencer's online publication is called "altright.com," SAC ¶ 21, which he used to solicit and advise attendees of UTR, No. 17-cv-00072, Dkt. 557 ("SAC") ¶¶ 86, 91, 119 ; (ii) defendant Eli Mosley, a key organizer of UTR, has described himself as the "command soldier major of the 'alt-right,'" SAC ¶ 29; (iii) in the May 13, 2017 march that was a precursor to UTR, certain defendants carried "altright.com branded signs," SAC ¶ 49; (v) defendants Andrew Anglin and Robert Ray published an article days before UTR noting that UTR "will serve as a rallying point and battle cry for the rising Alt-Right movement," SAC ¶ 61; (vi) the online platform Discord, on which defendants did most of the principal planning for UTR, was "for closed, top super secret communications intended for the elite inner circle of the alt-right," SAC ¶ 71; and (vii) defendant Christopher Cantwell referred to UTR as an "alt-right protest," SAC ¶ 302.

[3] It appears that Yiannopoulos has an affiliation with Censored.tv (formerly FreeSpeech.tv), a "conservative streaming site" that was recently banned by Facebook and Instagram.  *See Facebook 'Link-Bans' Conservative Streaming Site 'Censored.TV' Featuring Gavin McInnes,* Breitbart (Feb. 8, 2020), https://www.breitbart.com/tech/2020/02/08/facebook-link-bans-conservative-streaming-site-censored-tv-featuring-gavin-mcinnes/.

working for the "Breitbart News Network" prior to his resignation in February 2017, Yiannopoulos

co-authored a March 29, 2016 article titled:  "An Establishment Conservative's Guide to the Alt-

Right," Ex. 1,[4] which defendant Spencer credited after UTR as "present[ing] us in a palatable

manner," Ex. 2 at 18:30–18:53.  And in July 2016, Spencer, along with numerous other influential

and self-professed members of the alt-right, attended a party thrown by Yiannopoulos to celebrate

the nomination of Donald Trump, with Spencer subsequently commenting that it "was a moment

when we were all on the same team."  Ex. 3 at 3:10–4:10.

At some point, however, Yiannopoulos and Spencer had a falling out.  Further to their feud,

on November 3, 2019, while discovery in the underlying litigation was ongoing, Yiannopoulos

publicly released an audio recording of Spencer ranting to several co-conspirators in the immediate

aftermath of UTR.  As Yiannopoulos boasted:

> Leaked audio of white nationalist Richard Spencer, published here
> for the first time, shows him fuming after the death of Charlottesville
> counter-protester Heather Heyer.  In the recording, Spencer is heard
> raging against Jews and blacks.  "My ancestors fucking enslaved
> those little pieces of fucking shit," Spencer is heard shouting on the
> recording.  "They don't do this to fucking me.  We're going to
> fucking ritualistically humiliate them."

> "Little fucking kikes," Spencer is heard screaming in a terrifying
> minute-long rant.  "They get ruled by people like me.  Little fucking
> ocatroons."  A source close to Spencer confirmed to FreeSpeech.tv
> that the audio was recorded in Charlottesville at an "emergency
> meeting" Spencer assembled immediately after he learned of
> Heather Heyer's death.  It was not clear why Spencer was blaming
> Jews and black people for the death.

Ex. 4.  Further, the audio recording that Yiannopoulos released depicts Spencer declaring that he

and his co-conspirators "are coming back here like a fucking hundred times," and that we "are

going to destroy this fucking town."  Ex. 5.

---

[4] Citations to "Ex. [_]" refer to the exhibits attached to the Declaration of Michael L. Bloch.

5

The recording of Spencer that Yiannopoulos released on November 3, 2019 provided key support for a number of elements the plaintiffs will have to prove to establish their claims under the KKK Act, while dramatically undermining some of Spencer's asserted defenses.  At a minimum, the recording forcefully illustrates the requisite discriminatory animus the plaintiffs must prove under the KKK Act.  Additionally, Spencer maintains that he "was not an organizer of either the August 11 or 12 events," and that he was simply "invited as [a] speaker and participant." Ex. 6 at 19.  But the evidence that Yiannopoulos released on November 3, 2019 suggests, to the contrary, that Spencer had a leadership role in UTR, and that he had authority to convene meetings and organize further demonstrations.[5]   In the recording, Spencer urges the group to return to Charlottesville "like a fucking hundred times" in order to "ritualistically humiliate them," which was met with the audible approval of the other potential co-conspirators. Ex. 5 at 00:00–00:15. As promised, Spencer indeed led a subsequent rally in Charlottesville later that year.  *See* Ex. 7 at 00:50–1:05.  In a segment of an October 9, 2017 podcast titled "Spencer Strikes" on the "Alt-Right Politics podcast," Spencer reinforced his leadership role and predicted that "[w]e can expect a lot more events like this."  Ex. 7 at 1:50–2:00.

Upon learning that Yiannopoulos possessed this material highly relevant to the underlying litigation, the plaintiffs served Yiannopoulos with a Rule 45 document subpoena on November 5, 2019 (the "Subpoena").  *See* Ex. 8.  The Subpoena required Yiannopoulos to produce by 5:00 p.m. on December 5, 2019 at the law offices of Kaplan Hecker & Fink LLP at 350 Fifth Avenue, New York, NY 10118 the following:

---

[5] In addition, Yiannopoulos subsequently represented that present during Spencer's post-UTR rant were several other defendants, including, for example, defendant Kline, Bloch Decl. ¶ 14.c , a former leader of defendant Identity Evropa and one of UTR's principle organizers.

