# KAPLAN HECKER & FINK LLP

350 Fifth Avenue
Suite 7110
New York, NY 10118
(212) 763-0883
www.kaplanhecker.com

Direct Dial: (212) 763-0883
Direct Email: bwhite@kaplanhecker.com

August 12, 2020

**By ECF & E-mail**

The Honorable Katherine Polk Failla
United States District Court
for the Southern District of New York
40 Foley Square, Room 2103
New York, NY 10007
Failla_NYSDChambers@nysd.uscourts.gov

    Re:    *Sines et al. v. Yiannopoulos*, No. 20-mc-00241 (KPF)

Dear Judge Failla:

    We write on behalf of Movants in the above-captioned action, which seeks to compel Respondent Milo Yiannopoulos to comply with a subpoena issued to him in connection with *Sines v. Kessler*, No. 17-cv-72 (W.D. Va.). Specifically, we write in response to Mr. Yiannopoulos' invocation at a July 29, 2020 hearing of a "journalist's privilege" to protect from disclosure the identities of individuals that he testified possess evidence responsive to Movants' subpoena and critical to the Movants' case in the underlying litigation. As to be discussed below, for several independent reasons, Mr. Yiannopoulos cannot invoke that privilege here.

    In short, Mr. Yiannopoulos has now confirmed—under oath—the existence of audio and video files that are critical to the Movants' attempt to hold the white supremacists responsible for the violence they perpetrated on the weekend of August 11 and 12, 2017 in Charlottesville, VA. Specifically, Mr. Yiannopoulos testified that he has personally heard and/or seen content that shows certain defendants in the underlying action specifically planning to commit race-based violence at Charlottesville. He has also subsequently confirmed that, in his view, the plaintiffs will win their case if they get their hands on that material. Although Mr. Yiannopoulos now denies being in possession of this material, he has testified that his "sources" possess it, and that at least one of these sources—the "main guy"—was himself present at the planning sessions depicted in the recordings at issue.

    For the reasons that follow, the Court should require Mr. Yiannopoulos to disclose the identity of these sources.

I.    **Relevant Background and Recent Developments**

As discussed in the Movant's motion papers—familiarity with which is assumed herein—this proceeding seeks to compel Mr. Yiannopoulos to comply with a subpoena issued to him on November 5, 2019, principally seeking disclosure of audio and video files that Mr. Yiannopoulos represented over a span of months were in his possession and were critical to the plaintiffs' case. Throughout months of communication, Mr. Yiannopoulos never raised a single objection to producing under the subpoena—to the contrary, he roundly and eagerly committed to producing pursuant to its terms—but he suddenly reversed course in February 2020 when he reported that he would not produce any materials because he had none, and that to the extent he did, he was "asserting journalistic privilege."  Dkt. No. 1-17.

The Movants moved to compel Mr. Yiannopoulos' compliance with the subpoena, and when the Court placed Mr. Yiannopoulos under oath at a July 29, 2020 hearing, Mr. Yiannopoulos repeatedly testified that he was "messing [us] around" when he said he possessed the relevant material.  Tr. of July 29, 2020 Proceedings ("Tr.") 17 (attached hereto as Exhibit 1); *see also id.* at 7-8, 16-17, 27-28, 38.  Although Mr. Yiannopoulos denied being in possession of those materials, he did confirm under oath that those files actually exist and that he was personally shown them by, principally, one individual, whom he referred to as his "source." *Id.* at 16, 34-40, 47-49, 66-67, 71.  When pressed to identify that individual, and the other individuals that also purportedly showed him relevant material, Mr. Yiannopoulos invoked the "journalist's privilege," which he asserted was pursuant to "well-established federal and state law."  Tr. 72-73.

Given this shift in circumstances—*i.e.*, instead of claiming that he had materials that were protected by the journalist's privilege, Mr. Yiannopoulos contended at the hearing that his *source* (not him) possesses the materials and that the identity of that source was protected by the privilege—the Court offered the Movants an opportunity to brief the question of whether Mr. Yiannopoulos could properly invoke the privilege to withhold the identity of the sources. *See* Tr. 70.  The Court also ordered Mr. Yiannopoulos to ask those individuals whether they would be willing to have their identities disclosed.  Tr. 75.

