K7TLSINO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ELIZABETH SINES, et al.,

4                  Movants,

5           v.                              20 mc 241 (KPF)

6

7   MILO YIANNOPOULOS,
                                Oral Argument (Teleconference)

8                  Respondent.

9   ------------------------------x
                                    New York, N.Y.
10                                  July 29, 2020
                                    11:30 a.m.
11
    Before:
12
                        HON. KATHERINE POLK FAILLA,
13
                                        District Judge
14

15                          APPEARANCES

16  KAPLAN HECKER & FINK LLP
            Attorneys for Movants
17  BY:  MICHAEL LOW BLOCH
         BENJAMIN WHITE
18

19      Pro-se for Respondent
    BY:  MILO YIANNOPOULOS
20

21

22

23

24

25

K7TLSINO

1          DEPUTY CLERK:  Counsel, before we get started there's

2     a few things I need to go over before I bring in the Judge.

3     This is a public courtroom, even if it's remote.  And as such,

4     members of the media and/or public have been known to dial in

5     to listen to proceedings.  And there are members of the public

6     and media on the line.

7          I would just ask that for the court reporter's sake,

8     that you identify yourself each time you speak so that way it's

9     clear on who's speaking and the transcript will be accurate.

10    The recording and/or rebroadcasting of this conference is not

11    allowed.  You will see a banner that comes up that says

12    "recording has started."  That is the Court's backup recording.

13    We do have a court reporter on the line, and the court

14    reporter's transcript is the official transcript of this

15    conference.

16          Does anyone have any questions about the instructions

17    that were just given?

18          The last thing is that there is an echo -- the one

19    thing I'll ask is that if you're not speaking at any given

20    time, you do put yourself on mute so that way it will cut down

21    on the background noise and/or feedback.  And when you do need

22    to speak, just remember to unmute yourself.

23          (Case called)

24          MR. WHITE:  Good morning, your Honor.

25          Ben White, from Kaplan Hecker & Fink, on behalf of the

K7TLSINO

1    movants.  I'm here with my colleague, Michael Bloch.

2           THE COURT:  Thank you very much.  Good morning to both

3    of you.

4           Mr. White, it's between you and Mr. Bloch.  To whom

5    shall I be directing my questions?

6           MR. WHITE:  You can direct your questions to me,

7    your Honor.

8           THE COURT:  All right.  Thank you very much.

9           Mr. Yiannopoulos, are you able to see and hear me at

10   this time?

11          MR. YIANNOPOULOS:  Yes, I am, your Honor.

12          THE COURT:  All right.  Thank you very much.

13          Now let me speak to the parties about the nature of

14   this proceeding.  Normally this is a proceeding that I would be

15   having by video.  That doesn't make this proceeding any less

16   judicial, and it doesn't make it any less serious.  I want to

17   be sure that you understand that.

18          Mr. White, to the extent that your client would

19   otherwise have a right to have this proceeding take place in a

20   courtroom in the Southern District of New York, are you waiving

21   that right?

22          MR. WHITE:  Yes, your Honor.

23          THE COURT:  All right.  And, Mr. Yiannopoulos, to the

24   extent that you would have a right, sir, to appear in open

25   court to talk about this motion to compel, are you waiving that

K7TLSINO

1    right, sir?

2               MR. YIANNOPOULOS:  Yes.  And I'm grateful to you and

3    to moving counsel for allowing this, because I wasn't able to

4    attend due to COVID restrictions and not being in the states.

5    So thank you both.

6               THE COURT:  All right.  Mr. Yiannopoulos, I've

7    received in connection with this matter a series of materials

8    from Mr. White and Mr. Bloch, and they include a motion to

9    compel and exhibits to a motion to compel that were filed in

10   June, on June 25th.

11              Did you receive those documents, sir?

12              MR. YIANNOPOULOS:  Yes, I did.

13              THE COURT:  As well, there were supplemental letters

14   sent to me.  I believe there were two on the 14th of July and

15   one on the 20th of July.

16              Did you receive those as well?

17              MR. YIANNOPOULOS:  Yes.  They were kind enough to

18   provide me with copies submitted to you.  Yes.

19              THE COURT:  All right.  One moment, please.

20              (Pause)

21              THE COURT:  I'm having a technical issue.  I'm going

22   to have to ask for your patience for a moment.  Excuse me.

23              (Pause)

24              THE COURT:  All right.  I believe it to be resolved.

25   Thank you.

K7TLSINO

| | |
|---|---|
| 1 | All right.  You're all still able to see and hear me, |
| 2 | correct? |
| 3 | MR. YIANNOPOULOS:  Yes, your Honor. |
| 4 | MR. WHITE:  Yes. |
| 5 | THE COURT:  Thank you very much. |
| 6 | So, Mr. Yiannopoulos, in some of these submissions |
| 7 | there were discussions that perhaps may have just been in the |
| 8 | vein of puffery or not being serious.  But there was discussion |
| 9 | about you needing to be in a courtroom with a Bible.  I've been |
| 10 | a judge for a number of years, sir, and I've never sworn in a |
| 11 | witness with a Bible.  It doesn't make the swearing any less |
| 12 | real.  So I want to -- |
| 13 | MR. YIANNOPOULOS:  I'm sorry to interrupt, your Honor. |
| 14 | I don't recognize that as being relative to me.  I've never |
| 15 | made any kind of statement along those lines.  I think perhaps |
| 16 | you might be talking about somebody else. |
| 17 | THE COURT:  I hope I am, sir.  That is -- |
| 18 | MR. YIANNOPOULOS:  No.  I never mentioned a Bible in |
| 19 | relation to this case or any other. |
| 20 | THE COURT:  All right.  And, sir, do I need to put you |
| 21 | under oath? |
| 22 | MR. YIANNOPOULOS:  You certainly could, your Honor.  I |
| 23 | am happy to -- to -- I do believe, if I may just very, very |
| 24 | briefly explain.  There are some things in various submissions |
| 25 | from the movants that don't reflect very well on me.  And I |

K7TLSINO

1    would like, with your permission, to extremely briefly explain

2    why some of those are accurate.  And at the end of that, if you

3    would like to place me under oath, you're certainly welcome to

4    do so.

5          Would it be all right if I just take two minutes to

6    explain?

7          THE COURT:  You may, sir.

8          MR. YIANNOPOULOS:  Thank you.

9          The first thing I want to say to you, which you have

10   no reason to know, is I am intensely sympathetic to the aims of

11   justice in this lawsuit.  I think the Unite the Right rally

12   were discussing, if I understand coverage correctly in the

13   media, which weapons to bring with them and the legal

14   ramifications of various weapons.  That seems to be a

15   cut-and-dry definition of domestic terrorism.  And I also don't

16   believe they can hide behind the First Amendment if they were

17   inciting and planning violence.  I am in support of the

18   objectives of this lawsuit and I'm not hostile to it.  I see no

19   more difference between the far right, Unite the Right, and --

20         THE COURT:  Mr. Yiannopoulos, can I ask you just to

21   speak up a little slower and a little louder so that the

22   reporter can hear you?  Thank you.

23         MR. YIANNOPOULOS:  Absolutely.

24         So I truthfully, speaking plainly, am keen to see

25   Richard Spencer and his friends bankrupt and languishing in a

K7TLSINO

1    jail cell as the plaintiffs are.  My reservation has been with

2    the funders and organizers of this lawsuit, the ADL.

3          And there are some respects in which the submissions

4    from the movants' counsel are true.  I did, your Honor, mess

5    them about a bit; that's true.  And the reason for that is that

6    I was aware of where this lawsuit was coming from and who was

7    funding and organizing it.  And this is an organization -- the

8    ADL -- that has wrongly and very damagingly described me in a

9    variety of hateful ways.

10          And I want to keep this brief, so I won't bore you

11    with examples.  But the ADL, which does a lot of ^ -- work,

12    does, nonetheless, have the habit of calling conservative media

13    personalities "extremists" on the basis of very flimsy

14    evidence.  I'm one of the people they've done that to.  And

15    they've done all kinds of other awful things.  They said I have

16    engaged in efforts to promote white identity, which is a

17    heinous lie.  And unfortunately, it's those horrendous

18    allegations that have found their way into public court filings

19    by plaintiffs' counsel too.  They allege that I am a one-time

20    ally of Richard Spencer, and nothing could be further from the

21    truth.  After a long history of published written work and

22    videos going back to 2016, that's precisely the time that they

23    alleged that I was an ally of Richard Spencer.

24          In January of 2017, I published a video on YouTube

25    that said white nationalism is not the answer.  I was

K7TLSINO

1    disavowing explicitly him and his ideology at precisely the

2    time they inferred that I was some kind of ally.  And then the

3    other work that the ADL has done to defend my character, it

4    isn't an exaggeration to say that they, along with other

5    organizations, have destroyed my life.  And I was angry about

6    that and I perhaps -- to the extent that I messed them around a

7    little bit, because I wanted to find out how bad this situation

8    was for Richard Spencer and the state of the lawsuit and just

9    kind of wanted to find out what was going on and therefore

10   inferred that I had all the ^ information I did, the extent to

11   which that communicates any disrespect to the Court, I

12   sincerely apologize; and to the extent that that communicates

13   disrespect to the idea of the lawyers, I don't.  But that's

14   basically what was happening.  And I just wanted to kind of

15   figure out how bad it was for Richard Spencer.  I have a long

16   history of animosity towards him.  But ideologically, he

17   accepted a payment of $10,000 to stage a video to make it look

18   like I was singing to a group of white nationalists.

19           And it's important to note, by the way, I have not

20   violated any of my obligations as far as the subpoena goes,

21   because I don't have any materials that they're looking for

22   other than the things that I publicly published on my YouTube

23   channel, which I published as I received them.  So there are

24   two videos that I published that speak to Richard Spencer, both

25   of which I believe fall under the scope of their subpoena.

K7TLSINO

1    Those videos came to me on the day, or within 48 hours, of me

2    publishing it.  The second video, for instance, came to me --

3    and I am perfectly happy to prove this to the Court with

4    documents in evidence, if necessary.  Long after the subpoena

5    was issued, the second video came to me, and I published it

6    almost immediately.

7            And so I understand that it might look like I was

8    withholding material and dropping it on YouTube while I

9    shouldn't have been giving it out, but that's not the case.  I

10   have complied with all of my legal obligations under the

11   subpoena.  And it's true that I did give their lawyers a bit of

12   the run-around.  And to the extent that that communicates any

13   sort of disrespect to the Court, I apologize.  And I probably

14   shouldn't have done it.

15           The plain fact of the matter is I don't have

16   anything -- other than the two videos -- relevant to any of the

17   United the Right events.  I just published those.  And I

18   remain, despite all of this, willing to help them if I can.  I

19   think it might be quite powerful to their case to have somebody

20   who is perceived as being quite -- perceived as being very

21   conservative, let's say, like me, testify against these

22   defendants, which I would be perfectly happy to do based on my

23   limited contact.

24           So I remain happy to help them with this lawsuit.  I

25   simply don't have the materials that they're looking for.  And

K7TLSINO

I'm very happy to comply with anything the Court might require
of me, including investigation or reexamination of my devices
and my email account to establish that to your satisfaction.
Thank you.

     THE COURT:  Thank you for what I think is a summary of
your view.  I think I might want to ask a few followup
questions.  I will ask you, sir, please to raise your right
hand and either swear or affirm.  I don't know whether you are
someone who will invoke a religion.  Perhaps I'll just have you
affirm.

     MR. YIANNOPOULOS:  I'm a Christian, but I'm perfectly
happy to take whatever oath.

