Sunday, August 30, 2020

**By email**

The Honorable Katherine Polk Failla
United States District Court for the Southern District of New York
40 Foley Square, Room 2103
New York, NY 10007
Failla_NYSDChambers@nysd.uscourts.gov

Dear Judge Failla:

**Re: Sines et al. v. Yiannopoulos**

I write in reference to Plaintiff's motion to compel me to reveal a source whom I believe possesses or at one time possessed recordings of Richard Spencer and unnamed other individuals discussing the planning of a "Unite the Right" rally in Charlottesville, VA.

I also write attaching further responsive materials to Plaintiff's earlier subpoena.

**1. Efforts to contact the source and to obtain materials Plaintiffs desire**

The developments since our discovery conference, as laid out in Plaintiff's letter dated August 12, 2020, I believe to be substantially correct. I have, as ordered by the Court, made repeated attempts to contact my source, convince my source to disclose their identity to the Court, and acquire copies of the materials in question. I have not been successful in these aims.

Having originally agreed to share their name with the Court under seal, my source now insists that I do not reveal their identity to anyone. I cannot prove they were the person who played me the audio, and they now insist that they were not—and, further, that they do not possess and never did possess these materials.

To the best of my recollection they were the person who played me the recordings. There was a lot of alcohol consumed on the night in question. It is unlikely but possible that I am mistaken. I cannot provide substantiation for my recollection, nor can I provide the audio files, which have never been in my possession.

Several years have passed since I was played this audio at a late-night afterparty, so I cannot reliably quote from it or provide any exact wording that may or may not appear on the tapes, but to the best of my recollection it featured Richard Spencer and others discussing the planning of one of the Unite the Right rallies, and the participants on the

recording expressed a mixture of anticipation and pleasure at the prospect of physical engagement with protesters and Antifa domestic terrorists.

My source now claims these materials were never played to me and that they do not possess them, and also say that they would give the same answer in response to a subpoena, which suggests that they have deleted and no longer have access to the materials in question. (Several of the people on the periphery of the Unite the Right events have expressed to me and to others that they since deleted materials relating to the event, after a protester was killed and the rumors of prosecutions and lawsuits began to circulate.)

### 2. A Court order would destroy my life and imperil my family

I am a *New York Times*-bestselling author and award-winning investigative reporter who commands the trust of millions of readers. Although I have written some very damaging stories about powerful and wealthy people, and although I have engaged in highly aggressive reporting styles over the years, I have never been sued for two reasons: One, I get my facts right. Two, I never break confidences. These are the two professional oaths I live by, without which my work would be impossible.

Given my sympathy for the aims of this lawsuit, I have vacillated on this issue several times, orally and in writing, with Plaintiff's counsel. I have wrestled with it. I have done what I can to persuade the source to reveal themselves. But I have come to the conclusion that I cannot violate the sanctity of the agreement I made with this source.

Aside from the ethical considerations of such a betrayal of trust, even though my source's story has changed multiple times since we began working together—this is not unusual—it would cause such extraordinary and disproportionate harm to my professional reputation that it would, in all likelihood, permanently destroy my ability to make a living for the rest of my professional life.

My source insists that they have no responsive materials. Therefore the Court must decide whether to obliterate my career and even risk my freedom for no benefit whatever to Plaintiff's case. Should the Court choose to do so, not only I but also my entirely African-American family, who are wholly dependent on me financially. My husband is not in employment and we have two dependents in the house, one of whom is a minor aged 17, the other of whom is 18 years old.

If I am ordered by the Court to reveal my source, I am faced with an impossible choice. Either I refuse, and face the prospect of imprisonment, which will destroy my life. Or I comply and ruin my career. Both options have the very real prospect of throwing my Black family out onto the streets. Your honor, this is not a fair, reasonable or proportionate thing to do to my family, when the source has made it clear they will not provide any materials should they receive a subpoena.

It is the very real terror of these consequences and my helplessness in working out how to avoid them that is responsible for my lateness in submitting this response, for which I once again apologize to the Court and for which I beg forgiveness. I am utterly at your mercy in this matter.

### 3. I assert a right to journalistic privilege that I have never knowingly waived

As the Court knows, this process has been extraordinarily burdensome on me. I am a private citizen with none of the vast resources of Plaintiff's Anti-Defamation League-backed lawyers. Such is my financial hardship at present, thanks to COVID-19, that I have been compelled to ask for extensions of rent due dates and the waiving of late fees on said rent payments, and, like millions of others, I am behind on payments to a wide variety of other utility bills and essential domestic services.

I feel compelled to restate that I cannot afford a lawyer to represent me in this case and am therefore at a colossal and terrifying disadvantage when set against the bottomless pit of money to which Plaintiffs have access. As a freelance reporter today, I do not have the backing of a major news organizations to whom I can appeal for legal support. I am left in the awful position therefore of appealing to the Court for understanding and fairness. Put simply I did not know I was faced with a ticking clock the second I received the subpoena, and that I had to assert various privileges within that timeframe or lose my right to them.