1. All documents concerning the Underlying Action.

2. All documents and communications concerning any rally or event on August 11 or 12, 2017 in Charlottesville, Virginia, including but not limited to all documents and communications that anticipated, planned, publicized, discussed, reported on, or otherwise concern such rally or event.

3. All documents and communications concerning Richard Spencer, including but not limited to all audio and video recordings that contain communications with or by Richard Spencer.

Ex. 8 Attach. A at 7.

The Subpoena also notified Yiannopoulos that if he had any objections to the Subpoena, he was required to serve written objections to the plaintiffs' counsel within fourteen days of service of the Subpoena, or November 19, 2019.  Ex. 8 at 3.

**III.    Yiannopoulos Initially Claims He Was Eager to Comply with the Subpoena, and Confirms that He Has Responsive Material, but Subsequently—Months After His Production Deadline—Abruptly Reverses Course and Announces That He Will Not Comply**

At first, Yiannopoulos purported to be eager to comply with the Subpoena.  Indeed, the same day that the Subpoena was served, Yiannopoulos bragged on his public Telegram channel,[6] in reaction to receipt of the Subpoena, that he was "delighted to supply everything in [his] vault on the odious Richard Spencer," and that he would "be in touch soon."  Ex. 9.  And on December 3, 2019—two days before his deadline to produce documents pursuant to the Subpoena (and two weeks after his time to serve objections to the Subpoena)—Yiannopoulos stated on a live internet talk show (The Ralph Retort) that he was planning to release additional documents regarding Spencer.  Indeed, as he explained in vivid terms, the audio released on November 3, 2019 was just the tip of the iceberg:

---

[6] Telegram is an encrypted instant messaging and social media platform, and Yiannopoulos has approximately 17,800 subscribers to his main channel t.me/MiloOfficial. His username is @miloinc.

> The audio I dropped of him screaming and ranting about the consequences to him of this death [of Heather Heyer], is but one in a large catalogue of things that I have about Richard Spencer which I will be slowly and excruciatingly dripping out over the next decade.  I have never met a grudge I don't like.  I have an external hard drive—I'll show it to you now.
>
> [Yiannopoulos retrieves the hard drive and displays it to the camera]
>
> This is called The Vault, this is the vault.  This has shit on everyone you have ever heard of.   Video, pictures, emails, audio, text messages, phone calls.  Anything you have ever really wanted to know about every public figure I have ever encountered, most of the conversations I've had with people when I've been in single party consent state, recorded, archived.  I have shit on everyone and I'm now in a position in my career where I'm perfectly happy to start dropping it all, so I have a lot of crap on Richard Spencer and everybody else.  Maybe there is a reason to sign up for Telegram after all.  So watch this space.

Ex. 10 at 4:05–5:18.

Notwithstanding these public representations about the "large catalogue" of evidence that he had, and despite his stated intention to "be in touch soon," Yiannopoulos did not at that time contact the plaintiffs, did not exercise his right to move or quash the Subpoena, and did not produce any documents by the December 5th deadline.  And on December 6, 2019, the plaintiffs' counsel notified Yiannopoulos that his "time to comply has elapsed. We have not heard from you or received any materials in response to our subpoena," and that if his "intention [was] to resist compliance, we intend to seek to enforce the subpoena."  Ex. 11.  The plaintiffs' counsel nevertheless represented that he was available should Yiannopoulos want "to discuss prompt compliance."  Ex. 11.

Yiannopoulos responded on December 6, 2019, confirming that he remained eager to comply with the Subpoena.  Indeed, he represented to the plaintiffs' counsel that he "had just looked into the basis for the lawsuit and I think I can help you more than you might realize. We can discuss when I see you."  Ex. 11.  In light of these representations, the plaintiffs' counsel

agreed to extend Yiannopoulos' production deadline and ultimately met with Yiannopoulos in person on December 18, 2019 at the plaintiffs' counsel's New York office.  *See* Ex. 12; *see also* Bloch Decl. ¶ 14.

During the December 18th meeting, Yiannopoulos made multiple, specific representations regarding the responsive materials that he possessed and would produce, including as to their content, format, and length.  To start, Yiannopoulos represented that he possessed between twenty and thirty distinct audio recordings that ranged in length from ten minutes to two hours.  *See* Bloch Decl. ¶ 14.a.  He specifically claimed that he had recordings of Spencer with his lieutenants, which included planning sessions of them related to UTR that can be best described as spoiling for a fight.  *See* Bloch Decl. ¶ 14.a.   Yiannopoulos also specifically represented that he possessed a video of Spencer making a Nazi salute.  *See* Bloch Decl. ¶ 14.b.  According to Yiannopoulos, and consistent with his December 3, 2019 description of the format of the materials that he possessed, all of the material was at home, on an external hard drive.  *See* Bloch Decl. ¶ 14.d.

Although Yiannopoulos made no mention of any objection to the nature of the documents requested by the Subpoena, he did represent that in his view the scope of the Subpoena was too large and that he did not know how to answer all of it.  Bloch Decl. ¶ 14.e.[7]  Consequently, and on Yiannopoulos' representation that he possessed and would produce evidence that was centrally relevant to the plaintiffs' claims, the plaintiffs agreed to narrow the scope of their request.  Bloch Decl. ¶ 14.f.  Specifically, the plaintiffs' counsel ultimately agreed to narrow the requests to the following:

---

[7] Yiannopoulos also asked the plaintiffs' counsel how he would go about making the production if the FBI did not want him to.  Bloch Decl. ¶ 16.f.