Since the hearing, the Movants' counsel and Mr. Yiannopoulos have engaged in discussions. *See* Declaration of Benjamin D. White ("White Decl.," attached hereto as Exhibit 2) ¶¶ 2-3.  Through those discussions, Mr. Yiannopoulos has made several relevant representations:

1. Mr. Yiannopoulos strongly affirmed his representation under oath that the materials at issue are highly relevant to the underlying litigation. Indeed, Mr. Yiannopoulos reported in no uncertain terms that were the plaintiffs to obtain the material, they would, in his estimation, win the case. *See* White Decl. ¶ 2.d.

2. Mr. Yiannopoulos confirmed that there is a "main guy" who is principally in possession of the materials that the Movants are seeking, but that there were other sources as well.  White Decl. ¶ 2.a.  Mr.

>    Yiannopoulos reported that he was shown these materials by this individual at some sort of "after hours" event. Mr. Yiannopoulos could not recall any details about when or even where this happened, other than that he thought it was "on tour," and that there was one other person in the room when the materials were shown to him. White Decl. ¶ 3.c.
>
> 3. Mr. Yiannopoulos strongly implied that the source was present at the events depicted on the recordings, specifically noting that the source was afraid of retaliation given that there were few people in the room and that those present might be able to identify the source from the recordings. White Decl. ¶ 2.e.
>
> 4. Mr. Yiannopoulos represented that he contacted this individual immediately after the July 29th hearing, and that this person reported to him at that time that he does not have the recordings he played to Mr. Yiannopoulos. White Decl. ¶ 2.c. However, on August 5, 2020, Mr. Yiannopoulos represented that he again contacted this individual and that his story purportedly changed. This time, the individual supposedly claimed that not only does he not possess these materials, but that he never showed Mr. Yiannopoulos those materials at all, and that Mr. Yiannopoulos was incorrect in his recollection. White Decl. ¶ 3.a. According to Mr. Yiannopoulos, this individual was lying. White Decl. ¶ 3.b.

II. **The Sources That Purportedly Showed Mr. Yiannopoulos the Relevant Material Cannot be Protected by Any Journalist's Privilege**

      **A. Mr. Yiannopoulos Has Waived Privilege-Based Objections to the Subpoena**

As discussed in the Movants' opening papers, Mr. Yiannopoulos has waived any objections to the at-issue subpoena by failing to offer any objections within almost three months of its service, let alone within the first fourteen days as required by the rules. *See* Dkt. No. 1-1 at 10-14. Because nothing has changed to obviate that waiver, Mr. Yiannopoulos cannot invoke the journalist's privilege to protect the identity of his sources.

For one, Mr. Yiannopoulos has still identified no "good cause" for his failure to timely object to the subpoena despite confirming under oath that he was "aware that that's the argument [the Movants] are making." Tr. 14. To the contrary, Mr. Yiannopoulos' candid explanation of his approach to the subpoena conclusively shows a lack of good cause for his failure to timely object. Specifically, Mr. Yiannopoulos effectively admitted under oath that he purposefully pretended that he had no objection to the subpoena—indeed, that he was eager to produce according to its terms—solely so that he could manufacture access to the plaintiffs' counsel which he aimed to exploit for his own personal benefit. As he put it, he chose to lie about what he possessed so that he could "find out how bad this situation was for Richard Spencer and the state of the lawsuit and just kind of wanted to find out what was going on and [I] therefore inferred that I had all the . . . information

I did." Tr. 8; *see also* Tr. 17 (testifying that he "strongly suggest[ed] that [he] had material that would greatly assist their lawsuit"). Lying for months that you will produce highly relevant material in compliance with a duly-issued subpoena so that you can take advantage of the access that your lie provides is hardly "good cause" justifying delay in objecting to a subpoena.

It is also of no moment that Mr. Yiannopoulos has now limited his invocation of the privilege solely to the identity of his source, and that the subpoena issued to him did not expressly call for that information. Stated differently, Mr. Yiannopoulos cannot credibly argue that because the Movants are now specifically requesting the source of the content (and not just the content itself), that he in effect gets an objection "do-over." *See generally In re DG Acquisition Corp.*, 151 F.3d 75, 81 (2d Cir. 1998) ("Rule 45(c)(2)(B) . . . require[s] the recipient of a subpoena to raise *all* objections at once, rather than in staggered batches, so that discovery does not become a 'game'" (emphasis added)). This is so for two principal reasons.