     THE COURT:  All right.

 MILO YIANNOPOULOS,

     called as a witness by the Court,

     having been duly sworn, testified as follows:

BY THE COURT:

Q.  All right.  Sir, you did receive late last year, a subpoena
in this case; is that correct?

A.  Yes.  It would have been during the Roger Stone trial in
Washington, D.C., because that's where I was served, in the
courthouse.  So I believe that indeed that would have been
where I was.

Q.  Great.  I'm given to understand that the subpoena was
issued on November 5th of last year, and it required certain

K7TLSINO

1    categories of documents.  I also understand that sometime in or

2    around mid December -- perhaps December 18th -- of last year,

3    there was a meeting with plaintiffs' counsel where they agreed

4    to narrow the scope of the subpoena?

5    A.   That all sounds right to me.  I wouldn't know the precise

6    date without checking.  But if that's what you have in front of

7    you, I'm sure it's right.

8    Q.   Okay.  Well, I have a letter dated January 9th of this

9    year.  And it's a letter to you that was included in an exhibit

10   in a document submitted to me.  It was from Mr. Bloch.  And it

11   appears to reflect a narrowing of the subpoena to request audio

12   and visual recordings --

13   A.   So --

14   Q.   I'm just going to ask you for the court reporter's benefit

15   and my own if you could just let me finish question.  Thank

16   you.

17   A.   I'm sorry.  I'm sorry.

18   Q.   The letter of January 9th, that's a letter of which you are

19   familiar, sir?

20   A.   Yes, your Honor.

21   Q.   Do you have a copy of it with you now?

22   A.   I can certainly pull it up if you'd like me to.

23   Q.   I just want to make sure we're on the same page, as it

24   were.

25   A.   It's the only letter I've received from them, so it must be

K7TLSINO

1     the same letter.

2     Q.   Okay.   It requires audio and visual recordings that you

3     have in your possession relating to the Unite the Rights events

4     in Charlottesville, Virginia on August 11th and 12th of 2017,

5     and which were recorded in Virginia.

6              That's the first category, yes?

7     A.   Yes.   Yes.

8     Q.   All right.

9     A.   To the best of my recollection, yes.

10    Q.   And what you're telling me now is that all that is

11    responsive to that particular category of materials would be

12    the two venues that you received at some date that was not

13    November of 2019.

14             Is that correct?

15    A.   Yes.   So the subpoena was issued initially in response to a

16    video that I published, which was really an audio extract of

17    Spencer shrieking and yelling and dropping a number of racial

18    slurs and various other things.   And I felt that this kind of

19    revealed the real Richard Spencer behind the nicely polished

20    media character and I was quite anxious to, you know, see that

21    come to light, so I published that.   And in response to that,

22    both the plaintiffs' counsel and the FBI got in touch with me

23    and asked for -- well, the FBI was -- well, both of those

24    contacts were a result of that first video.

25    Q.   All right.   I just want to ask my questions.   I appreciate

K7TLSINO

1    your answering them as I ask them.

2                And so this particular first video that you published

3    that may have been the impetus for this subpoena was something

4    that you did not yourself create, you received from someone

5    else?

6    A.   Correct.

7    Q.   And do I also understand that it was published on your

8    website within 48 hours of its receipt?

9    A.   Yes.   I published -- I posted it to YouTube and I also

10   published an accompanying story -- a news report about it on

11   the website of an online conservative media network that I have

12   a show for.

13   Q.   May I ask the name of the website on which your story was

14   published?

15   A.   Yes.   It's Freespeech.tv and was rebranded as Censored.tv.

16   So you'll have one of the two in front of you.   And I published

17   a story -- I'm not sure what happened to it online, but I'm

18   happy to provide you with a copy of it if it's not available --

19   which basically just explains the concept of the video, and

20   went on to ask why the media was continuing to give a platform

21   to somebody with these views, why he still had the accounts,

22   why he was still apparently a regular featured public voice

23   based on the horrendousness of the audio, which journalists

24   have known -- at least some had some inkling of.

25               And I heard from a reporter at the *Washington Post* who

K7TLSINO

1    is one of the people I used to verify that the voice was

2    Spencer's, that he had heard similar things privately from

3    Spencer too.  And I asked him why the media had never reported

4    on these things and instead focused on how dapper and

5    well-dressed he was, treating him as some sort of cerebral

6    intellectual movement leader rather than what he is, and that

7    was the extent of the accompanying piece.

8    Q.  Mr. Yiannopoulos, I'm just going to ask you to pause for a

9    moment.

10           I should have mentioned this earlier on, but I did

11   want to note that one of the things that the movants are

12   raising is the fact that your objection would have been due

13   within 14 days of receipt of this subpoena.  I do appreciate

14   that you were perhaps negotiating with them during that time to

15   produce a narrowed quantity of materials.  But to the extent

16   that there's going to be discussion later on in this conference

17   about bases for nonproduction, I did want you to be aware that

18   the argument has been made that you lost your chance.  I'm not

19   making a final decision on that, I'm simply letting you know.

20   And I think you're aware that that is the argument that they're

21   making.

22   A.  I'm aware that that's the argument they're making.

23   Q.  All right.  Sir, as you were telling me, upon the posting

24   of this story -- this audio -- or video actually -- to YouTube

25   and the accompanying news story, you were contacted both by

K7TLSINO

1   counsel in this case and by the FBI.

2           Am I understanding your story?

3   A.  That's right.  They called me and asked me.

4   Q.  Which "they" are we speaking of, sir?

5   A.  Excuse me.  I was handed a subpoena in the courtroom by

6   plaintiffs' counsel, and the FBI called me on my cell phone and

7   asked if they could meet me.

8   Q.  I see.  And did you, in fact, meet with the FBI?

9   A.  Yes, I did.

10  Q.  Is it something that you're able to discuss, sir?

11  A.  For the most part, yes.

12  Q.  May I understand -- well, you don't give me the specifics.

13  But were there materials, be they documents, or video, or audio

14  recordings, or anything that you gave to the FBI in the context

15  of those meetings?

16  A.  No. since I don't have -- I didn't have at that time

17  anything additional to that one video itself, so I have no

18  problem telling you that I hadn't given them anymore than I've

19  given plaintiffs' counsel.  Indeed, the first the FBI heard of

20  the second recording was seeing it appear on my YouTube channel

21  just like everybody else.

22  Q.  All right.  Mr. Yiannopoulos, obviously you've figured out

23  why I asked that question.  I would be sad if there were

24  documents you produced to the FBI and did not produce to

25  movants' counsel in this case.

K7TLSINO

1   A.   I'm aware.

2   Q.   I'm not going to focus more on the FBI.

3         So you've used the term, "messing them about a bit" in

4   reference to plaintiff's counsel.  And I think I need to know

5   what that means, because certainly I'd be, again, sad.  And the

6   difference between movants' counsel and I is that I have

7   contempt powers and they do not if you were messing about with

8   me.  So obviously you understand the seriousness of this

9   proceeding.

10         But I need to understand, when you say "messing them

11   about," what did you do?

12   A.   I do understand.  And that's why in the statement that I

13   gave you at the beginning I'll try to explain the difference

14   between my conversations with them and the one that I'm having

15   with you now.  I do understand the seriousness and the

16   difference.

17         I think what I meant -- what I meant by that post was

18   that I think I alluded strongly without saying explicitly that

19   I was almost certainly in possession of material that would

20   assist their lawsuit.  Now, I have a variety of sources who

21   hold on to materials until they choose to give me them, to give

22   me some sense of what those materials may contain.  And that's

23   what I was referring to briefly.  I have asked and not been

24   provided with any pertinent information from those sources.

25   And in my own possession, I did spend some time and money just

K7TLSINO

checking to make sure that -- I didn't want to get caught out
having overlooked something accidentally -- just to ensure that
the things that I was referring and I'd been told about -- just
to make sure that I did not possess any of my backup hard
drives and any location, anything that should fall apart.  And
I did not have such things.

        So to the extent I was "messing them around," it was
strongly suggesting that I had material that would greatly
assist their lawsuit.  And the reason I did that is I wanted to
kind of sound out more information about the suit really, and
that turned into more aggressive and confrontational kind of
situation.  So that didn't pan out for me and I probably
shouldn't have done it.  And that's about it.

Q.  And so did I understand you a moment ago to say that, while
maybe in the land there are sources who you know about who
might have information, they themselves always held on to
materials, the information that they had?

A.  Correct.  And I have been, despite my attempts, unable to
acquire it.  However, one thing that did come in as a result of
those initial inquiries, as a result of the inquiries that I
made in a good-faith effort to comply with the subpoena,
sometime later, I did receive that video, the second video,
which I posted immediately publicly, provided it to everybody
who was interested.  Nothing else has come in since.

BY THE COURT:

K7TLSINO

1    Q.  One moment, please, sir.

2            Before you received and therefore released this second

3    video, had you made a representation to movants' counsel that

4    you had no responsive materials, or were you in the process of

5    leading them to believe that you did?

6    A.  I would have to check the dates since it temporarily

7    escapes me when that video was published.  If you just let me

8    look, I can give you an answer.  But I would have to look it up

9    since I'm not --

10   Q.  I believe it was April 6th of this year, sir.

11   A.  When the video dropped?

12   Q.  Yes.

13   A.  Yeah.  That sounds correct.  So all we just have to do is

14   compare that to the email in which I said that I didn't have

15   responsive materials.  I don't have the date, but I can

16   certainly look it up for you.

17   Q.  All right.  Did you meet with them once or more than once,

18   sir?

19   A.  Do you mean the movants' counsel?

20   Q.  Yes, sir.

21   A.  I met with them once in their offices in the Empire State

22   Building.

23   Q.  And separate and apart from the one in-person meeting, were

24   there telephone conferences or video conferences?

25   A.  Not to my recollection.  A few emails.

K7TLSINO

1  Q.  All right.  If you are able from your records to note when

2  that meeting took place, I would appreciate it.  I'm sure

3  movants' counsel has a date for it as well, but I want your

4  recollection of it, first.

5  A.  I could probably find out precisely for you, because I'm

6  fairly sure it's on my calendar.  So if you give me just a

7  moment, I'll be able to return that very quickly for you.

8  Q.  I will.

9  A.  That would have been in mid December, we said, right?

10 Q.  December is -- there's a letter to you dated January 9th,

11 which suggests that your meeting took place prior to January

12 9th.

13 A.  If my records are correct, I believe it would have been

14 4:00 p.m., Wednesday, December 11th.

15         Does that line up with what they say?

16 Q.  I --

17 A.  I think that we rescheduled it once, so there's a

18 possibility that was the first penciled-in date and -- oh, you

19 know what?  I think it was.  That was the first penciled-in

20 date.  And I believe we rescheduled it to 11:00 a.m. on

21 Wednesday, December 18th.

22 Q.  Okay.  Thank you.

23 A.  I have two entries for the December 18th in my calendar.

24 And I remember it was rescheduled.  So to the best of my

25 ability to find out, I think that's what happened and I think

K7TLSINO

1     that's what those two dates are.

2     Q.  All right.  And my understanding from my law clerk is that

3     the meeting was the 18th and that the first email to them where

4     you say you do not have responsive documents is February 12th

5     of 2020?

6     A.  That sounds correct.  And at that time it was accurate and

7     truthful that that claim -- the subsequent second video.

8          And just to reiterate, if I may, I'm perfectly able

9     and willing and happy to demonstrate to the Court's

10    satisfaction that I received that second video much later,

11    within 48 hours of its publication and, therefore, when I said

12    I didn't have responsive materials, that was entirely accurate.

13    Q.  All right.  So between February 12th and April -- let's

14    just say early April, have you had any communications with

15    movants' counsel?