During the timeframe the Plaintiffs are concerned with, I was a senior editor at a major news website, Breitbart.com. I am aware that Breitbart divides opinion, to put it mildly. But there is no realistic argument that Breitbart was and remains a significant, professional and influential journalistic outlet. I have published tens if not hundreds of thousands of words of closely reported news stories for its website, in addition to giving lectures on college campuses that were themselves highly journalistic in nature *and* which themselves appeared in full in writing in a proper journalistic context. Any suggestion that web-based news services are somehow not prestigious or old enough to be regarded as legitimate journalistic operations is laughable, based on snobbery and not reality.

Furthermore, I was writing and speaking extensively about the dangers of white nationalism and white supremacy at the time in question, speaking on the subject on a near-daily basis. Any conversations I may have had with white nationalists or recordings I may have been played about events they were planning are clearly directly relevant to my daily work as a senior salaried journalist at a major news organization.

There is therefore no plausible argument that my activities were not performed in furtherance of journalistic activities, and Plaintiffs have no evidence or basis to assert that they were not. Plaintiffs further cannot show that I did not learn the identity of the source "in the course of gathering or obtaining news"; I assert that I did. If Plaintiffs are correct that New York's shield law is not applicable in this case, I nonetheless insist and can clearly

show that I was engaged in the precisely the sort of journalistic activity it is designed to protect.

As for the federal journalists' privilege, there is simply no justification for selectively ignoring the fact that when I acquired the identity of the source and listened to materials and became aware of various facts in the course of reporting, I was at the same time a senior salaried professional reporter at a well-established news organization, and that I was present at the said "afterparty" for journalistic purposes. As is the case throughout Plaintiff's submission, these are assertions made on the basis of speculation and hope and without evidence.

Plaintiffs suggest that I was collecting information in furtherance of a private feud, rather than the legitimate dissemination of information to the public, but this has only become true *since* the events in question, and was not true at the time, since the feud in question did not exist at the time we are discussing. My collection of said information was indeed for the purposes of information-gathering and reporting, which I did on dozens of occasions in multiple formats and on multiple platforms.

Plaintiffs assert that the material they seek to gain from the source in question is not obtainable from any other place. This may or may not be true, but they have no evidence to support this claim. I do not myself know how many people may have heard or possessed these recordings, or made covert copies. This is a failure of their own thoroughness in issuing subpoenas.

I should not be punished for a failure of their information-gathering and subpoena process, especially given the resources at their disposal, and especially since I have informed them that I was played the recordings at an "afterparty" at which many other people, not known to me but surely known to Plaintiff after all the resources they have thrown at this case, were present. It stretches credulity to believe that I was the only person these recordings were ever played to and that I was played the only copy of them. Plaintiffs claim they cannot obtain these recordings from any other source. They need to demonstrate that they have attempted to do so.

As to the question of how material these recordings might or might not be to Plaintiff's case, I have expressed the lay view that it would be very helpful indeed for Plaintiff to possess them. But I am not in a position to say with any authority how material to their case the recordings might be, if they still exist anywhere. Regardless, this is not a basis on which to ruin a man's life and Plaintiff's arguments that I do not qualify for journalistic privilege are rooted in conjecture and snobbery, and quote exclusively from my own sincere attempts to help them in this process, and not in any established facts or evidence.

**4. Further materials responsive to Plaintiff's subpoena**

Subsequent to the subpoena being issued to me, I have been sent or discovered new materials responsive to the newly narrowed scope. Therefore please find attached to this motion ("Exhibit A," "Exhibit B," "Exhibit C") the following items responsive to the restricted scope of the Plaintiff's subpoena.

1. **Exhibit A**: Text messages between me and Richard Spencer
2. **Exhibit B**: Telegram direct messages between me and Jason Kessler
3. **Exhibit C**: A video of Richard Spencer running across a grass field

This submission represents all the remaining materials in my possession responsive to the subpoena as narrowed in Plaintiff's letter. I believe there may have been previous SMS messages to Richard Spencer that are no longer on my devices and which I have not been able to retrieve from older devices, but to the best of my recollection these predate the events Plaintiff is interested in by some time and do not relate to the planning or execution of any events.

The Telegram messages between me and Jason Kessler occurred after the subpoena was issued. I submit this today in order to bring my compliance with the subpoena fully up to date.

I do not know when or where the video of Richard Spencer running across a grass field was taken. It was described to me as "running from the potty back to the conference." It does not appear to be pertinent to Plaintiff's case, but in the interest of completeness and full compliance with the newly reduced scope of the subpoena I am including it today.

Respectfully submitted

*/s/ Milo Yiannopoulos*

(Attachments)