1. All audio and visual recordings that you have in your possession relating to the Unite the Right event that took place in Charlottesville, Virginia on August 11 and 12, 2017, and which were recorded in Virginia.

2. Any other communications between you and any of the defendants in *Sines v. Kessler* that relate to Unite the Right.

*See* Ex. 13.

Yiannopoulos followed up with the plaintiffs' counsel on December 29, 2019, asking for a letter or amended subpoena that would memorialize the revised scope of the Subpoena, noting that "I will require a copy of the letter or amended subpoena before we can proceed further." Ex. 14. The plaintiffs' counsel documented the revised scope of the Subpoena in a December 31, 2019 e-mail, noting the parties' agreement that Yiannopoulos would produce the responsive materials by January 17, 2020. *See* Ex. 14. Although Yiannopoulos confirmed that this e-mail was "sufficient," he provided that he "would be more comfortable with it on your letterhead via PDF, or, failing that, an assurance that a copy has been sent by mail." Ex. 14. The plaintiffs' counsel provided a PDF letter documenting the narrowed scope of the Subpoena—and the responsive date of January 17, 2020—on Kaplan Hecker & Fink LLP letterhead on January 9, 2020. Ex. 13.

Yiannopoulos, however, failed to make any production by the revised negotiated production deadline of January 17, 2020. And on January 20, 2020, the plaintiffs' counsel notified Yiannopoulos that "the date we discussed for your production (January 17) has passed. I'm available to discuss if you have questions. Please let us know the status of your production. Thanks." Ex. 14. Receiving no response, the plaintiffs' counsel again contacted Yiannopoulos on January 24, 2020, stating: "Milo, I'm concerned I haven't heard from you and it is now a week beyond the date we allowed for compliance with the subpoena. Please let us know the status of your production." Ex. 14. Yiannopoulos responded on January 25, 2020, noting:

> Hi Michael.  Thanks for the update.  So far I've spent $3,500 on travel and associated expenses to review materials on your behalf. But many questions remain about the FBI's desire to acquire them exclusively.
>
> I am meeting my contacts at the Bureau next week in person and will be in a better position to answer you after that.  As I'm sure you will understand I have been obliged to prioritize federal law enforcement over your civil action.

Ex. 14.  On January 26, 2020, the plaintiffs' counsel responded, reiterating the relevance of the requested materials, noting the lack of burden in their production, and reminding Yiannopoulos that the plaintiffs had been willing in good-faith to negotiate a more narrow request "based on your representations that you were interested in voluntarily complying with the subpoena." Ex. 14.  The note continued: "Assuming that is still your intention, I am willing to extend the date for your compliance a final time to this Friday, January 31.  Beyond that, we will need to take steps to enforce the subpoena."  Ex. 14.

And, on January 30, 2020, just one day before Yiannopoulos' third and final production deadline, Yiannopoulos represented for the first time that he would not in fact be making any productions to plaintiffs:

> Upon researching this matter thoroughly on your behalf, and after discussion with the law enforcement agenc(y/ies) to which I previously alluded, and to whom, as we discussed, I am compelled to give deference, priority and in most cases exclusivity, and in light of the agreed and newly contracted scope of your subpoena, I am writing to let you know I will not be producing any documents or recordings as I possess nothing that falls within the scope of our discussion.

Ex. 15.

On February 7, 2020, the plaintiffs' counsel sought clarification given Yiannopoulos' previous eagerness to comply with the Subpoena and his representations that he indeed had "content responsive to our subpoena, including audio recordings of planning discussions relating

11

to the Unite the Right rally involving defendants in our case." Ex. 15.  The plaintiffs' counsel also noted once more that the plaintiffs had more than accommodated any burden concern by agreeing to narrow the scope of the Subpoena.  Finally, the plaintiffs' counsel requested more information as to which law enforcement entity directed Yiannopoulos not to comply with the Subpoena, and requested further explanation by February 12, 2020 for any "legal basis to resist compliance." Ex. 15.

On February 12, 2020, Yiannopoulos responded to the plaintiff's counsel:

> Thanks, Michael.  I am happy to clarify.  Having spent time and money researching this for you, I have nothing to produce relevant to the planning of "Unite the Right."  I was under the impression I was in possession of recordings of Richard Spencer and others, but was mistaken.  I have consulted the source of these recordings, who reminded me that they were played to me, but I did not retain copies of them.  Other recordings in my possession do not relate to Unite the Right or the planning of physical violence by any of the named defendants.  Regarding anything else I possess tangentially related to your case, such as emails, I am asserting journalistic privilege, which enjoys broad protection in the state of New York.

Ex. 15.

This was the last communication the plaintiffs' counsel has had with Yiannopoulos.

## IV.  After Representing to the Plaintiffs on February 12, 2020 That He Has No Responsive Materials, Yiannopoulos Publicly Releases Responsive Material on April 6, 2020 and Promises More.