*First*, any supposed change in circumstances at the hearing occurred solely as a result of Mr. Yiannopoulos' bad faith in response to the underlying subpoena. To the extent Movants only now specifically request the source of the at-issue material, it is because for months Mr. Yiannopoulos repeatedly represented (supposedly falsely) that *he* was the source of the material. To the extent the exposure of Mr. Yiannopoulos' lie required the Movants' to shift their focus with respect to the enforcement of their subpoena, Mr. Yiannopoulos should not stand to benefit from that shift. *See generally Hurst v. F.W. Woolworth Co.*, No. 95-cv-6584, 1997 WL 61051 (S.D.N.Y. Feb. 11, 1997) (in assessing whether a subpoena recipient waived objections to a subpoena by failing to comply with applicable rules, court's look to "the nature of the violation, its willfulness or cavalier disregard for the rule's requirements, and the harm which results to other parties") (quotation marks omitted)).

*Second*, regardless, any contention that Mr. Yiannopoulos' waiver is effectively eliminated given the change in circumstances at the hearing—*i.e.*, that the focus is now on the source of the material rather than the content—fails as a matter of law. Although "when time passes and circumstances change between a waiver and a subsequent appearance, the initial waiver may not be applied to the subsequent event," that principle applies only where, unlike here, the subpoena recipient "had no firm basis for asserting the privilege [earlier]." *In re DG Acquisition Corp.*, 151 F.3d at 83 (citation omitted); *see also id.* (applying the doctrine because "recent events had helped the attorney conclude that the Dabah Wives did indeed have a basis for assertion of the Fifth Amendment privilege"). Here, Mr. Yiannopoulos had a plain basis from the start to object to the terms of the subpoena on the ground that it would require him to reveal his sources. For one, as a general matter, content, on the one hand, and the source of that content, on the other, are of course intimately intertwined. It is for that reason that the Second Circuit has concluded that a subpoena recipient may seek a declaratory judgment against a subpoena requesting certain content if the revealing of that content might also, as here, reveal the sources. *See The New York Times Co. v. Gonzales*, 459 F.3d 160, 167 (2d Cir. 2006) ("There is a substantial chance that the phone records, although they will not reveal the content of conversations or the existence of other contacts, will

provide reasons to focus on some individuals as being the source(s). If so, the *Times* may have no chance to assert its claim of privileges as to the source(s)' identity.").

This principle applies with particular force here because Mr. Yiannopoulos had every incentive to raise the journalist's privilege from the start on the basis that it would require him to reveal his sources. The subpoena as served requested "*[a]ll* documents and communications concerning any rally or event on August 11 or 12, 2017 in Charlottesville, Virginia." Dkt. No. 1-10 Attach. A at 7, And Mr. Yiannopoulos all but confirmed under oath that such a request would have required him to disclose the identity of his source because he would have been required to produce the communications between himself and the source to comply with the subpoena. Specifically, Mr. Yiannopoulos testified in no uncertain terms that—as to the two videos provided by his sources that he publicly released—he was sent the materials from the sources in an electronic format that would reveal the identity of the sources if that electronic communication were produced. Tr. 66-67. Mr. Yiannopoulos thus had every incentive upon issuance of the subpoena to object on the ground that to produce according to its terms might reveal the identity of a supposedly confidential source.[1]

### B. In Any Event, No Journalist Privilege Protects Mr. Yiannopoulos' Sources

As discussed, Mr. Yiannopoulos has purported to invoke the "journalist's privilege" pursuant to "well-established federal and state law." Tr. 72-73. But Mr. Yiannopoulos cannot protect his sources under either source of law.

#### 1. New York's Shield Law Does Not Protect the Identity of the Sources

Section 79-h of the New York Civil Rights Law, known as New York's Shield Law, "provides an absolute privilege that prevents a journalist from being compelled to identify confidential sources who provided information for a news story." *Holmes v. Winter*, 22 N.Y.3d 300, 303 (2013).[2] Mr. Yiannopoulos, however, cannot invoke this privilege for two principal reasons: (i) federal common law, not New York law, governs this privilege question; and (ii) regardless, Mr. Yiannopoulos cannot show that he was engaged in the type of activities that the Shield Law protects.