16    A.  If I did, they would have been by email.  So I can give you

17    a definitive answer very quickly.  Let's see.  I've got emails

18    from December 12th.  I believe Mr. Bloch would have been --

19    looks like it was February 4th.  I'll have a look.  Yeah.

20          All right.  So January 1st is when they said they

21    would send me a letter about the reduced scope.  January 20th,

22    they give me a reminder that I'm running a bit late.  And

23    that's when I say on January 26th that I had been dedicating

24    time and money to the process of reviewing materials.  And I

25    also make a reference to FBI requiring them exclusively should

K7TLSINO

they come into my possession.  So they, in any event, did not

come into my possession.  I did not supply any additional

materials to the FBI.  And, therefore, sometime later I simply

reported that I had no relevant materials.  Another email on

January 26th, which was basically Mr. Bloch saying that they

had extended the compliance date for me and that they were

running out of time and wanted to get a move on.  That, as far

as I know...

          Then they sent an email on January 30th, and I said I

wouldn't be producing anything because I had nothing relevant.

On February 7th, they responded -- Mr. Bloch responded and said

basically that:  When we met, you said you had a bunch of

stuff, and now two months later, you say you've got nothing.

On what basis are you refusing to produce?

          I think this email -- I think the underlying

supposition in this email is that I do, in fact, have

materials, I'm simply refusing to produce them.

Q.  Yes.  Well, to be clear, you did leave them with that

misimpression -- or impression.

A.  That's correct.  And I -- on revisiting my email of January

30th, I do see that the way I phrased it might well have led

them to believe that.

          On February 7th, the underlying assumption of this

email appears to be that I have materials that I am

withholding; however, on January 30th, about a week before

K7TLSINO

that, I do say in writing explicitly:  I possess nothing that
falls within the scope of our discussion, meaning the scope of
the subpoena.

Now, I do say:  I'm writing to let you know that I
will not be producing any documents or recordings, as I possess
nothing that falls within the scope of our discussion.  And by
"nothing," I meant nothing except for that first video, which
everybody knew about because it was public.

So I had made the definitive explicit statement to
them on January 30th that I did not possess any additional
materials aside from that first recording; that was a true
statement.  And they wrote back to me, perhaps understandably,
I have to say, understandably, and asked for more information
about the basis for me withholding materials that they were
convinced that I did -- and I understand why that may have been
the case.  I understand the reasons for their suspicions and
skepticism; I do.

Q.  All right.  There was another email from you on the 12th.

And then was there radio silence until this motion to
compel?

A.  As far as I'm aware, that's right.  I believe that June the
24th was the first time I heard from them again; an email from
Mr. Bloch letting me know that he was filing a motion to
compel.  To the best of my recollection, and according to what
I have in front of me without, you know, doing any forensic

K7TLSINO

1    search of my inbox, it looks as though that's accurate.

2    Q.  All right.  Right now today, sir, do you have any audio or

3    visual recordings in your possession relating to the Unite the

4    Right events and that were recorded in Virginia other than the

5    two that we've been discussing in this conference?

6    A.  No, your Honor, I do not.

7            THE COURT:  All right.  I'm going to turn now to Mr.

8    White.  And then, Mr. Yiannopoulos, I'll return to you a bit

9    later.

10           Mr. White, before I ask you some questions, if there

11   are additional dates or events that you wish to add to the

12   chronology that Mr. Yiannopoulos and I have been putting

13   together for the past few minutes, I will hear from you.

14           MR. WHITE:  Thank you, your Honor.  And good

15   afternoon.  And I'll just say, first, we appreciate your Honor

16   conducting this hearing and giving this issue the sort of

17   attention it deserves.

18           I think the Court has the proper chronology both laid

19   out today at this hearing and also in our papers, so I don't

20   think there's anything to correct on the dates.  I'll take the

21   opportunity to -- and I'll take your Honor's direction -- ask

22   some questions.  There are certain statements Mr. Yiannopoulos

23   makes here today that I think require some clarification.  If

24   you'd like, I could offer those now or I could take

25   your Honor's questions that you have planned to ask.

K7TLSINO

1          THE COURT:  I'll hear from you just because I've heard

2     Mr. Yiannopoulos' statement.  So I'll hear your disputed

3     portions of that statement.

4          MR. WHITE:  Sure.  Thank you for that opportunity,

5     your Honor.

6          I think most importantly, Mr. Yiannopoulos I do not

7     believe is accurately characterizing the tenor of his

8     conversations with movants' counsel on this matter,

9     specifically with respect to the December 18th in-person

10    meeting that Mr. Yiannopoulos and my colleague, Mr. Bloch, had

11    at our offices.  To be clear, Mr. Yiannopoulos was very certain

12    at that meeting about the specific materials that he had that

13    was responsive to our subpoena.  We've identified in an

14    affidavit attached to our motion the specific representations

15    that Mr. Yiannopoulos made.  And those include, describing with

16    specificity, between 20 to 30 audio recordings describing

17    individuals who were planning Unite the Right events, and

18    specifically representing that the individuals contained in

19    those recordings are defendants in our action.

20         But I think the most notable representation that Mr.

21    Yiannopoulos made with specificity at the December 18th meeting

22    was that he was in possession of a video slowing one of the key

23    defendants in our action, Richard Spencer, giving what Mr.

24    Yiannopoulos determined to be a Roman salute, which we

25    understand to be another name, a Nazi salute.

K7TLSINO

1          Mr. Yiannopoulos described the possession of that

2    video with specificity, which is notable principally because

3    the April 6th, 2020, video that Mr. Yiannopoulos subsequently

4    released on YouTube, after becoming in receipt of that video,

5    depicted just that, depicted Richard Spencer providing a --

6          THE COURT:  Mr. White, please pause.  Thank you very

7    much.

8          I want to be sure I understand what you're saying when

9    you're telling me that Mr. Yiannopoulos was identifying

10   materials in that December 18th meeting with specificity.  If

11   what you say is that he said he had a video of Mr. Spencer

12   giving a Roman salute, all right, although it would not shock

13   me that such a video existed since it was produced in April.

14   But I'm not sure that that's the level -- if that's the level

15   of specificity, they could have been either educated guesses or

16   something short of actually identifying inventory materials

17   they had.

18         But I need your help in understanding why I should

19   believe that he was not just especially detailed in fabricating

20   information when he met with your office on the 18th of

21   December and he was, in fact, describing materials he then had

22   in his possession.

23         MR. WHITE:  Your Honor, it's a fantastic question.

24   And we are in a difficult position because everything that we

25   are relying on is based off the verbal representations of Mr.

K7TLSINO

1    Yiannopoulos.  We can provide the Court with as much

2    specificity as we can about what he represented to us.  And we

3    can say that he represented to us that he was in possession of

4    this material, that he had it at hand in a specific device that

5    he identified in detail for us at the December 18th meeting,

6    that he had also publicly laid in front of a camera on December

7    3rd of 2018.

8              THE COURT:  And what was the device?

9              MR. WHITE:  Sure.

10              So, your Honor, on December 3rd, after we had issued

11    Mr. Yiannopoulos a subpoena, and Mr. Yiannopoulos had confirmed

12    publicly that he was in receipt of the subpoena, he recorded a

13    video at which he described his possession of the materials he

14    had regarding Richard Spencer and others.  And he waved in

15    front of the camera during that video --

16              Your Honor, I was describing the representation Mr.

17    Yiannopoulos made on December 3rd in a video about the physical

18    media on which he possessed material relevant to our underlying

19    action.

20              THE COURT:  Mr. White, if I may pause you.  I have,

21    for example -- I have your declaration and I have Mr. Bloch's

22    declaration, and so I have the level of detail that is

23    contained in that.  I guess I'm asking if there's something

24    additional to that, if there are details that are not recited

25    in this declaration.

K7TLSINO

1          MR. WHITE:  I believe the declaration makes it out

2     accurately.  But the point I was trying to make, your Honor, is

3     the consistency between what Mr. Yiannopoulos told us on

4     December 18th and what he publicly waved in front of the camera

5     on December 3rd.  On December 18th, Mr. Yiannopoulos claimed

6     the material was on a particular hard drive at his home in New

7     York.  On December 3rd, Mr. Yiannopoulos had waved what looked

8     like a singular hard drive in front of the camera and claimed

9     that that hard drive was what contained all of the materials,

10    some of which is we think unquestionably responsive to the

11    subpoena.

12          So all of this is a very difficult exercise,

13    your Honor, because we're trying to figure out whether Mr.

14    Yiannopoulos was lying then or whether Mr. Yiannopoulos is

15    lying now.  And we can provide indication we have that we think

16    he was telling the truth then.  Although obviously it's limited

17    because we're basing our assumptions on what Mr. Yiannopoulos

18    has told us.  Fortunately, some of what he told us was

19    subsequently confirmed, which casts doubt on the representation

20    he's made to your Honor today.

21          We do think the Court is in a difficult position to

22    figure out exactly how this issue is to be resolved.  Mr.

23    Yiannopoulos has admitted here today that he was lying to us.

24    He refers to it as "messing around."  But messing around in the

25    context of a very expensive and complex litigation is a serious

K7TLSINO

1    issue.  And it's one that has cost our case and our clients

2    considerable expense both in terms of distracting us as we had,

3    for one, file this motion, and, two, negotiate with Mr.

4    Yiannopoulos over the span of months in light of

5    representations he made about having material that is directly

6    relevant to the core issues that we're going to have to prove

7    to a jury.

8            So we understand -- and I think Mr. Yiannopoulos has

9    proposed today one possible solution which we think is just a

10   minimal solution which will allow foreign inspection of the

11   devices that he claims potentially possesses this material.

12   And I think the starting point for that, your Honor, would be

13   what he called "the vault."  He has publicly stated that the

14   vault contains information directly relevant to our case.  He

15   said today that that's not true.  I think the only way to test

16   that assertion is to allow someone apart from Mr. Yiannopoulos,

17   potentially apart from the movants here, to test that

18   assertion.

19           THE COURT:  All right.  I'll let you continue, sir, if

20   there were other things that you wish to dispute or clarify.

21           MR. WHITE:  Sure.

22           There's just one other I think that is important at

23   the outset, which is that Mr. Yiannopoulos has said today that

24   after we agreed to narrow the scope of the subpoena, he has

25   then informed us that he has nothing that's within the scope of

K7TLSINO

1   our discussion.  And he says today that his reference to the

2   scope of our discussion is broadly about the subpoena at issue.

3           We just point out, your Honor, that Mr. Yiannopoulos

4   is attempting to take advantage of the revised scope of the

5   alleged subpoena to any point he has nothing that is relevant

6   and responsive to that amendment of the subpoena.  And we think

7   that obviously can't be held in court, your Honor.  Mr.

8   Yiannopoulos can't represent that he has certain responsive

9   material -- for lack of a better term -- to amend the scope of

10  that subpoena in light of those representations.  And then to

11  stand up and say, well, I have nothing, that responds to the

12  more limited nature of what he ultimately asked for.  I think

13  just keeping that in context here is important.  Our initial

14  subpoena sought documents that is are significantly --

15          THE COURT:  I'm trying to understand that.  I'm also

16  advised by my deputy that you might be doing better with the

17  handset and not the headphones if you're using your phone as

18  the audio for this, because you are coming in actually a bit

19  muffled from this end.  But let me pause and ask the court

20  reporter whether she is able to understand you.