Despite Yiannopoulos' sudden representation to the plaintiffs' counsel that he did not have non-privileged material responsive to the Subpoena, Yiannopoulos subsequently released to the public via YouTube on April 6, 2020, a video recording of defendant Spencer leading a group of white supremacists in Charlottesville on May 13, 2017—including defendants Kline and Heimbach[8]—in a chant of 'Seig Heil' while giving Spencer a Nazi salute.  *See* Ex. 16.  As alleged

---

[8] Matthew Heimbach is the former leader of both defendant organizations the Traditionalist Worker Party and the Nationalist Front.

in the plaintiffs' complaint, this May 13, 2017 event, referred to by its participants as "Charlottesville 1.0," was a precursor event to UTR, which they referred to as "Charlottesville 2.0." *See* SAC ¶¶ 49-54.  And a few days after Yiannopoulos released the recording of the May 13, 2017 event, Yiannopoulos reposted the video alongside his previously published audio of Spencer and claimed that there is "much, much more to come." Ex. 17.  Once again, on June 13, 2020, Yiannopoulos announced, amidst specific and detailed references to this litigation:  "A lot more Richard Spencer drops still to come from me.  Keep an eye out." Ex. 18.

## ARGUMENT

This Court should compel Yiannopoulos to comply with the Subpoena because (i) he waived any objection to the Subpoena, and (ii) regardless, the objections he has half-heartedly raised have no merit.  In short, Yiannopoulos' objections are too late and too little.

## I.   Yiannopoulos Has Waived Any Objection to the Subpoena

"Objections to a non-party subpoena are waived if not made within the time specified by Rule 45[d](2)(B), that is, generally fourteen days." *Schweizer v. Mulvehill*, 93 F. Supp. 2d 376, 412 (S.D.N.Y. 2000).  Here, Yiannopoulos was required to serve any written objections to the Subpoena by November 19, 2019.  But not only did Yiannopoulos fail to serve objections to the Subpoena by that date, he subsequently and repeatedly expressed eagerness to comply with the it, both publicly and to the plaintiffs' counsel.  Indeed, even after his December 5, 2019 *production* deadline, Yiannopoulos represented to the plaintiffs that "I can help you *more* than you might realize." Ex. 11 (emphasis added).  In fact, Yiannopoulos raised no objections to the Subpoena in any form until January 25, 2020, almost three months after he was served and nearly a month after the plaintiffs offered to narrow the scope of the Subpoena in light of Yiannopoulos' representation

that he possessed and would produce responsive materials.   Yiannopoulos has waived any objection to the Subpoena.[9]

## II.      Yiannopoulos' (Untimely) Excuses for Non-Compliance Are Meritless

As documented above, in his communications with the plaintiffs' counsel, Yiannopoulos has made reference to three potential objections to the Subpoena: (i) he has no responsive material; (ii) the material he has is protected by New York's "journalistic privilege"; and (iii) he is choosing to exclusively give the documents to law enforcement.   Each supposed objection—apart from being waived—has no merit.

### a.   Yiannopoulos Has Responsive Materials

This Court should reject Yiannopoulos' plainly contrived contention that he is not in possession of materials that fall within the scope of the Subpoena.   To start, as described above, Yiannopoulos publicly released responsive material on November 3, 2019, bragged on the internet a month later that the recording was "but one in a large catalogue of things that I have about Richard Spencer," noted that he has a "lot of crap on Richard Spencer and everybody else," Ex. 10 at 4:10, and then told the plaintiffs' counsel on December 18, 2019 that he has between twenty to thirty relevant audio recordings sitting on a hard drive in his home, certain of which depict planning sessions for UTR, *see* Bloch Decl. ¶ 14.   And (after stating on February 12, 2020 that he supposedly has no responsive material), Yiannopoulos then proved that his boasting to the public and to the plaintiffs' counsel was no idle chatter.   Specifically, on April 6, 2020, Yiannopoulos publicly released on YouTube a March 13, 2017 video depicting events taking place in

---

[9] To be sure, the "failure to serve written objections to a subpoena within the time specified by Rule 45[(d)](2)(B) . . . may be forgiven in unusual circumstances and for good cause." *Homeward Res., Inc. v. Sand Canyon Corp.*, No. 12-cv-5067, 2017 WL 4676806, at *17 (S.D.N.Y. Oct. 17, 2017) (quotation marks omitted).   But Yiannopoulos has identified no "unusual circumstances," or any circumstances, excusing his failure to timely object to the Subpoena, nor are any apparent.

Charlottesville at what the plaintiffs' complaint described was a precursor event to UTR and thus plainly relevant to it.  *See* SAC ¶¶ 49-54.  What's more, the April 6, 2020 material that Yiannopoulos released, *i.e.*, a video of Spencer giving the Nazi salute, matched the description of a video that Yiannopoulos claimed that he possessed on December 18, 2019 (which Yiannopoulos conceded was responsive to the Subpoena).  *See* Ex. 17; Bloch Decl. ¶ 14.  And for the avoidance of doubt, Yiannopoulos acknowledged after the April 6, 2020 release that—consistent with the above representations—he had "[m]uch, much more." Ex. 17; *see also* Ex. 18 (making a similar representation on June 13, 2020 with reference to this litigation).  The notion that Yiannopoulos has no responsive material is fanciful.