At the outset, New York's Shield Law does not apply to this federal civil rights action. "[I]n cases presenting federal questions," such as this action brought pursuant to 42 U.S.C. § 1986, "privileges . . . are governed by federal law, not state law." *Crosby v. City of New York*, 269 F.R.D. 267, 274 (S.D.N.Y. 2010); *see also id.* at 274 n.25 (collecting authority); *Citizens Union of City of*

---

[1] Further, Mr. Yiannopoulos was plainly aware of his right to invoke the journalists' privilege given that he did so on February 12, 2020 (months too late). *See* Dkt. No. 1-17.

[2] The Shield Law also serves as a qualified privilege as to other material, an argument that was addressed in Movant's opening papers. *See* Dkt. No. 1-1 at 17-22. Further, because the test to overcome the qualified privilege is substantially similar to the test to overcome the common law/First Amendment reporter privilege, *see infra*, the issue is in large part discussed below.

*New York v. Attorney Gen. of New York*, 269 F. Supp. 3d 124, 152 n.11 (S.D.N.Y. 2017) ("Because Plaintiffs' primary claims arise under federal law, federal common law, and not the New York constitutional privilege, is applicable to . . . claims of privilege."). And for the avoidance of doubt, this principle applies as to New York's Shield Law. *See In re McCray, Richardson, Santana, Wise, and Salaam Litig.*, 928 F. Supp. 2d 748, 753 (S.D.N.Y. Mar. 5, 2013) ("While Florentine raises New York's Shield Law as a ground under which Defendants' amended subpoena should be quashed, asserted privileges in actions that raise both federal and pendent state law claims are governed by the principles of federal law."). Further, the inapplicability of state privileges to federal actions applies with special force to claims brought under federal civil rights laws such as the KKK Act.[3] *See King v. Conde*, 121 F.R.D. 180, 187 (E.D.N.Y. June 15, 1988) ("Rather than apply state privilege law to a federal civil rights claim, the magistrate must vindicate the purposes of federal discovery and privilege law."). Indeed, importing state law privileges in this context would "frustrate the important federal interests in broad discovery and truth-seeking and the interest in vindicating important federal substantive policy such as that embodied in [the KKK Act]." *Id.* (collecting cases).

Even if the Shield Law were to apply here (and it does not), Mr. Yiannopoulos does not qualify for its protections. The Shield Law, by its terms, protects only "professional journalists and newscasters," who have "in the course of gathering or obtaining news for publication," received information that was "intended for dissemination to the public." N.Y. Civ. Rights L. § 79-h(a)(6), (b), (c); *see also Trussell-Slutsky v. McIlmurray*, No. 031137/2017, 2018 WL 7569367, at *7 (Sup. Ct. N.Y. Cnty. Oct. 11, 2018) ("courts [s]trictly construe the qualifying conditions for invoking its protections, because the Shield Law operates as an exception to the generally liberal search for truth that is at the heart of . . . discovery."). Mr. Yiannopoulos cannot make this showing.

*First*, Mr. Yiannopoulos cannot establish that he was acting as a "professional journalist" when the sources showed him the relevant material. The Shield Law defines "professional journalist" as follows:

> [O]ne who, for gain or livelihood, is engaged in gathering, preparing, collecting, writing, editing, filming, taping or photographing of news intended for a newspaper, magazine, news agency, press association or wire service or other professional medium or agency which has as one of its regular functions the processing and researching of news intended for dissemination to the public.

N.Y. Civ. Rights L. § 79-h(a)(6). Consequently, the Shield Law, unlike analogous laws of other states, "explicitly limits the qualified privilege to professional journalists or newscasters." *Persky*

---

[3] That the plaintiffs also brought claims under Virginia law for which the court asserted supplemental jurisdiction does not allow for the import of state law privileges. *See, e.g. In re McCray*, 928 F. Supp. 2d at 753; *see also* Committee Notes to Fed. R. Evid. 501, S. Rep. No. 93-1277 ("It is also intended that the Federal law of privileges should be applied with respect to pendant State law claims when they arise in a Federal question case.").