21          (Pause)

22          THE COURT:  Mr. White, if you're able to use the

23  handset and not the headphones, I would appreciate you doing

24  that.  If you can't or you're worried you'll disengage yourself

25  from this call, then we'll do something else.

K7TLSINO

| | |
|---|---|
| 1 | MR. WHITE:  Your Honor, I'm happy to take the |
| 2 | old-fashioned method and use the phone on my ear, if that's |
| 3 | okay. |
| 4 | THE COURT:  I appreciate it.  Thank you. |
| 5 | MR. WHITE:  Your Honor, does this work? |
| 6 | THE COURT:  It is better for me.  So that's a start. |
| 7 | Thank you. |
| 8 | Mr. White, what did you understand to be the status of |
| 9 | the requests from your clients of Mr. Yiannopoulos?  I mean, I |
| 10 | see this January 9th letter. |
| 11 | MR. YIANNOPOULOS:  I'm sorry, your Honor.  I'm not |
| 12 | able to hear anything you're saying. |
| 13 | THE COURT:  Well, that's problematic. |
| 14 | (Pause) |
| 15 | THE COURT:  Yes.  Mr. Yiannopoulos, I can hear you, |
| 16 | sir, although your video has frozen. |
| 17 | MR. YIANNOPOULOS:  Sorry, your Honor.  I wasn't able |
| 18 | to hear any of your question.  If that was directed at me, I |
| 19 | don't know. |
| 20 | Could you possibly ask me again? |
| 21 | THE COURT:  All right. |
| 22 | MR. YIANNOPOULOS:  I just had a big lag.  I'm so sorry |
| 23 | if you weren't even talking to me.  I just heard fragments and |
| 24 | syllables for an extended period of time.  So I'm sorry, I |
| 25 | didn't catch any of that. |

K7TLSINO

1          THE COURT:  Mr. Yiannopoulos, I was, in fact, speaking

2     with Mr. White.

3          Are you able to hear and see me now?

4          MR. YIANNOPOULOS:  Sorry.  I can now.  It's come back.

5     Yes.

6          THE COURT:  Well, we'll be grateful for that.

7          Mr. White, I suppose one problem is fixed and another

8     one appears.  But hoping that we can all continue, I will do

9     that.

10          Sir, I had understood the subpoena to be narrowed.

11     You're now saying because the narrowed subpoena was not

12     complied with, you no longer wish to narrow it?

13          MR. WHITE:  I think as a technical matter I was just

14     pointing out to the Court that what is at issue here is our

15     underlying subpoena.  I think we understand the context of this

16     dispute and where we're at in our pending trial date.  So we

17     are, as a case team, particularly focused on the materials that

18     are responsive to the amended subpoena.

19          I've raised the issue with the Court fully to give the

20     Court the context about Mr. Yiannopoulos' efforts here to

21     comply with the subpoena in good faith.

22          THE COURT:  All right.  I think I understand that.

23          Other things you'd like me to know, sir?

24          MR. WHITE:  I think that's all I have in terms of

25     direct responses to Mr. Yiannopoulos' statements for the Court.

K7TLSINO

1   And I'm happy to answer any questions that your Honor might

2   have.

3           THE COURT:  Well, sir, where we are right now is I

4   have placed Mr. Yiannopoulos under oath and he has told me what

5   he has told me under oath, under penalty of perjury, with my

6   contempt powers and all of those things, and I'm trying to

7   understand -- I mean, I can ask him some more questions.  And

8   it may just be that he was playing you, and your firm, and Mr.

9   Bloch, and that's unfortunate and is a waste of time.  But I'm

10  not sure it means he has these responsive materials.  It may

11  just be he was a very detailed dissembler to you.

12          But I need to understand what evidence you have other

13  than the quantity of detail in his discussions with you that

14  would suggest that the representation he is making to me today

15  are false.

16          MR. WHITE:  I think, your Honor -- and at risk of

17  going over issues we've discussed -- to us, the specificity

18  with which Mr. Yiannopoulos referred to materials he had in his

19  possession, in conjunction with the ultimate release of

20  information that matched those descriptions, appears to us to

21  be quite persuasive evidence that he was telling us the truth,

22  at least in part, when he met with us on December 18th.

23          Further, I think your Honor is entitled to take into

24  account Mr. Yiannopoulos' public representations here today

25  under oath that he was lying to us when he negotiated the scope

K7TLSINO

of the subpoena.  Of course, we don't have direct physical
evidence that Mr. Yiannopoulos committed perjury here today.
We do have evidence that Mr. Yiannopoulos is one that doesn't
take his obligations of candor seriously dealing with a duly
issued subpoena.

        And I think, given that context, we're not asking
your Honor to issue an order of contempt.  We're not asking
your Honor to issue a finding that Mr. Yiannopoulos committed
perjury today.  We're simply asking your Honor to do what is
available to just test the accuracy the representations that
Mr. Yiannopoulos is making.  And we think there are several
devices available to do that that are common in discovery
disputes similar to this.

        And I think your Honor has the authority, for example,
according to Rule 53, to appoint a master to take a look at the
materials Mr. Yiannopoulos has described in detail to us as
containing relevant information and to take a simple
cost-effective look through those materials.  Mr. Yiannopoulos
has also offered today to provide his cell phone and his email
addresses.  And we think the Court should take him up on that
offer and just test the assertions.  We think it can be done
quickly.  And frankly, your Honor, it's one we've done before
in this very case, given the challenges we've had from our very
defendants in getting access information.  So the process we're
used to is a process we've had success with, and we think it's

K7TLSINO

1   a reasonable approach here to test the assertions from someone

2   who has candidly, publicly, and in court acknowledged that he

3   has lied while negotiating the scope of a properly duly issued

4   subpoena.

5          THE COURT:  All right.  Thank you.

6          Mr. Yiannopoulos, I am reminded of the declaration

7   that was submitted by Mr. Bloch in connection with this motion.

8   And I'm just going to go through the things that you are

9   alleged to have said at this meeting on December 18th.

10  BY THE COURT:

11  Q.  Did you, in fact, tell them that you had between 20 and 30

12  distinct audio recordings ranging in length from ten minutes to

13  two hours?

14  A.  I told them that those audio recordings do exist but I do

15  not possess them.  I had been played portions of them by

16  somebody else and I was unable to acquire them.  I represented

17  that I physically possessed files of them, which I did not.

18  Q.  But have you actually, yourself, been privy or have heard

19  between 20 and 30 audio recordings?

20  A.  Not the complete recordings.  I've seen them -- I saw on a

21  screen that it was that number of files, but I did not listen.

22  I was just played a couple of clips.

23  Q.  Was this by one person or more than one person, sir?

24  A.  By one person.

25  Q.  And this is one of the sources to which you referred

K7TLSINO

1    earlier?

2    A.   Yes.   It's the same sources that provided me with other

3    things as well, specifically the second video, the second thing

4    I posted on YouTube.   I've been able to get things from this

5    source partially, but this source has withheld I guess the

6    stuff that plaintiffs' counsel really wants badly, and which I

7    really want badly too.   And I continue my efforts to --

8    Q.   Stop.   Stop.   Stop.   I don't want you to editorialize.

9    Thank you.   I just want you to answer my questions.

10   A.   Sure.

11   Q.   All right.   So when you told them that you could speak with

12   such specificity because you had heard them and you had seen

13   indications of their length and their number?

14   A.   That's correct.

15   Q.   How many of the between 20 and 30 did you listen to, even

16   if for a little portion?   All?

17   A.   No.   No, no, no.   I would say -- I was played clips.   I

18   wasn't looking at the screen the whole time.   And I was played

19   a number of clips from the total collection.   And I would guess

20   no more than five of those recordings.

21   Q.   Were those recordings, in fact, of Mr. Spencer and

22   individuals associated with him?

23   A.   They were a extremely poor quality.   It was represented to

24   me that they were all Jason Kessler and -- what's his name --

25   Eli Kline, I think is the other one, and some of Spencer.   I

K7TLSINO

1    wasn't able to -- I can't confirm to you that that's accurate.

2    I know that the recordings that I released to Spencer are

3    accurate because I went to quite great lengths to verify them.

4    The things that I was played over laptop speakers that were

5    already of poor quality, I can't speak to whether or not they

6    really were what I was told they were.

7    Q.   All right.   You also represented that you had a video of

8    Mr. Spencer giving a Nazi is salute.

9         Did you, in fact, have that video?

10   A.   No, but I was aware that at least five different videos

11   exist of Spencer giving said salute.   One of them is the video

12   he was paid to stage in order to make life difficult for me.

13   Another is the one I was aware of but -- well, I was aware of a

14   couple of them floating around, because, as you'll note from

15   watching the video, the second video is a room with an awful

16   lot of people in it.   And my understanding is that there are

17   several different angles available of that event of which I

18   came into possession of one of those recordings.   I was aware

19   of I think at least five recordings floating around people that

20   showed Spencer giving this neo-Nazi salute -- this or Roman

21   salute, as they like to say.   And so I don't think it's much of

22   a secret that those videos exist.   And I don't think it was a

23   secret in 2017.

24   Q.   And when you say that you were aware of at least five, was

25   that because you had seen them or because people had told you

K7TLSINO

1  about them?

2  A.   That would have been a mixture of being shown on other

3  people's phones and being told about them.  I think I've seen

4  one or two.  I would have to think about it.  But I certainly

5  haven't seen all five.  But I've heard about a lot.

6  Q.   All right.

7  A.   And I've heard about them -- I've -- there are two events

8  that I sometimes get confused, the Unite the Right one and,

9  two -- one after the other and subsequent years, I believe.  I

10  sometimes have to check which is which.  But I believe that

11  there are videos out there of Spencer performing that gesture

12  before or during both of those different events.

13  Q.   I am told as well by Mr. Bloch that you represented during

14  the December 18th meeting that the audio that you had publicly

15  released, and that was the genesis of the subpoena to you, was

16  of a meeting with Mr. Spencer on August 12th of 2017, including

17  as well Mr. Kline, Mr. McClarin, Mr. Ponte (phonetic) and other

18  unidentified people.

19         Was that, in fact, what that audio was?

20  A.   Yes, your Honor.  That information was provided to me with

21  the video by the source.  And I also did provide that same

22  summary that I gave at that December 18th meeting to the FBI

23  when I met them.  That video was already public.  All did I was

24  tell them and provide them with a -- I just told them, I think,

25  precisely what I said at that 18th meeting, which is the listed

K7TLSINO

1    names that my source had provided as being people audible on

2    the recording.  So with respect to that specific thing that was

3    already out there, all of that is correct.

4    Q.  According to Mr. Bloch, you represented to the attorneys

5    during this meeting that you had information on a single

6    external hard drive which they are -- and perhaps you are

7    describing as "the vault."

8         Did you make that representation to them?

9    A.  Yes.

10   Q.  Do you, either in the context of messing about with

11   movants' counsel or other contexts, refer to this hard drive or

12   any hard drive as a vault?

13   A.  I have referred to it in many contexts.  It's an absolute

14   long-running -- I guess you would say an analogy, or a

15   metaphor, or a meme for a variety of materials that I have on a

16   variety of different people I've encountered in the ordinary

17   course of my reporting.  And social and professional encounters

18   I tend to characterize it as a controversy of damaging material

19   about dreadful people that I, you know, have reserved the right

20   to release at my own time and for my own reasons.

21        And the vault, as a concept if you'd like, existed

22   long before that specific -- was brandished on camera.  It's

23   something I've been referring to for I think many years now.  I

24   call it the vault.  And I think I mean it more metaphorically.