### b.  Yiannopoulos Cannot Hide Behind a "Journalistic Privilege"

On February 12, 2020, Yiannopoulos for the first time asserted without elaboration that he is "asserting journalistic privilege, which enjoys broad protection in the state of New York."  Ex. 15.  Yiannopoulos did not clarify whether he is asserting such a privilege under the federal common law as applied by federal courts in New York, *see Chevron Corp. v. Berlinger*, 629 F.3d 297, 306-08 (2d Cir. 2011), or rather the journalist's privilege codified at N.Y. Civ. Rights Law § 79-h, known as New York's "Shield Law," *People v. Combest*, 828 N.E.2d 583, 585-86 (N.Y. 2005).  Regardless, Yiannopoulos can seek refuge in neither privilege.  Apart from waiving the right to assert any such privilege by failing to timely invoke it, *see supra* at 14, Yiannopoulos' claim of privilege fails for additional reasons:  (i) he failed to comply with Fed. R. Civ. P. 45(e)(2), which governs how a subpoena recipient must make a claim of privilege; and (ii) he is not entitled to invoke either privilege, and even if he were, both are limited and qualified privileges that the plaintiffs can easily overcome.

### i. Yiannopoulos Failed to Comply with the Federal Rules as to Claims of Privilege

Yiannopoulos' assertion of any "journalistic privilege" fails at the outset because Yiannopoulos not only waived the objection, *see supra* at 14, he did not comply with important rules governing the withholding of discovery on the basis of privilege.  Specifically, Fed. R. Civ. P. 45(e)(2) provides that a "person withholding subpoenaed information under a claim that it is privileged . . . must . . . (i) expressly state the claim; *and* (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim" (emphasis added).  And indeed, the rule specifically "deters parties from asserting the [journalist's] privilege haphazardly," and thus requires the party invoking the privilege "to identify the material in question with specificity to demonstrate that it relates to newsgathering."  *Am. Savings Bank, FSB v. UBS Painwebber, Inc.*, No. M8-85, 2002 WL 31833223, at *1-2 (S.D.N.Y. Dec. 16, 2002).

Here, Yiannopoulos invoked the "journalistic privilege" in a single and conclusory sentence with no explanation.  *See* Ex. 15.  He has therefore not "enable[d] [the plaintiffs] to assess the claim."  Fed. R. Civ. P. 45(e)(2).  Indeed, a party invoking either the federal common law or New York journalist's privilege bears the burden of establishing the factors going to its applicability.  *See Chevron Corp.*, 629 F.3d at 309 ("the burden is on the person who claims the privilege to show entitlement"); *PPM Am., Inc. v. Marriott Corp.*, 152 F.R.D. 32, 35 (S.D.N.Y. 1993) (the party asserting New York's Shield Law has the "burden of demonstrating its entitlement to the protections of Section 79-h"); *see also Trussell-Slutsky v. McIlmurray*, No. 031137/2017, 2018 WL 7569367, at *7 (Sup. Ct. N.Y. Cnty. Oct. 11, 2018) ("In applying the Shield Law, courts [s]trictly construe the qualifying conditions for invoking its protections, because the Shield Law operates as an exception to the generally liberal search for truth that is at the heart of . . .

discovery.").  Without knowing the basis on which Yiannopoulos believes he is entitled to the protection of a journalist's privilege, or even which journalist's privilege Yiannopoulos purports to invoke, the plaintiffs simply cannot adequately assess the privilege claim.  The Court should reject Yiannopoulos' invocation of a "journalistic privilege" on this basis alone.

### ii.  New York's "Shield Law" Offers No Protection to Yiannopoulos

Yiannopoulos' vague reference to the "journalistic privilege" offering "broad protection in the state of New York" was seemingly a reference to § 79-h of New York's Civil Rights Law, known as New York's "Shield Law," which exempts "professional journalists and newscasters" from being held in contempt for certain non-disclosures of news-related information.  But New York's Shield Law offers no protection to Yiannopoulos, for several independent reasons.

*First*, New York's Shield Law does not apply where, as here, the relevant conduct took place outside of New York.  *See Stephens v. Am. Home Assur. Co.*, No. 91-cv-2898, 1995 WL 230333, at *5-7 (S.D.N.Y. Apr. 17, 1995); *see also Mazzella v. Phila. Newspapers, Inc.*, 479 F. Supp. 523, 527 (E.D.N.Y. Nov. 2, 1979) (applying Pennsylvania's shield law under New York conflict principles where the "events that led to the newspaper article, including the news gathering and confidential communications, apparently occurred in Pennsylvania"); *Pugh v. Avis Rent A Car System, Inc.*, No. M8-85, 1997 WL 669876, at *3 n.2 (S.D.N.Y. Oct. 28, 1997) ("The federal common law of privilege, rather than the New York State Shield Law, N.Y. Civ. Rights Law § 79-h, applies to this motion because the underlying [civil rights] lawsuit involves a claim under federal common law."); *Holmes v. Winter*, 3 N.E.3d 694, 704 (N.Y. 2013) (noting that although "there are uncertainties concerning the application of the outer reaches of our statute, . . . the scope of the qualified privilege for nonconfidential news . . . must be determined on a case-by-case basis").  Yiannopoulos offers no basis why New York's Shield Law should protect materials seemingly

created in Virginia, depicting events happening in Virginia, that are relevant to a lawsuit brought by Virginia residents in a federal court in Virginia, against defendants who are residents either of Virginia or states other than New York, and that relates to events that also happened in Virginia.