*v. Yeshiva Univ.*, No. 01-cv-5278, 2002 WL 31769704, at *2 n.1 (S.D.N.Y. Dec. 10, 2002); *see also Too Much Media, LLC v. Hale*, 20 A.3d 364, 382 (N.J. 2011) (holding that an independent blogger was covered by the New Jersey Shield Law and contrasting it with New York's version, which applies "only to 'professional journalists and newscasters'"). Indeed, since 2009, the New York legislature has considered—and failed to pass—numerous bills to broaden the protections of the Shield Law to include "journalist bloggers." *See* Dkt. No. 1-1 at 19 n.11.

Even on the limited factual record available here, it is evident that Mr. Yiannopoulos does not qualify as a "professional journalist" under the Shield Law.[4] For one, Mr. Yiannopoulos has proffered only minimal explanation or evidence of his qualifications or experience. *See* Tr. 47 ("I'm a working professional journalist. I'm a *New York Times* bestselling author and award-winning investigative reporter."). *But see In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 225 (2d Cir. 1984) (observing that the burden of a party invoking a privilege is not "discharged by mere conclusory or ipse dixit assertions") (quotation marks omitted)). Regardless, Mr. Yiannopoulos' sworn testimony, along with publicly available facts, demonstrate that Mr. Yiannopoulos was not acting as a "professional journalist" when he was shown the relevant materials, *e.g.*, at an "after hours" event that took place at some unspecified point and place after August 2017.[5] *See* White Decl. ¶ 3.c. As far as Movants can tell, Mr. Yiannopoulos has never worked for a newspaper, magazine, press association, or wire service, and although it appears that he was at one point a reporter of some kind for the "Brietbart News Network," he resigned from that position in February 2017.[6] Since then, the details of his journalistic endeavors are unclear beyond some connection to a "conservative streaming site," Dkt. No. 1-1 at 4 n.3, and a blog he seems to maintain to air his social and political grievances.[7] But these activities are no more "professional journalis[m]" than was the defendant's in *Trussell-Slutsky*, where the court rejected the defendant's similar assertion of the Shield Law as "entirely bald and self-serving." 2018 WL 7569367, at *8.

*Second*, Mr. Yiannopoulos did not learn the identity of the source "in the course of gathering or obtaining news," N.Y. Civ. Rights L. § 79–h(b), that he intended to disseminate to the public "at the inception of the newsgathering process." *In re McCray*, 991 F. Supp. 2d at 467

---

[4] Mr. Yiannopoulos has not contended that he is a "newscaster" as defined by the statute, and for good reason. The Shield Law defines "newscasters" as only those "who, for gain or livelihood, [are] engaged in analyzing, commenting on or broadcasting news *by radio or television transmission*." N.Y. Civ. Rights L. § 79-h(a)(6) (emphasis added). Yiannopoulos is clearly not a newscaster by this definition.

[5] The Shield Law does protect journalists seeking to protect sources even if they had "previously been employed or otherwise associated with" a professional medium or agency. *See* N.Y. Civ. Rights L. § 79-h. But that provision only applies where, unlike here, the individual was employed or affiliated with that agency when they learned the identity of the source. *See id.*

[6] Deepto Hajela, *Milo Yiannopoulos apologizes for remarks, quits Breitbart*, ASSOCIATED PRESS (Feb. 21, 2017), https://apnews.com/dad34289eed148e982c436e7f5547e3b/Milo-Yiannopoulos-apologizes-for-remarks,-quits-Breitbart.

[7] *See, e.g.*, Milo Yiannopoulos, *A Statement on Sines v. Kessler*, MILO (July 9, 2020), https://milo.net/51023/a-statement-on-sines-v-kessler; Milo Yiannopoulos, *Is It Okay to Be Glad When a Vindictive Old Bastard Dies?*, MILO (Aug. 26, 2018) https://milo.net/48621/is-it-okay-to-be-glad-when-a-vindictive-old-bastard-dies (referring to the late Senator John McCain).