25   But that is true, I did brandish a video I think that said

K7TLSINO

1   "Archive 2019" on a sticker, an external hard drive.  But the

2   vault, as it were, is really a description of the various

3   things I've got up my sleeve about various previous reporting

4   subjects.

5   Q.  I see.  And so it's not that hard drive or any specific

6   hard drive, but it's how you refer to all the material you have

7   -- damaging material?

8   A.  It is how I metaphorically refer to all the damaging

9   material I possess on people, although I have brandished the

10   hard drive as though that was the physical vault and refer to

11   it as the vault, certainly have that on camera.  Plaintiffs'

12   counsel is right about that.  But the vault really is just a

13   kind of -- it's an analogy that I've been using for some time.

14   Q.  All right.  However or whatever comprises the vault, does

15   it include any audio or visual recordings relating to the Unite

16   the Right events of August 12th and 11th, 2017?

17   A.  Except for the two videos that have been released on my

18   YouTube channel, no, it does not.

19   Q.  All right.  And do you consider those two videos to be part

20   of the vault?

21   A.  I don't know that they would ever have touched it.  I mean,

22   I don't know because the vault is typically stuff I would kind

23   of want to store, you know, store away for a rainy day or for

24   when it suits me, if you like.  And I don't know that I would

25   have stored those videos in any specific external location or

K7TLSINO

1  stashed them anywhere else since I published them as soon as I

2  got them.  I think many places they would have existed would

3  have been on the software and initially from the source, and

4  then on the desktop of my computer, and then uploaded to

5  YouTube and then probably into the recycle bin on the right.  I

6  don't know that they would have been retained anywhere.  But to

7  the extent that the vault was a metaphorical thing, I guess

8  they would have within 48 hours been received and published.

9  Q.  Well, to that very point, sir, after these videos were

10  posted to YouTube, did you retain a copy of them or did you

11  simply discard what you had received?

12  A.  I felt no need to retain a copy, since the platform I

13  received them on, they were still in there.  So I didn't delete

14  or locally store them.  Since that platform has cloud storage,

15  I knew I could retrieve them at any time.  Also on YouTube, I

16  didn't see any need to store a local copy, because you can

17  always go into your YouTube studio and download copies of as

18  many as you'd like.  There was a copy on my local hard drive on

19  one of my laptops.  And I believe that that would have been on

20  my desktop perhaps before I uploaded to YouTube, and that copy

21  was probably almost certainly then put in the recycle bin and

22  deleted.

23      It is possible -- just to be strictly accurate and

24  entirely complete, I do sometimes put all of the sorted desktop

25  into a download folder and then throw that onto an external

K7TLSINO

1   drive just in case I ever need to find a screenshot from last

2   April or download PDF that I can no longer locate.  But I do

3   that in somewhat scattered fashion; I'm terribly organized.

4           So it is possible that a version of that video is

5   lingering somewhere on a hard drive somewhere for sure.  I

6   don't specifically recall storing it anywhere, because I didn't

7   see the need to.  But it's possible -- when I think about my

8   workflow, it's possible that it is a movie file in a download

9   from somewhere.

10  Q.  All right.

11  A.  If that makes sense.

12  Q.  It does.  I didn't ask this question because I didn't think

13  I needed to but, I will ask it now.

14          When you've responded to me about your possessions or

15  access to documents responsive to the narrow subpoena request,

16  you were, I presume, including materials that you kept away in

17  the vault for a rainy day?

18  A.  Yes, of course, because that's precisely -- that would be

19  the material that they're looking for, would it not?  So, yeah.

20  Q.  All right.  One moment, please.

21          (Pause)

22          THE COURT:  Mr. Bloch, if I could turn to you.  And I

23  appreciate your patience during this proceeding.  I've been

24  reciting and referring to things that you've identified for me

25  in your declaration.

K7TLSINO

1          But are there other details or other materials that

2      were discussed in the December 18 meeting that I should be

3      questioning Mr. Yiannopoulos about?

4          MR. BLOCH:  I don't believe so.  I think Mr. White has

5      covered it pretty compellingly and comprehensively.  I think it

6      is fairly -- it's all captured in the declaration.  And I don't

7      think at this point that I have more facts to add.

8          THE COURT:  All right.  Thank you.

9          And, Mr. White, may I hear from you then, sir, in

10     reply?  I've asked the questions about what was discussed at

11     the meeting.  And I've gotten the answers that I've gotten.

12     And you're going to tell me now why I oughtn't believe them.

13         MR. WHITE:  Your Honor, I won't venture to go that

14     far.  I will just point out one thing we just heard from Mr.

15     Yiannopoulos, which might need further clarification, which is

16     that he purported to delete the video responsive to our

17     subpoena at some point after receiving it without providing it

18     to us.  And I would point out to your Honor that obviously

19     providing -- or publicly posting material is not sufficient to

20     comply with a subpoena.  I mean, we were fortunate enough to

21     come across the video in our kind of diligence and

22     investigation, but had we not, we wouldn't have come across

23     that.

24         And we're learning now that Mr. Yiannopoulos, instead

25     of producing that video to us, instead -- as he put it -- put

K7TLSINO

it on his laptop and deleted it.  And so I think that goes,

again, towards Mr. Yiannopoulos' frame of mind for when he's

complying with the subpoena, and it begs the question:  What

other evidence has either been on that laptop, the hard drive,

the cell phone and been deleted as well?  And, again, I think

we're not asking the Court to make any ruling about Mr.

Yiannopoulos' truthfulness.  We're just asking the Court to

allow us to engage in a process that can test that

truthfulness.

        And your Honor, I'll raise one other point in response

to Mr. Yiannopoulos' response to your most recent questions,

which is Mr. Yiannopoulos' defense now seems to be that the

word "possessed," that was the fabrication, and that he didn't

possess the material but some unidentified source possessed the

material.  Obviously that information is highly relevant to our

case.  And it sounds to me like Mr. Yiannopoulos has at least

confirmed that the material exists, which is a very revealing

statement for us to learn in court here today, because it means

he wasn't lying about the existence of the material, he was

simply lying about whether he possessed it.  And so we think

the Court should entertain some process by which Mr.

Yiannopoulos should disclose what he knows about the source of

that information so that the point of the underlying litigation

can proceed to ascertain how they might obtain that

information.

K7TLSINO

1          And obviously Mr. Yiannopoulos is in a kind of unique

2     position to know exactly who these individuals are that he met

3     with, what they described to him, and how plaintiffs in this

4     court frankly might be best situated to access those materials,

5     which, again, if Mr. Yiannopoulos' statements in court today

6     are true, are directly relevant to the fundamental issues that

7     will be presented to the jury in October.

8          THE COURT:  Mr. Yiannopoulos, when you were engaging

9     in the December 18th meeting, is it fair to say that you did

10    not fabricate material or responsive material, you simply

11    fabricated possession -- you didn't make up stuff, you just

12    made up whether you had it?

13         MR. YIANNOPOULOS:  I think that's largely true.  I

14    don't think any of this has a transcript or a recording, so I

15    wouldn't like to say that with certainty unless some kind of

16    covert recording and it turns up that they --

17         THE COURT:  They have different issues if they

18    covertly recorded the meeting.

19         The issue is simply:  We are trying as best we can to

20    recreate what was discussed at the meeting.

21         MR. YIANNOPOULOS:  I do understand that.  I think it's

22    mostly true -- the way that you put it to me is mostly true --

23         THE COURT:  Mr. Yiannopoulos, I need you to repeat

24    yourself.  I'm getting every third word.  So let's try that

25    again.

K7TLSINO

1          Where it ended for me is you said:  How I would

2    describe it, which was actually borrowing from Mr. White, was

3    mostly true.

4          Now, please begin again.

5          MR. YIANNOPOULOS:  Right.  I believe that that is

6    mostly true in the sense that I think the majority of materials

7    that were discussed did exist.  But I perhaps overstated my --

8    slightly overstated my access to them or my possession of them

9    in spinning the yarn, I guess, or enticing them to engage with

10   me.  I can't say with absolute certainty that that's the entire

11   extent of it and that that characterizes all the materials we

12   discussed, but I think it is at least most of them.

13         I mean, the plain fact remains that I did not possess

14   those materials and I still don't, with the exception of the

15   video I published.

16         THE COURT:  All right.  And I believe Mr. White's

17   point, Mr. Yiannopoulos, is that particularly after receiving

18   the subpoena -- and I would hope that if you take away one

19   thing from this process is that subpoenas are real and they

20   have significance and consequence.

21         You are not to discard materials that you received

22   that might be responsive to a subpoena, even if you put them

23   into a different format.

24         MR. YIANNOPOULOS:  Judge, may I respond to that?

25         THE COURT:  You may, sir.

K7TLSINO

1          MR. YIANNOPOULOS:  It's laughable and implausible to

2     claim that they were just lucky to come across a publication on

3     my YouTube channel when -- before, and during, and throughout

4     this process.  They spent a lot of money on the kind of sleezy

5     opposition research that they are engaged in, which has done so

6     much damage to my career.  They've been watching me like a

7     hawk.  That's how they found the original video and that's why

8     they issued the original subpoena.  It's laughable to suggest

9     that they were lucky to come across the second one.  Published

10    in that video was -- I appreciate that it might not have been

11    specifically and exactly the process I was supposed to follow,

12    for which I apologize to you.  I probably should have sent them

13    a copy of the file.  Perhaps making it publicly available I

14    guess I thought was -- you know, was the same thing, which

15    perhaps it wasn't.  And I'm sorry for that.

16         And I understand also an additional technical

17    violation of the rules of the subpoena and the precise process

18    I followed with the computer desktop situation, but I hope you

19    understand that I was trying to explain it in clear detail in

20    answer to your question about whether I still had a copy of it.

21    So I was trying to be as open, and clear, and in detailed as

22    possible.  So I see the sharp legal minds have identified a

23    little technical violation there on the fly.  But I think that

24    you understand what I was trying to explain to you when I said

25    that.

K7TLSINO

 1          THE COURT:  Yes.  Now, please understand, sir, that

 2     I've listened to everything you've said and the fact that I

 3     haven't commented or responded to all of it doesn't mean I

 4     agree with that to which I do not respond.  I take no position

 5     on some of the comments that you're making.

 6          But there are sources, sir.  You've gotten your

 7     material from sources, and you've seen from at least one source

 8     these audio files.  You've been privy to them and have seen

 9     them.

10          What is your -- I mean, if I ask you right now to

11     disclose the identity of that person, your response would be

12     what?

13          MR. YIANNOPOULOS:  Well, I don't think it would

14     surprise you, your Honor.  Like any other journalist, I'm a

15     working professional journalist.  I'm a *New York Times*

16     bestselling author and award-winning investigative reporter.  I

17     think you know my response would be my career would be over

18     tomorrow if I broke the confidentiality of sources like that.

19     And my ability also to make life difficult for the defendants

20     in this case would be severely damaged.  If I were to burn one

21     of my sources, I would burn them all and, you know, destroy my

22     career.  I hope that you can see that it's reasonable that I

23     wouldn't want to do that.  And I think it's a fairly

24     well-established response from any working professional

25     journalist that that's just untenable for me to be able to do

K7TLSINO

that in open court in a public environment being reported on.

That's just not possible.

THE COURT:  Well, I do understand it, sir.  I will say

that I think I understand as well under federal law that there

is such a privilege, but there are certain criteria to its

assertion.

MR. YIANNOPOULOS:  Right.

THE COURT:  I now understand that you've asserted it.

And I don't know that you've officially articulated all that

has to be articulated, but I'm also not sure that I'm going to

walk you through it at this point.  I think the movants'

counsel now has your position that you're not going to disclose

the source, citing I presume the federal and New York state

journalistic privilege.