*Second*, regardless, § 79-h offers no protection to Yiannopoulos because "only 'professional journalists or newscasters' as defined in the Press Shield Law can assert the privilege." *Torah Soft Ltd. v. Drosnin*, No. 00-cv-0676, 2001 WL 1425381, at *5 (S.D.N.Y. Nov. 14, 2001) (emphasis added); *see also Persky v. Yeshiva Univ.*, No. 01-cv-5278, 2002 WL 31769704, at *2 n.1 (S.D.N.Y. Dec. 10, 2002) ("The New York Shield Law explicitly limits the qualified privilege to professional journalists or newscasters."); *People v. Le Grand*, 415 N.Y.S.2d 252, 255 (2d Dep't 1979) (the law "evince[s] a clear legislative design to benefit 'professional journalists' and 'newscasters' only. They should not by judicial fiat and strained interpretation be deemed to encompass those engaged in a different field of writing and research"); *PPM Am., Inc.*, 152 F.R.D. at 35 (rejecting the privilege where respondent had "not born its burden of demonstrating that these analysts are 'professional journalists' within the terms of Section 79-h").

Yiannopoulos has made no showing that he is a "Professional journalist" as contemplated under § 79-h.[10] *See Trussell-Slutsky v. McIlmurray*, No. 031137/2017, 2018 WL 7569367, at *13-14 & n.1 (Sup. Ct. N.Y. Cnty. Oct. 11, 2018) (concluding that a defendant failed to meet her "threshold burden to demonstrate that [she is a] journalist[] under the Shield Law" where she failed to make the requisite evidentiary showing, other than the "entirely bald and self-serving" contention that she was a "professional journalist"). Nor could he. Section 79-h defines "professional journalist" to encompass work only "intended for a newspaper, magazine, news

---

[10] Yiannopoulos is plainly not a "newscaster" because that term applies only to those "who, for gain or livelihood, [are] engaged in analyzing, commenting on or broadcasting news *by radio or television transmission*." N.Y. Civ. Rights L. § 79-h(a)(6) (emphasis added).

agency, press association or wire service or other professional medium or agency which has as one of its regular functions the processing and researching of news intended for dissemination to the public."  N.Y. Civ. Rights L. § 79-h(a)(6).  Here, Yiannopoulos' connection to a "conservative streaming site" notwithstanding, *see supra* at 5 n.3, Yiannopoulos' role in disseminating the materials relevant to the Subpoena was not connected to a professional news medium or agency as contemplated in § 79-h.  Indeed, Yiannopoulos has previously commented upon and released the responsive material on his myriad personal social media channels, which are means of dissemination that the Shield Law does not reach.[11]  *See Too Much Media, LLC v. Hale*, 20 A.3d 364, 382 (N.J. 2011) (applying New Jersey's shield law to an independent blogger by contrasting with New York's Shield Law, which applies "only to 'professional journalists and newscasters,'" and noting that the New Jersey "Legislature could have chosen [New York's] approach but did not"). Yiannopoulos is thus not and has not been acting as a "professional journalist" that would be entitled to the protection of § 79-h.

*Third*, § 79-h, by its terms, provides that a person waives the exemption where "such person voluntarily discloses or consents to disclosure of the specific information sought to be disclosed to any person not otherwise entitled to claim the exemptions."  N.Y. Civ. Rights L. § 79-h(g). Here, as quoted above, Yiannopoulos has made plain that he intends to release the purportedly privileged information "slowly and excruciatingly . . . over the next decade," Ex. 10 at 4:20, and he has already begun doing so.  Because he has released, and will release, the responsive material, he cannot claim the protection of § 79-h.

---

[11] Indeed, in 2009, New York lawmakers proposed a bill to broaden the definition of "Professional journalist" to include "journalist bloggers," *see* https://cityroom.blogs.nytimes.com/2009/05/20/bill-would-extend-shield-law-to-cover-bloggers, but the bill has never passed, *see* https://www.nysenate.gov/legislation/bills/2019/S431.

*Finally*, even if Yiannopoulos could invoke the privilege (which he cannot), the plaintiffs would easily overcome it. Where, as here, there is no credible claim that the material is confidential,[12] a party can overcome an assertion of the Shield Law by making a "clear and specific showing" that the information is "(i) highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source." *People v. Bonie*, 35 N.Y.S.3d 53, 55 (1st Dep't 2016) (quoting N.Y. Civ. Rights L. § 79-h(c)). Yiannopoulos' own representations—as well as the material that he has already released—prove the satisfaction of each of the above three elements.

1.     As Yiannopoulos has himself effectively acknowledged, the material he possesses is "highly material and relevant." As he described it, the audio he released on November 3, 2019, *see* Ex. 5, "shows [defendant Spencer] fuming after the death of Charlottesville counter-protester Heather Heyer," and Yiannopoulos notes that the "audio was recorded in Charlottesville at an 'emergency meeting' Spencer assembled immediately after he learned of [the] death." Ex. 4. Further, in the recording, as Yiannopoulos also acknowledges, Spencer "is heard raging against Jews and Blacks," and referring to "[l]ittle fucking kikes" and "[l]ittle fucking octaroons." Ex. 4. Finally, Yiannopoulos later confirmed that several co-defendants were present for the recorded event, including Kline. *See* Bloch Decl. ¶ 14.c. Spencer's description of the events that took place at UTR, to a group that included other leading co-defendants, and in which Spencer made plain his status-based animus, are certainly highly material and relevant to the plaintiffs' claims.