(quoting *von Bulow*, 811 F.2d at 144). Indeed, Mr. Yiannopoulos has provided "nothing to suggest" that the privileged information was compiled in the pursuit of newsworthy material. *Torah Soft Ltd. v. Drosnin*, No. 00-cv-0676, 2001 WL 1425381, at *6 (S.D.N.Y. Nov. 14, 2001). To the contrary, his sworn testimony refutes the notion. For one, even crediting Mr. Yiannopoulos' contention that he has acted as a journalist in other contexts, his testimony was plain that he never did so in relation to the Unite the Right events. Specifically, he testified with no ambiguity that he has "never had information about Unite the Rights [*sic*] . . . never reported on it[, and] never been in discussion with sources about it." Tr. 53. And Mr. Yiannopoulos was similarly candid under oath in disclosing what his true aims were, confirming that they had nothing to do with the professional dissemination of news to the public but rather everything to do with obtaining "damaging materials about Richard Spencer as part of [his] ongoing animosity with that personality." Tr. 57; *see also* Dkt. No. 1-1 [Ex. 10] at 4:08–4:32 ("I have never met a grudge I don't like.").

New York's Shield Law—rooted in broad public policy principles—simply does not exist to aid individuals like Mr. Yiannopoulos in their personal vendettas.

### 2. The Federal Journalist's Privilege Also Does Not Protect the Identity of Mr. Yiannopoulos' Sources

The Second Circuit generally allows for a "journalists' privilege."[8] *Gonzales v. Nat'l Broadcasting Co.*, 194 F.3d 29, 33 (2d Cir. 1999).[9] This privilege, as with the Shield Law, is motivated by "the interest of protecting a vibrant free press from unwarranted intrusion." *Lebowitz v. City of New York*, 948 F. Supp. 2d 392, 394 (S.D.N.Y. 2013). Also, as with the Shield Law, however, it has no role to play in Mr. Yiannopoulos' effort to protect the identity of his supposed source.

The federal journalist's privilege does not apply to protect Mr. Yiannopoulos' source for similar categorical reasons as to why the New York Shield Law does not apply here. Specifically, given Mr. Yiannopoulos's testimony, he is not a "member of the class entitled to claim the privilege." *von Bulow v. von Bulow*, 811 F.2d 136, 142 (2d Cir. 1987). As with the Shield Law, to determine whether a person may invoke the journalist's privilege, the proponent of the privilege must first establish that, "at the inception of the investigatory process, [he or she] had the intent to disseminate to the public the information obtained through the investigation." *Id.* at 143. Consequently, "[a] person who gathers information for personal reasons, unrelated to dissemination of information to the public," cannot invoke the privilege. *Id.*; *see also id.* at 146 (rejecting the privilege because "Reynolds gathered information initially for purposes other than to disseminate information to the public"). This rule reflects the basic fact that the privilege is

---

[8] On a motion to compel compliance with a subpoena issued by a court in another jurisdiction, this Court is to apply the law of the court where compliance is required, here, the S.D.N.Y. *See, e.g.*, *New England Teamsters & Trucking Indus. Pension Fund v. New York Times Co.*, No. 14-mc-59, 2014 WL 1567297, at *3 (S.D.N.Y. Apr. 17, 2014).

[9] It is an open question "whether the journalists' privilege is constitutionally required, or rooted in federal common law." *Gonzales*, 194 F.3d at 35 n.6.

"designed to support the press in its valuable public service of seeking out and revealing truthful information." *Chevron Corp. v. Berlinger*, 629 F.3d 297, 308 (2d Cir. 2011).

Here, largely for reasons already discussed in the context of the Shield Law and incorporated herein by reference, *see supra* at 6-8, Mr. Yiannopoulos' conduct and testimony belie the journalistic intent and independence that underpin the journalist's privilege. Indeed, on numerous occasions, Mr. Yiannopoulos has stated that, rather than an intent to independently collect and disseminate to information he obtained relevant to the Unite the Right, he was motivated by securing an arsenal to use in his personal feud with Mr. Spencer. Even if Mr. Yiannopoulos had a change of heart, and now feels that his source might be helpful in his efforts to independently disseminate news, that was certainly not his intent when he first interacted with his sources. Regardless, such a shifting intent (assuming that even to be the case), *i.e.*, where "the information was gathered for other reasons and the intent to publish arose only later," is an "improper invocation" of the journalist's privilege. *Chevron*, 629 F.3d at 307. Similarly, that Mr. Yiannopoulos has, on occasion, disseminated some information to the public through various channels does not transform his original, personal motive to harm Mr. Spencer into an intent to inform the public that would permit him to invoke the privilege. *See von Bulow*, 811 F.2d at 145 (denying a claim of journalist's privilege over information gathered with a personal motive despite subsequent efforts to publish a news report and creation of a book manuscript based on the same information).