MR. YIANNOPOULOS:  Yes.  I think there's a fairly

well-established understanding, and it seems to be getting more

enshrined in law and more, if you like -- I'm not a lawyer.

But my understanding is that protection is becoming stronger

with the trajectory of that general protection for journalists.

And to the extent I'm able, I'd certainly like to assert it

with respect to my source.  I don't really need to assert it in

respect to materials because I don't have anything additional.

So I'm not trying to hide behind journalistic privilege and

thereby not provide materials that respond to the subpoena.

But with specific respect to my source, I think I would like

K7TLSINO

1    to, because it would just -- it would be professionally

2    catastrophic to me to break the confidence like that.

3            THE COURT:  All right.  I understand the contour of

4    the journalistic privilege.  I'm expecting Mr. White and Mr.

5    Bloch to write to me if they think what we've discussed to

6    today is insufficient.  But I'm hearing you today to say the

7    privilege you wish to assert as to the identification of the

8    source.  Because you've already told us about the materials,

9    you just simply don't have them.

10           MR. YIANNOPOULOS:  Right.

11           THE COURT:  All right.  I do understand that.

12           And, sir, Mr. White, or Mr. Bloch?

13           MR. BLOCH:  This is Mr. Bloch.  I'm sorry to

14   interrupt.  I don't know if this is a good point to jump in.  I

15   just wanted a point of clarification with respect to Mr.

16   Yiannopoulos' assertion of journalistic privilege.

17           Just as a factual matter, one of the representations

18   that he made to us during the course of our discussions -- this

19   was on February 12th, 2020 -- was that there were, in fact,

20   emails that were responsive to our subpoena that he purported

21   to assert journalistic privilege over.  And so as a factual

22   matter, I wanted to clarify how that squares with the

23   representations earlier about whether or not there is anything

24   in his possession that is responsive to the subpoena.  We were

25   spending, understandably, time on the issue of audio and video

K7TLSINO

1  files, but there was a request for documents as well, which Mr.

2  Yiannopoulos purported to withhold on the basis of a stated

3  journalistic privilege, which we do take issue with as a legal

4  matter.

5          But I just want to clarify:  Are there documents that

6  Mr. Yiannopoulos has in his possession that he is withholding?

7  And we didn't receive any privilege log or anything more

8  specific other than the things that he's saying are privileged.

9

10          THE COURT:  All right.  A couple points to that.  Mr.

11  Bloch, that may be in part because Mr. Yiannopoulos is

12  proceeding under belief that a subpoena was narrowed to refer

13  to -- or just to pertain to the recordings.

14  BY THE COURT:

15  Q.  But, Mr. Yiannopoulos, I think -- I may have muddied the

16  record, which certainly was not my intention.  I asked you a

17  few moments ago about whether the -- if you will, the sin that

18  was committed at the December 18th meeting was that misstating

19  materials or misstating your access to them.

20  A.  Yes.

21  Q.  Do you recall representing to movants' counsel that you

22  also had emails that might be responsive to the requests that

23  they were make something?

24  A.  I don't recall that.  I don't believe that I said that.  I

25  do have an email that I sent on February 12th, which I think

K7TLSINO

1    where this is coming from.  And that email says -- I was under

2    the impression that --

3    Q.  I need to you slow down for the court reporter.

4    A.  This email from February 12th says:

5         "I was under the impression I was in possession of

6    recordings for Richard Spencer and others, but was mistaken.  I

7    have consulted the source of these recordings who reminded me

8    that they were played for me, but I did not retain copies of

9    them.  Other recordings in my possession do not relate to Unite

10   the Right or planning of physical violence by any of the named

11   defendants.  So you are correct that I was proceeding under the

12   assumption that the subpoena had been narrowed.  That's exactly

13   right."

14        And I go on to say:  "Regarding anything else I

15   possess tangentially related to your case, such as emails, I am

16   asserting journalistic privilege."

17        So what I think I was trying to communicate through

18   that is obviously I've got emails that refer to Richard

19   Spencer, but they're not within the narrow scope of the

20   subpoena and not relevant to your case, but in the ordinary

21   course of reporting on the alt-right and on racist -- obviously

22   I have vast numbers of emails of me discussing him, drafting

23   texts about him, or whatever it is, not relevant to the case

24   law's subpoena, but it would be extraordinarily burdensome to

25   produce all of them.  I'd have to take a month off work to do

K7TLSINO

it, because he has obviously been the subject of wide and broad
discussion.

When I was an editor at *Breitbart News*, we were
speaking constantly about our frustration with how he was
covered in the media and how best to draw a bright red line
between us to make clear that there was a legitimate and
respectable right emerging in America that had nothing to do
with these people, which I believe we did both editorially and
publicly.  And those are the emails I was referring to when I
said I'm going to have to keep those to myself, because many of
them involve external sources and other people.

So when I said "tangentially related to a case," I
suppose it was a pointless statement; it's got me in trouble
because I was saying that stuff is not relevant to privilege,
which is kind of pointless because I didn't have to produce
that stuff anyway.  So now that I revisit the wording, I see
that perhaps I could have been more specific or retold that
formulation.

Q.  Well, Mr. Yiannopoulos, which is it?  Are these emails
responsive but burdensome, responsive but privileged, or not
responsive at all?

A.  They're not responsive at all.  And it would have initially
been burdensome for me to produce everything on every device
going back -- what is it now -- half a decade that ever
mentioned Richard Spencer, which was kind of the initial scope

K7TLSINO

1    of the subpoena, which would have been an extraordinary

2    undertaking to try to assemble and catalog and provide every

3    communication I've ever had of any kind about him, or Jason

4    Kessler, or any of the other named defendants.

5          That's what I meant when I was talking of burdensome.

6    I wasn't trying to have it both ways.  I was just explaining

7    that obviously I've got lots of emails that mention his name,

8    but there are no materials that are respondent to the subpoena

9    in respect of planning or execution of Unite the Rights.  And

10   so I suppose it was redundant to assert privilege over them

11   since they weren't responsive anyway.

12         Does that make sense?  Do you see the --

13   Q.  Well, I do.  But I wish to follow up on that.  My concern

14   is the following:

15         If you have so many emails -- and presumably several

16   sources -- that reviewing the emails was burdensome, how can

17   you state to me with the certainty that you need to have when

18   making a representation to a district judge that you do not

19   have responsive emails?

20   A.  Well, because I have never had information about Unite the

21   Rights or I've never reported on it.  I've never been in

22   discussion with sources about it.  I don't -- I mean, I

23   don't -- let me consider that question for a second, if that's

24   all right?

25   Q.  Sure.

K7TLSINO

1   A.  Can I just take a moment to make sure that I'm being

2   completely accurate?

3   Q.  Yes.

4   A.  So let me just start that again.

5         The subpoena that requires -- okay.  I'm able to

6   search my email, which I did, to see if there was anything

7   pertinent for planning Unite the Right, which there wasn't.

8   The burdensome component I'm talking about is comparing that to

9   comply with the -- you know, the four methods necessary, the

10  catalog.  And that's the stuff that takes time.  It's a fairly

11  quick and easy process to search your emails and scan through

12  emails and see if there's anything relevant to that.  I know

13  that there's nothing -- but I would have to, you know, do a lot

14  of digging around there just to kind of prove what I already

15  know.

16        So I did perform a search of my email, which is where

17  all of my professional activity flows through, and saw that

18  there were no conversations relevant to what they were looking

19  for.  But the business of cataloging and extracting and all of

20  the rest of it is the thing that would take a long time.  And

21  that's what I was referring to as "burdensome."

22  Q.  Mr. Yiannopoulos, in responding to me right now, I worry

23  that you may have redefined the scope of the narrowed subpoena

24  in that you were saying to me that you did not have emails

25  regarding the planning of the Unite the Rights events and --

K7TLSINO

1    A.   In the political context.

2    Q.   Mr. Yiannopoulos, I'm going to ask you to wait until I

3    finish my question before responding.

4         What I heard you respond to a moment ago in discussing

5    your emails were emails regarding the planning of the Unite the

6    Right event or the associated violence or violence of that

7    type.  But I actually thought the narrowed subpoena was

8    regarding the Unite the Right events not merely as planning.

9    So for example, you had an attach of emails regarding attendees

10   at the events or what they observed or things of that nature, I

11   would think that that would be responsive.  So why I'm asking

12   this followup question is because you limited it to the

13   planning of the events.  And I thought the scope was broader

14   than that.

15   A.   I see what you mean now.  Just emails that deals with the

16   narrow scope, I was just reading.

17        Okay.  So the narrowed scope of the subpoena does not

18   refer to emails.  It simply says:  "We're requesting all audio

19   and video recordings that you have in your possession related

20   to this event" -- and they go on to say -- "any communications

21   between you and the defendants that relate to Unite the Right."

22        So the emails that we're talking about now do, in

23   fact, fall outside the scope of the ^ merely narrowed subpoena.

24   Q.   All right.  And so when you were spoke of --

25   A.   I mean, that's kind of a technical point, I guess.  I'm not

K7TLSINO

1    trying to play, as we would say, "silly bags" (phonetic) in

2    England.  I'm not trying to be clever, or difficult, or

3    slippery with you.  But it is, as a matter of records, in fact

4    the case that they were asking only for audio and visual

5    recordings, and then any communications I had personally --

6    directly with the defendants relating to Unite the Rights.  And

7    that is the scope of the narrowed subpoena.  So a discussion of

8    emails that broadly refer to the event would not fall within

9    that scope.

10   Q.  And so, Mr. Yiannopoulos, when you spoke earlier about

11   emails regarding planning the event, you were misspeaking.  Now

12   that you understand, and now that you've been reminded of this

13   second category of information that was sought, which was

14   communications between you and any of the defendants in this

15   case that relate to Unite the Right, are there any responsive

16   emails that you possess now or once did possess that are

17   responsive to that category?

18   A.  Well, it says here --

19         Could you repeat the question?  I just don't want to

20   misspeak again.

21   Q.  All right.  Yes, I will.  We've already talked about the

22   recordings.  I'm putting that to the side.

23   A.  Yes.

24   Q.  The other category of information that was sought in the

25   narrowed subpoena --

K7TLSINO

1   A.   Yes.

2   Q.   -- were communications between you?

3   A.   Yes.

4   Q.   Sir, the second category of information seeks

5   communications between you and any of the individual defendants

6   in the Sines case that relates to Unite the Rights, I am

7   asking:

8           Do you now possess, or have you ever possessed,

9   communications between you and any of the individual defendants

10  that relates to the subject of Unite the Right?

11          Please answer that question.

12  A.   I can.  I need to check on one bit of information, which I

13  can do very quickly, which is the list of defendants.

14          One thing I can tell you is that I have been in touch

15  -- after everything we've been discussing that's happening, I

16  have been in touch with Jason Kessler.  I was attempting to get

17  out of him damaging materials about Richard Spencer as part of

18  my ongoing animosity with that personality.  So I will have

19  mentioned that event in the course of those conversations.  I'm

20  happy to provide that.  That would have happened very recently

21  within the last month or something.

22          And I just need to check here the list of defendants

23  to see if -- let me just check now.  If you can give me just a

24  minute, I believe that there are -- I'm sorry.

25          THE COURT:  Mr. White, did you provide a list of

K7TLSINO

1   defendants?

2          MR. YIANNOPOULOS:  Can you just read them to me?  I'm

3   sorry.  I just don't have a copy of the complaint in front of

4   me.