---

[12] Yiannopoulos cannot credibly claim that any of the information sought by the Subpoena is confidential—indeed Yiannopoulos has already publicly released certain of the materials responsive to the Subpoena, promised to release "[m]uch, much more," and has specifically acknowledged that he will be publicly releasing the "large catalog of things . . . over the next decade." Exs. 10, 17. Consequently, in light of his promise to release all of this material at some point (and that he has already released some of it), Yiannopoulos cannot show that the information was "obtained or received in confidence." *See* N.Y. Civ. Rights L. § 79-h(c). And it is irrelevant whether Yiannopoulos wants to maintain the confidence of his *source*, because the question is whether the "*news*" was "obtained or received in confidence." *Id.*

20

The recording Yiannopoulos released on April 6, 2020 of Spencer with defendants Kline and Heimbach (and others) depicting them at a May 13, 2017 rally in Charlottesville is much the same.  *See* Ex. 16.  As the plaintiffs' complaint makes clear, the May 13, 2017 event depicted on the recording that Yiannopoulos released was directly related to UTR.  *See* SAC ¶¶ 49-54.  Indeed, the complaint makes plain that the May 13, 2017 event, which was attended by several defendants, was a precursor to UTR and was referred to as "Charlottesville 1.0," with "Charlottesville 2.0" being UTR.  *Id.* Moreover, defendant Jason Kessler filed a municipal application for a permit to hold the UTR on May 30, 2017, just two weeks after Charlottesville 1.0.  *Id.* ¶ 54.

And Yiannopoulos has repeatedly and specifically represented that the materials that he has yet to produce are similar in nature.  For one, his initial reaction to the Subpoena was that after "look[ing] at the basis for the lawsuit," he could "help [the plaintiffs] *more* than [they] might realize."  Ex. 11 (emphasis added).  And not only has Yiannopoulos publicly stated that what he has released is part of "a large catalogue of things," that he has a "lot of crap on Richard Spencer and everybody else," Ex. 10 at 4:10–5:10, and that there is "[m]uch, much more," Ex. 17; *see also* Ex. 18, he also specifically told the plaintiffs' counsel that he has twenty to thirty recordings, at least a number of which directly relate to planning sessions for UTR in which the recorded participants were spoiling for a fight.  *See* Bloch Decl. ¶ 14.a.

2.      The recordings contain information that is critical to the plaintiffs' claims and the issues that the plaintiffs will have to prove at trial.  As discussed, the plaintiffs must show that each of the defendants conspired with another to engage in violence against others motivated by a class-based animus.  Although the defendants are likely to argue at trial, as, for example, Spencer previously has, *see* Ex. 6, that they had no intent to commit class-based violence, the recordings Yiannopoulos has *already* publicly released refute those very defenses.  They show, for example,

Spencer in a leadership role at UTR—and its precursor event months earlier—blaming "[l]ittle fucking kikes" and "[l]ittle fucking octaroons" for the death caused by his own co-conspirator, and promising to come back and "destroy this town."  Ex. 5.  Moreover, the material that Yiannopoulos has not yet produced—but that he has described to the plaintiffs' counsel—is even more critical, in that it describes not just the defendants' after-the-fact reactions to events at UTR, but planning sessions for the event, which will go directly to the defendants' intent on organizing and attending UTR, *see* Bloch Decl. ¶ 14.a., which are to be critical issues at trial.

3.      Finally, all indications are that Yiannopoulos is in exclusive possession of the material sought by the Subpoena.  Indeed, Yiannopoulos represented as such when he gleefully described that the material is secured away on his "Vault," and that he will be "slowly and excruciatingly dripping [it] out over the next decade."  Ex. 10 at 4:23.  Further, throughout a lengthy and robust discovery process, the plaintiffs have gotten no indication that any other person is in possession of the material supposedly on Yiannopoulos' "Vault."

### iii.   The First Amendment/Common Law Journalist's Privilege Also Offers No Protection to Yiannopoulos

To the extent Yiannopoulos' reference to a New York journalistic privilege was meant to invoke the "qualified reporter's privilege, based in the First Amendment and federal common law," *Schoolcraft v. City of New York*, No. 10-cv-6005, 2014 WL 1621480, at *2 (S.D.N.Y. Apr. 22, 2014), the claim also fails.

*First*, similar to New York's Shield Law, Yiannopoulos simply is not entitled to invoke the First Amendment/common law journalist's privilege because the privilege is only available to individuals acting as "*independent* press."  *Chevron Corp. v. Berlinger*, 629 F.3d 297, 307 (2d Cir. 2011) (emphasis in original).  Indeed, "any discussion of the reporter's privilege begins with an inquiry into whether a journalist can first establish entitlement to the privilege by demonstrating

the independence of her journalistic process." *In re McCray, Richardson, Santana, Wise, and Salaam Litig.*, 928 F. Supp. 2d 748, 754 (S.D.N.Y. 2013); *see also Chevron*, 629 F.3d at 309 (as a general matter, the journalist's privilege applies only where the "research and reporting were done with independence from the subject of the reporting"); *see also id.* at 308 ("Jones, who was commissioned to write a book promoting a particular point of view regardless of what her investigations may reveal, either possesses no privilege at all, or if she possesses the privilege, holds one that is weaker and more easily overcome."). Indeed, it is an "improper invocation" of the privilege "where the information was gathered for other reasons and the intent to publish arose only later." *Id.* at 307.