That Mr. Yiannopoulos should not be entitled to invoke the journalist's privilege should be clear given that his self-professed and seemingly exclusive motivation was to use the information the source provided him to *harm* Mr. Spencer. Indeed, had the source provided Mr. Yiannopoulos with information that did not advance his personal objectives—*i.e.*, if it reflected, for example, positively on Mr. Spencer—it is highly doubtful that Mr. Yiannopoulos would have released *any* of it. As with the Shield Law, this pursuit of a personal vendetta does not reflect the "valuable public service of seeking out and revealing truthful information." *Chevron*, 629 F.3d. at 308. To allow Mr. Yiannopoulos to invoke the journalist's privilege would be wholly improper.

Moreover, unlike the Shield Law, the qualified federal journalist's privilege permits a court to order the disclosure of a journalist's confidential sources "upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *Gonzales v. Nat'l Broadcasting Co.*, 194 F.3d 29, 33 (2d Cir. 1998) (quoting *In re Petroleum Products Antitrust Litigation*, 680 F.2d 5, 7 (2d Cir. 1982)).[10] That test is easily met here.

---

[10] Not only did Mr. Yiannopoulos represent under oath that he in fact was shown the relevant materials by the individual he refers to as his "sources," but he also represented that they were shown to him under some veneer of "confidentiality." Tr. at 47. This representation is significant because "when protection of confidentiality is not at stake, the privilege should be more easily overcome." *Gonzales*, 194 F.3d at 36; *see also id.* (where the information sought is not confidential, the proponent of the subpoena need only "show that the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources"). That Mr. Yiannopoulos was actually shown the relevant materials under a promise of confidentiality, however, is questionable, given Mr. Yiannopoulos' contention that his source has now supposedly taken the position that he never even showed Mr. Yiannopoulos the materials in the first place. *See* White Decl. ¶ 3.c; *see also Gonzales*, 194 F.3d at 33 (explaining that materials are privileged for the purposes of the journalists' privilege where it was "received by the publisher in

At the outset, it is important to note that, as the Movants addressed at length in their motion papers, the *content* that Mr. Yiannopoulos described to the plaintiffs' counsel on December 18, 2019—which Mr. Yiannopoulos has now sworn under oath was shown to him by his sources—would be perhaps the most relevant, critical, and elusive evidence pertinent to the underlying litigation. *See* Dkt. No. 1-1 at 20-22. Since the hearing, Mr. Yiannopoulos has only confirmed that to be the case. Indeed, on July 30, 2020, Mr. Yiannopoulos twice represented to the Movants' counsel that if the plaintiffs were to access these materials, they would, in his view, win the case. White Decl. ¶ 2.d. With that in mind, it becomes plain that the identity of the source Mr. Yiannopoulos now seeks to hide, just like the content that Mr. Yiannopoulos contends that source possesses, is (i) highly material and relevant; (ii) critical; and (iii) not obtainable from other available sources.

*First*, the source of the alleged recordings of the Unite the Right planning activity shown to Mr. Yiannopoulos is highly material and relevant to the maintenance of the plaintiffs' claims. Information is highly material and relevant for the purposes of overcoming the qualified privilege when, for example, the information sought could serve as evidence of an essential element of a claim, *see In re Ramaekers*, 33 F. Supp. 2d 312, 316 (S.D.N.Y. 1999), or contradict a witness' trial testimony, *see United States v. Burke*, 700 F.2d 70, 77 (2d Cir. 1983). Under these standards, Mr. Yiannopoulos' source is highly material and relevant. As the Movants previously noted, they will be required to convince the factfinder that the defendants specifically conspired with each other before the Unite the Right events to commit race-based violence. *See* Dkt. No. 1-1 at 6, 21-22. The defendants have denied nearly each of those elements and most certainly will at trial. Indeed, just days ago, three defendants moved for summary judgment, arguing in principal part that "they did not conspire with the other Defendants to commit racial violence." No. 17-cv-72, Dkt. No. 823 at 31-48. Mr. Yiannopoulos has now testified, however, that an unidentified individual played for him up to 20-30 recordings, at least some of which depict defendants in the underlying action engaged in planning sessions for Unite the Right. *See* Tr. at 34. It is precisely because this content goes both towards the core elements of conspiracy and the defendants' intent, that it is hard to imagine evidence that is more material and relevant. And the source will be uniquely situated to present this information to the factfinder, either by producing the relevant audio and video files to the Movants or by testifying about his experiences.