5          MR. WHITE:  Your Honor, yes, I could read the list of

6   defendants if that would be helpful.

7          THE COURT:  How long a list?

8          MR. WHITE:  It's a lengthy list.  I believe it's 18.

9          THE COURT:  Eighteen individuals?

10          MR. WHITE:  And organizations.

11          THE COURT:  Well, organizations as well.

12          All right.  Mr. White, begin.

13          MR. WHITE:  Jason, Kessler.  Richard Spencer.

14   Christopher Cantwell.  James Alex Fields, Jr.  Vanguard

15   America.  Andrew Anglin.  Moonbay Holdings, LLC (phonetic).

16   Robert Almador Ray.

17          THE COURT:  Mr. Yiannopoulos, are you getting all of

18   these names?

19          MR. YIANNOPOULOS:  Yeah.  I did find a copy of the

20   complaint online, so I was listening and reading just to make

21   sure that I have the same thing.

22          THE COURT:  Thank you.

23          Mr. White, you may continue.

24          MR. WHITE:  Nathan DiAmigo (phonetic).  Elliott Kline,

25   also known as Eli Moseley.  Identity Evropa.  Matthew Heimbach.

K7TLSINO

1   Matthew Parrott, also known as David Matthew Parrott.

2   Traditionalist Worker Party.  Michael Hill.  Michael Tubbs.

3   League of the South.  Jeff Shepp.  Natural Socialist Movement.

4   Nationalist Front.  Augustus Sol Invictus.  Fraternal Order of

5   the Alt-Knights.  Loyal White Knights of the Ku Klux Klan.

6   East Coast Knights of the Ku Klux Klan, also known as the

7   Eastcoast Knights of the True Invisible Empire.  Michael Enoch

8   Binovich (phonetic) who I will represent to the Court was

9   dismissed from the case at the Rule 12(b)6 stage, but was on

10  the list of defendants.

11          THE COURT:  All right.

12          MR. YIANNOPOULOS:  Thank you.  That was helpful.

13          I can tell you that it's almost certain that I

14  mentioned in the course of attempting to get materials from

15  Jason Kessler about Richard Spencer -- these people are all now

16  in this kind of ex-wive's club where they're all, you know,

17  trying desperately to hurl each other under the bus with

18  various agencies.  So I saw an opportunity in that squabbling

19  to get what I wanted journalistically, for my own reasons,

20  about Richard Spencer.  I thought this would be a good time

21  that the other people would be willing to produce that.

22          So subsequent to everything we've been talking about,

23  I did have discussions with Jason Kessler, which is all in

24  text, which was not off the record.  So I don't mind telling

25  you that it happened.  It's possible it was phrased Unite the

K7TLSINO

1   Right Crux -- I can check for you right now.  And I'm looking

2   through the rest of the list now, and I've never been in

3   contact with pretty much any of these people, with the

4   exception of the first two in the course of reporting, and then

5   a couple of DMs with Christopher Cantwell, and I quickly

6   blocked him out of my inbox.

7            As far as the rest goes -- okay.  Well, the subjects

8   of identity just in the interest of being completely strict,

9   and thorough, and accurate, the person who runs that has kind

10  of rebranded Evropa as -- the initials are AIM.  I don't

11  remember what it stands for.

12  BY THE COURT:

13  Q.  Mr. Yiannopoulos?

14  A.  Yes.

15  Q.  Have you had communications with the person who runs AIM?

16  A.  Yes, I have.  I don't believe that there is anything

17  respondent in those communications.  Again, I can check very

18  quickly and decisively now for you.  So if you give me perhaps

19  two or three minutes, I can tell you decisively.

20           MR. WHITE:  Your Honor, may I have a moment?

21           THE COURT:  No.  Let me finish my questions with Mr.

22  Yiannopoulos and I'll give you a moment.

23  BY THE COURT:

24  Q.  Mr. Yiannopoulos, are you able to check your communications

25  with Mr. Cantwell?

K7TLSINO

1   A.   I certainly can retrieve that conversation just to make

2   absolutely sure that there's nothing that's relevant to this

3   case.  And I'll do so right now.  They're all on the same

4   platform.  So let me do that for you right now.

5              (Pause)

6              THE COURT:  Mr. White, while he's doing that, I will

7   listen to you.

8              MR. WHITE:  Thank you, your Honor.

9              I just want to comment that it's quite perplexing --

10  to me, at least -- that it seems like Mr. Yiannopoulos is

11  engaging in this exercise in open court for the first time.  Of

12  course, the subpoena was issued to him in November of 2019.

13  The subpoena was amended to cover the documents he's looking

14  for now in open court on his computer shortly thereafter.

15             I think it just goes to the process Mr. Yiannopoulos

16  has engaged in, whether or not he was ever purposely lying.

17  But as to whether he diligently reviewed the materials he does

18  have per responsive material -- and I think that lends further

19  credence to dissolving some sort of outside process to

20  undertake the path that Mr. Yiannopoulos seems to diligently be

21  pursuing right now.

22             MR. YIANNOPOULOS:  Well, I can respond to that, which

23  is I did indeed review all of this stuff.  But you're talking

24  about -- I mean, in terms of the original scope and the

25  original subpoena, I was just like, Oh, my goodness, what am I

K7TLSINO

1  going to do about this?  I have to take months off of work.  I

2  did read through all of this stuff, I just don't remember the

3  tens of thousands of messages.

4        Okay.  So the only thing that I can confirm to you --

5  yeah.  So I have nothing from anyone except Jason Kessler,

6  which I mentioned to you a moment ago.  And I'm happy to

7  provide the Jason Kessler conversation immediately.  But I will

8  just point out to you that that conversation occurred on June

9  13th.

10  BY THE COURT:

11  Q.  That's all right.  We'll take it.  You can produce that.

12        You're saying Mr. Kessler's discussions were not

13  responsive?

14  A.  No, not at all.  And the very first time I ever had direct

15  contact with Jason Kessler was June 13th, a month and a half

16  ago.

17  Q.  All right.  I'm sure Mr. White and Mr. Bloch would welcome

18  those communications.

19  A.  Yes.  In fact, that wasn't the very, very first.  I think I

20  texted him, but it would have been about a week before that.  I

21  I'm very happy to provide those communications.

22  Q.  All right.  Mr. Yiannopoulos, let me pause you right there.

23  I'd actually would prefer that we complete this process.  And

24  you'll know when we end this that you can make sure that you've

25  gotten all of the responsive texts from Mr. Kessler.  Because,

K7TLSINO

to Mr. White's point, this is an analysis that could have been done contemporaneously with receiving the narrowed subpoena.

         I want to make sure, Mr. Yiannopoulos, that you have reviewed the list of defendants and it is only those three defendants with whom you might have had communications that were responsive, and then having reviewed all of those communications, there's only one defendant with whom you have responsive communications?

         Is that what you're telling me under oath, sir?
A.  To the best of my knowledge, that's correct.  I have exchanged text messages in the course of my reporting with Richard Spencer, but nothing that relates to the subpoena.  And I would just also like to point out that the messages we're currently talking about with Jason Kessler, it's not like I'm just discovering it because I didn't do the homework before. This occurred on June 13th, very recently, and in the course of much more recent reporting.  It's not the case that I didn't do the work properly or didn't respond to the subpoena fully. This just happened like a month ago.
Q.  I understand, sir.  I understand your position on that. What I'm saying to you:  It is not often the case for me -- and I suspect the same can be said for Mr. White and Mr. Bloch -- that folks are doing their review on the fly in the middle of a motion to compel hearing.  So I can wait for your final answer as long as I know that it is your final and most accurate

K7TLSINO

1    answer.

2    A.   I do understand that.  I think the reason that it's

3    happened now is that these conversations were so -- since we've

4    been discussing it, you know, there's a conversation that

5    happens five weeks ago that is responsive that didn't exist

6    before and therefore wouldn't have been part of any, you know,

7    such process or research or whatever.  So I think that's the

8    reason that it's happening now.

9              And I do understand the seriousness, given full and

10   complete and accurate attempts.  As far as I can tell, the only

11   additional thing that I may need to provide is one conversation

12   recently.  And, of course, it's not surprising because my --

13   this is all being kicked off by a subpoena and by the Spencer

14   videos.  So the only thing that mentions -- as far as I can

15   tell, the only thing that mentions Charlottesville, or Unite

16   the Right, or anything like that is one conversation with Jason

17   Kessler.  And I'll make sure that's everything.

18   Q.   All right.  You will.  Thank you.

19             THE COURT:  All right.

20             MR. WHITE:  Your Honor, if I may just respond to one

21   point, Mr. Yiannopoulos made -- and we've even included this as

22   an Exhibit to a letter that we filed with the Court on July

23   20th, Mr. Yiannopoulos represented to myself and Mr. Bloch on

24   July 14th, which is more than a month after supposed

25   conversation with Jason Kessler, responsive to our subpoena,

K7TLSINO

1    where Mr. Yiannopoulos said, quote:  "Alas, I possess none of

2    the documents or videos you are looking for."

3              So Mr. Yiannopoulos has made representations after

4    that conversation had taken place that he's now acknowledging

5    are not truthful.

6              MR. YIANNOPOULOS:  Hang on.  Hang on.

7              So the conversation with Kessler was June 13th.  When

8    are you suggesting that I --

9              MR. WHITE:  I received an email from you on July 14th

10   that was subsequently posted to your social media channel that

11   that says:  "I possess none of the documents or videos that you

12   are looking for."

13             MR. YIANNOPOULOS:  Right.  I sent you a -- let's see.

14   Sorry.  I just want to be clear what we're talking about.

15             Okay.  I guess based on timing, I suppose it didn't

16   occur to me I had a more recent conversation.  And I suppose I

17   was speaking on the previous search I conducted and not on the

18   stuff that was happening in the interim, perhaps.  I can tell

19   you that there's nothing you don't have already.  The extent of

20   my conversations with Jason Kessler consist of him sending me

21   material that's already been publicly filed in various filings

22   for this lawsuit and telling me stuff I already know and

23   linking me to public information.

24             So, anyway, you'll get all that.  But I think perhaps

25   it didn't impress me because it's so recent that this could be

K7TLSINO

1   relevant to the event in 2017, you know -- in direct

2   communications.  So therefore it is within the scope.  And I'll

3   go back and make sure.

4           THE COURT:  All right.  Mr. White, thank you.  Your

5   point is well taken.  And I also accept Mr. Yiannopoulos'

6   explanation.

7           MR. YIANNOPOULOS:  I do understand that assertion, by

8   the way.  I do understand what he is saying, and he is

9   technically correct.

10          THE COURT:  Well, more than technically, sir.  But,

11  yes, he is correct.

12          Mr. Yiannopoulos, earlier in this conversation that is

13  now finishing its second hour, you indicated to me that if I

14  wanted to -- or you could prove to me or substantiate the

15  claims you were making about the timing of your receipt of

16  certain materials.

17          How do you propose to do that, sir?

18          MR. YIANNOPOULOS:  I can -- if there's a mechanism by

19  which something can occur under seal where I can show an

20  officer of the Court, perhaps, the communications I had with my

21  source, if it's under seal and doesn't go any further and never

22  appears in documents, that's the furtherest I could go in

23  endangering my relationship with my source.  I certainly

24  couldn't -- I couldn't run the risk of it appearing, you know,

25  anywhere publicly or in the hands of anybody other than a Court

K7TLSINO

1    officer.  But I would be perfectly happy to show on my devices

2    and provide any other sort of information that's necessary.  I

3    could show the conversation.  I can show the precise moment in

4    that conversation on my devices when the video was delivered to

5    me.