Here, Yiannopoulos was not acting as an independent member of the press when he collected (and then partially released) the material responsive to the Subpoena. Indeed, Yiannopoulos has admitted that his aim for the materials is unrelated to independent newsgathering or dissemination but rather to settle a personal "grudge" that he has developed against Spencer and his co-conspirators. These are Yiannopoulos' own words:

> The audio that I dropped of [Spencer] screaming and ranting about the consequences to him of [Heather Heyer's] death is but one in a large catalog of things that I have about Richard Spencer which I will be slowly and excruciatingly dripping out over the next decade. **I have never met a grudge I don't like.**

Ex. 10 at 4:08–4:32 (emphasis added). It is thus plain that Yiannopoulos' "purpose to disseminate the information [did not] motivate[] the gathering of the information," rather, "the information was gathered for other reasons," *i.e.*, to use as leverage to settle his "grudge" against Spencer. *Chevron*, 629 F.3d at 307. This is not the type of activity that the journalist's privilege is designed to protect.

*Second*, even if the privilege were to apply (it does not), the plaintiffs would overcome it even more easily than they would New York's Shield Law. As with the Shield Law, the common law journalists' privilege distinguishes between confidential and non-confidential material and

offers less protection for the latter.  *See Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 30 (2d Cir. 1999).  Specifically, "where nonconfidential information is at stake, the showing needed to overcome the [] privilege is less demanding than for material acquired in confidence."  *Id.*  Similarly, "where the protection of confidential sources is not involved, the nature of the press interest protected by the privilege is narrower."  *Id.*  Consequently, to overcome Yiannopoulos' assertion of the common law privilege over the non-confidential materials in his possession, the Movants need only show that they are (i) "of likely relevance to a significant issue in the case" and (ii) "not reasonably obtainable from other available sources."  *Id.* at 36.  And for the reasons already discussed above with respect to the Shield Law, *see supra* at 21-23, plaintiffs can easily make that showing here, *i.e.*, that the materials in Yiannopoulos' possession are highly relevant to key issues in the case and are not obtainable from any other source.

### c. Yiannopoulos Cannot Use His Supposed Interaction with Law Enforcement as a Shield Against Production

Yiannopoulos has intimated that he cannot comply with the Subpoena because he is "compelled" to provide the documents "exclusively" to unidentified law enforcement agencies. Exs. 14, 15.  Specifically, on January 25, 2020, Yiannopoulos noted that the FBI "desire[s] to acquire them exclusively," and that he is "obliged to prioritize federal law enforcement over your civil action."  Ex. 14.  And days later, he similarly represented that he is "compelled to give deference, priority, and in most cases exclusivity" to "the law enforcement agenc(y/ies) to which [he] previously alluded."  Ex. 15.  (Notably, he did not raise this as a ground for withholding production in his February 12, 2020 email in response to the plaintiffs' counsel's request for any and all objections to the Subpoena, *see* Ex. 15, meaning the objection is doubly waived.)

Yiannopoulos' (untimely and procedurally improper) invocation of a supposed compulsion to give the materials exclusively to unidentified law enforcement "agenc(y/ies)" provides no basis

in law not to comply with the Subpoena.  To be sure, there is a limited and qualified "law enforcement privilege," which is "designed 'to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.'"  *U.S. v. Painting Known as "Le Marche"*, No. 06-cv-12994, 2008 WL 2600659, at *1 (S.D.N.Y. June 25, 2008).  But, the law enforcement privilege "belongs to the Government and must be asserted by it."  *Id.* (quoting *U.S. v. Reynolds*, 345 U.S. 1, 7 (1953)); *see also Carbajal v. Village of Hempstead*, No. 02-cv-4270, 2003 WL 23138447, at *1 (E.D.N.Y. Dec. 22, 2003) (discussing the "informer's privilege," but noting that "the privilege actually belongs to the government").  There simply is no basis for Yiannopoulos, the recipient of a duly issued subpoena in a civil litigation, to assert the law enforcement privilege.

## CONCLUSION

In light of the foregoing, Movants respectfully request that this Court issue an order compelling Yiannopoulos to produce all information responsive to the Subpoena, and for any other relief that the Court deems necessary and appropriate.

Dated: June 25, 2020

Respectfully submitted,

*/s/ Michael L. Bloch*
Michael L. Bloch
Roberta A. Kaplan
Julie E. Fink
Gabrielle E. Tenzer
Benjamin D. White
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
mbloch@kaplanhecker.com
rkaplan@kaplanhecker.com

25

jfink@kaplanhecker.com
gtenzer@kaplanhecker.com
bwhite@kaplanhecker.com

*Counsel for Movants and for the Plaintiffs in the Underlying Litigation*

Yotam Barkai
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
Fax: (212) 446-2350
ybarkai@bsfllp.com

Karen L. Dunn
William A. Isaacson
PAUL WEISS RIFKIND WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Fax: (202) 223-7420
kdunn@paulweiss.com
wisaacson@paulweiss.com

J. Benjamin Rottenborn
WOODS ROGERS PLC
10 South Jefferson St., Suite 1400
Roanoke, VA 24011
Telephone: (540) 983-7600

Jessica E. Phillips
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 237-2727
Fax: (202) 237-6131
jphillips@bsfllp.com

Alan Levine
Philip Bowman
COOLEY LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6260
Fax: (212) 479-6275
alevine@cooley.com
pbowman@cooley.com

Robert T. Cahill
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
rcahill@cooley.com

David E. Mills
Joshua M. Siegel
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Fax: (202) 842-7899
dmills@cooley.com
jsiegel@cooley.com

*Additional Counsel for the Plaintiffs in the Underlying Litigation*

26