*Second*, and relatedly, the identity of Mr. Yiannopoulos' source is necessary and critical to the maintenance of the plaintiffs' claims. Information is necessary or critical for purposes of overcoming the journalist's privilege when "the claim for which the information is to be used virtually rises or falls with the admission or exclusion of the proffered evidence." *In re Application to Quash Subpoena to Nat. Broadcasting*, 79 F.3d 346, 351 (2d Cir.1986) (quotation marks omitted). Despite the breadth of that language, the movant need not show "that the requested material will enable it to prevail on the merits" or that the material is "unique[]." *In re Natural Gas Commodities Litig.*, 235 F.R.D. 241, 245 (S.D.N.Y. 2006). A pertinent example is *Persky v. Yeshiva University*, No. 01-cv-5278, 2002 WL 31769704 (S.D.N.Y. Dec. 10, 2002). There, the

---

confidence"); *In re Application of Chevron Corp.*, 709 F. Supp.2d 283, 295 (S.D.N.Y. 2010) (rejecting application of "confidential" test where subpoena recipient had "not sustained his burden of establishing that any of the material sought is subject to any confidentiality agreement"), *aff'd sub nom. Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011). In an abundance of caution, we assume above that the test for confidential materials applies, although we note that the test for confidential materials wholly subsumes the test for non-confidential materials.

**KAPLAN HECKER & FINK LLP** 11

plaintiff alleged that she was discriminated against when her employer replaced her with a Dr. Fisher, who was more religious than the plaintiff. In pursuing her claims, the plaintiff came across a student newspaper article which reported that unidentified individuals had claimed that Dr. Fisher had stated that plaintiff was "not the proper role model." *Id.* at *1. When the non-party author of the article was subpoenaed, he invoked the journalist's privilege to protect the source of the statements about Dr. Fisher. The Court rejected the privilege, concluding in relevant part that the identity of the source was critical:

> If these sources are indeed knowledgeable, and they are knowledgeable according to [the journalist] himself as stated in the passage, this information alone might result in substantiation of plaintiff's claim. This may be the only evidence as to who the decision maker was and that [plaintiff's] religiousness was a factor in the employment decisions. It must be kept in mind that such information is very hard to find in a discrimination case. . . . The claim could indeed rise or fall upon knowledge of [Dr.] Fisher's role and his motivations.

*Id.* at *3.

In line with these principles, the identity of Mr. Yiannopoulos' source satisfies this component of the test. As stated above, the recordings the source possesses capture the defendants engaged in planning sessions for the Unite the Right events, including the organizers spoiling for a fight, and are therefore critical to the central issue of the plaintiffs' claims. Although, as discussed, the Movants need not show "that the requested material will enable it to prevail on the merits," *In re Natural Gas Commodities Litig.*, 235 F.R.D. at 245, Mr. Yiannopoulos has at least himself expressed the view that the plaintiffs will win their case if they get this information, *see* White Decl. ¶ 2.d, a significant statement as to the critical nature of the evidence.

*Finally*, by all accounts, the information the plaintiffs are seeking is not obtainable from other available sources. Despite substantial questioning, Mr. Yiannopoulos has repeatedly represented to Movants that he can only recall a single person present at those critical planning sessions, other than his source. And he refuses to disclose to Movants the name of that other witness as well.

As such, even if Mr. Yiannopoulos is permitted to invoke the journalist's privilege (and he should not be), the court should nonetheless order him to disclose the identity of his source who possesses this highly relevant and critical evidence which the plaintiffs cannot obtain from another source.

Respectfully submitted,

/s/ *Benjamin D. White*
Benjamin D. White

(Attachments)