6            So if there's a mechanism through which I could

7    perhaps appear and provide that to the Court's satisfaction so

8    that you know that it's accurate and true, without disclosing

9    my source publicly, I would be comfortable doing that.

10           THE COURT:  Mr. White, do you trust me to conduct an

11   in-camera investigation of Mr. Yiannopoulos' materials?  I'm

12   being glib here by using the term "trust."  His point is, he'll

13   show me, he won't show you.

14           You okay with that?  I am.

15           MR. WHITE:  We're okay with it.  I mean, there are

16   other avenues to ensure that we maintain the confidentiality of

17   the documents so that your Honor doesn't spend precious time,

18   but we're happy to do that under a very strong protective order

19   that we could negotiate with Mr. Yiannopoulos that only allows

20   us to engage some sort of outside vendor to review the

21   materials.

22           And the other point I would raise, your Honor, is it

23   seems to me that Mr. Yiannopoulos is only referring to proof of

24   his receipt of the two videos.  So it sounds to me like he

25   might be only offering up proof that he received certain videos

K7TLSINO

1    and then released them shortly thereafter.  It's our position

2    that a more thorough review is needed to ensure his

3    representations about what he possesses are also accurate.

4            We've learned today in court that for months he's now

5    just been incorrect about what he possesses.  And we just have

6    very little faith that Mr. Yiannopoulos has engaged in any sort

7    of thorough review of his devices such that we're confident

8    that he doesn't have information relevant to our clients.

9    While we're more than happy to have the Court undertake this

10   review, we think it should be broader than the one it sounds

11   like Mr. Yiannopoulos is proposing.

12           THE COURT:  Okay.  Thank you.

13           Mr. White, other than that last point about testing

14   your substantiation for what Mr. Yiannopoulos is saying, is

15   there anything else I should be addressing with you in this

16   proceeding?

17           MR. WHITE:  There is, your Honor.  We've laid this

18   out, although the scope has shifted with Mr. Yiannopoulos'

19   representations.  But we are certainly of the position that Mr.

20   Yiannopoulos is not entitled to invoke any sort of reporter's

21   or journalist's privilege.  And we've identified the reasons

22   for that in our paper.  They are numerous.  Apart from waiver,

23   Mr. Yiannopoulos hasn't identified any purported privilege

24   until months after receiving the subpoena.  Apart from failing

25   to properly attribute the documents he's claiming are

K7TLSINO

1    protected, Mr. Yiannopoulos just simply can't satisfy the

2    strictest to be protected by that privilege for the numerous

3    reasons we've laid out in our papers.  So we don't think that

4    Mr. Yiannopoulos is entitled to withhold the name of his

5    source, which he's attempted to do here today.  And we think

6    it's perfectly within the Court's power and discretion to issue

7    an order compelling him to provide that information.  And,

8    again, that could be under the terms of a protective order to

9    the extent Mr. Yiannopoulos wants protection of the ultimate

10   source.

11          It's just clear to us from this hearing today that

12   this source, if not Mr. Yiannopoulos -- if this source is in

13   his possession, as Mr. Yiannopoulos confirms, and is material

14   that would be front and center at trial in October, these are

15   materials of individuals, as we understand it, of the violence

16   that ultimately took place in Charlottesville, in violation of

17   the KKK Act.  And if what Mr. Yiannopoulos is saying is true,

18   we think every effort should be undertaken on behalf of our

19   client to ascertain that information.

20          And we're certainly not entitled to -- not keen to

21   defer to Mr. Yiannopoulos' invocation of a broad public policy

22   privilege we think he's not entitled to take advantage of.  So

23   we would appreciate the opportunity to allow the parties to

24   further clarify the issue for your Honor.  It sounds like we're

25   focusing more on the source of the material rather than on the

K7TLSINO

1    content.  It sounds like Mr. Yiannopoulos is invoking the

2    privilege as to the content, we're happy to provide further

3    argument as to why he's not entitled to the privilege to

4    protect the identity of the source.  And we think the arguments

5    will be very similar.  And we're happy to provide the Court

6    with color as to why we think there's just no basis for him to

7    assert the privilege in this context.

8          THE COURT:  I think that's fine.  And I think there

9    should be a schedule for such manner and Mr. Yiannopoulos

10   should be heard on the issue as well, because this is my first

11   opportunity to hear from him on these issues.  And I think, and

12   I would hope that as long as we've been at this this morning

13   and this afternoon, he appreciates the seriousness and the

14   gravity of the issues that are at play.

15         So how long do you want?  Do you want two weeks to

16   tell me why you think the source should not be protected?

17         MR. WHITE:  Yes, your Honor, although we would -- I

18   understand we're dealing with a somewhat unique situation.  I

19   mean, ordinarily it would be the proffering of the privilege

20   that would justify and meet their burden to show why they don't

21   have to produce the information.  So we would normally propose

22   that Mr. Yiannopoulos kind of go first, so to speak.  But we're

23   happy to, given the unique kind of context we find ourselves

24   in.  So two weeks is more than sufficient, we think.  If we can

25   have comfort at the extent of Mr. Yiannopoulos' basis for the

K7TLSINO

1    privilege has been stated on the record here today.  One of the

2    issues we had in addressing this argument in our opening papers

3    is we just didn't know what the basis of the privilege was.

4    So, one, we are comfortable with the idea that this source of

5    material that Mr. Yiannopoulos claims he possessed at the

6    December 18th meeting, we're happy to brief the issue, but that

7    source should be revealed.

8         THE COURT:  All right.  Mr. Yiannopoulos, to that

9    point, have you been following my conversations with Mr. White

10   just now?

11        MR. YIANNOPOULOS:  I have.

12        I'd like to point out that the various materials I may

13   have alluded to or referred to, I don't think absolutely

14   everything was just that one source.  So I think what we're

15   really talking about is a couple of sources, perhaps.  I just

16   don't see how I can be compelled to reveal that without it, you

17   know -- I'll have to look at what their argument is.  But it

18   seems -- what I will do -- I just want to reiterate that I am

19   sympathetic to the aims of this lawsuit, and to that end, I

20   will get in touch with this person and I'll ask if it would

21   ruin their life for me to just give you the name, if that might

22   speed all of this a little bit.  Because I have found in the

23   past that it's been quite ineffective and a much shorter way to

24   deal with these things.  But I have to get that permission.  I

25   have to get that okay.

K7TLSINO

         THE COURT:  All right.  But you've just begun this

portion of the conversation by saying there may be more than

one source.

         To the extent that there are two or three, are you

going to make that same request of all three of them?

         MR. YIANNOPOULOS:  I'm very happy to do so.  I'll have

to look and think and categorize what I've represented on

December 18th, I think it was, and if it ends up being two

people, I'll ask both; if it's three, I'll ask them; if it is

in fact one, then I will make strong representations to that

person.

         THE COURT:  All right.  Mr. Yiannopoulos, the broader

point that Mr. White is making is, to a degree, the conference

today has involved a little bit of a moving target, because

there was a certain statement made by you that you had nothing

responsive, and then it turns out that you did have something

responsive, and then it was the question of whether it was the

content or the source that you had or that you were protecting.

         So what Mr. White was just saying to me is he's

prepared to tell me why he believes -- or he will be prepared

to tell me why he believes that you cannot assert a

journalist's privilege, but he doesn't want to begin the

process of telling me why if you're going to change the playing

field.  So you've now told us today your bases for invoking the

journalist's privilege.  And it is with respect to, as I

K7TLSINO

1      understand it, an identity of the source.  It's not the

2      materials, because the materials are not yours anyway.

3              Correct?

4              MR. YIANNOPOULOS:  Yes.  That sounds right to me.

5      Yes.

6              THE COURT:  I don't want "that sounds right."  It

7      needs to be correct.

8              MR. YIANNOPOULOS:  Okay.  All right.  I believe that

9      -- I think I've been pretty consistent from emails, so I don't

10     know if moving target is quite fair.  But I accept your

11     characterization.  And to put it plainly, the only thing I'm

12     reluctant about handing over, the only thing that would cause

13     catastrophic damage to me professionally and what seems to be

14     in quite flagrant violation of well-established federal and

15     state law and the rest of it, and, you know, well-understood

16     principles of my profession is the identity of the person who

17     provided me with certain materials.  Everything else, I'm happy

18     to provide because I want to help them.

19             THE COURT:  Thank you.

20             Mr. White, that's the clarification you've gotten?

21             MR. WHITE:  Thank you, your Honor.

22             THE COURT:  All right.  So Mr. White, I'm going to

23     hear from you in two weeks telling me why I should not respect

24     or allow the assertion of the privilege.

25             Mr. Yiannopoulos, I am going to need to hear from you

K7TLSINO

1   in some way other than video conferences of this type.

2                Would you be able, within two weeks of receipt of Mr.

3   White's materials, to explain to me why you believe the

4   privilege should apply?

5                MR. YIANNOPOULOS:  Absolutely your Honor.

6                I don't have the resources that the other side do.  So

7   I'll just be writing for myself as a private citizen.  But I

8   will do the best I can to lay the information out clearly and

9   concisely and in a well-organized and helpful fashion.  And

10  I'll mimic the layout and format as best I can of the

11  submissions as I understand it.  And I'll certainly do that to

12  respond to their response.  Absolutely.

13               THE COURT:  All right.  And, sir, because you are not

14  registered for the electronic filing that we have in this

15  courthouse, in normal circumstances, you would be required to

16  go through our pro-se office in this court.  But instead, for

17  this limited purpose, and given the time constraints that we

18  have, you will be permitted to email your response to my

19  chambers account, which is on the website of this court.

20               MR. YIANNOPOULOS:  Thank you.  And I also have the

21  specific email address to one of your clerks, so I'll send it

22  to both and cc both counsel as well.

23               THE COURT:  Of course.  All right.

24               On the issue of substantiation, I will think about

25  what I want to do and how I want to receive that material, and

K7TLSINO

1    you'll hear from me in due course.

2             Mr. White, I'm assuming that you're going to get a

3    transcript of this conference?  Is my assumption incorrect?

4             MR. WHITE:  Your Honor assumption is correct,

5    your Honor.

6             THE COURT:  All right.  Mr. White, we have tormented

7    this court reporter for two hours.  May we let her go?

8             MR. WHITE:  That's fine.

9             MR. BLOCH:  One point.  Just a point of clarification.

10            If Mr. Yiannopoulos is going to check with his sources

11   to see if they can be revealed, I would just ask that that be

12   done expeditiously and not await the four weeks of the briefing

13   schedule in part because, as your Honor's aware, we do have a

14   trial date --

15            THE COURT:  Of course.

16            MR. BLOCH:  -- coming up on October 26th.  So to the

17   extent there's followup needed, we'll need time for that.

18            THE COURT:  Mr. Yiannopoulos, may I order you -- and

19   in fact, I am ordering you, within the next week to reach out

20   to your source or sources and see if they will consent to the

21   disclosure of their identities??

22            MR. YIANNOPOULOS:  I will do so without delay.

23            THE COURT:  I thank you.

24            Mr. Bloch, I appreciate you calling that to our

25   attention because you would be the one having to do all of this

K7TLSINO

1    work.  We want to find out.  Thank you.

2              MR. BLOCH:  Yes, your Honor.

3              THE COURT:  All right.  With that, and with my thanks

4    to each of you, and with my wishes for each of you for safety

5    and good health during this pandemic, we are adjourned.

6              Thank you.  You may leave the call.

7              MR. YIANNOPOULOS:  Thank you, your Honor.

8              MR. BLOCH:  Thank you, your Honor.

9                              ******

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25