**KAPLAN HECKER & FINK LLP**

350 Fifth Avenue
Suite 7110
New York, NY 10118
(212) 763-0883
www.kaplanhecker.com

Direct Dial: **(212) 763-0883**
Direct Email: bwhite@kaplanhecker.com

September 9, 2020

**By ECF & E-mail**

The Honorable Katherine Polk Failla
United States District Court
for the Southern District of New York
40 Foley Square, Room 2103
New York, NY 10007
Failla_NYSDChambers@nysd.uscourts.gov

  Re: *Sines et al. v. Yiannopoulos*, No. 20-mc-00241 (KPF)

Dear Judge Failla:

  We write on behalf of the Movants in response to the letter that Respondent Milo Yiannopoulos e-mailed to the Court on September 1, 2020.[1] In sum, nothing Mr. Yiannopoulos contends alters the fact that he may not invoke a journalist's privilege to protect the identity of the individual that showed him content relevant to the underlying action. Specifically, through his recent letter, Mr. Yiannopoulos: (i) missed his submission deadline and should be held to have (again) waived his privilege argument; (ii) offered no justification for his earlier failure to object to the subpoena; (iii) made representations seemingly meant to avoid his obligations here that are inconsistent with his sworn testimony; and (iv) offers nothing to show that he is entitled to invoke a journalist's privilege.

**I. Mr. Yiannopoulos Waived His Arguments (Again) by Missing His Filing Deadline**

  At the July 29, 2020 hearing, Your Honor set a briefing schedule in relation to Mr. Yiannopoulos' belated invocation of the journalist's privilege to protect the identity of his supposed source. The Movants' submission was due August 12, 2020 and Mr. Yiannopoulos' response was due August 26, 2020. Mr. Yiannopoulos unambiguously acknowledged his due date:

    Q. All right. So Mr. White, I'm going to hear from you in two
      weeks telling me why I should not respect or allow the
      assertion of the privilege. Mr. Yiannopoulos, I am going to
      need to hear from you in some way other than video
      conference of this type. Would you be able, within two

---

[1] Mr. Yiannopoulos dated his letter August 30, 2020, *see* Ltr. at 1, but he did not provide it to the Court until two days later.

>                weeks of receipt of Mr. White's materials, to explain to me
>                why you believe the privilege should apply?
>
> A.   **Absolutely your Honor.** I don't have the resources that the
>      other side do. So I'll just be writing for myself as a private
>      citizen. But I will do the best I can to lay the information
>      our clearly and concisely and in a well-organized and helpful
>      fashion. And I'll mimic the layout and format as best I can
>      of the submissions as I understand it. **And I'll certainly do
>      that to respond to their response. Absolutely.**

Tr. 73-74 (emphasis added). Further, the Court permitted Mr. Yiannopoulos to submit his response by e-mail "given the time constraints that we have." *Id.*[2] Mr. Yiannopoulos again confirmed: "Thank you. And I also have the specific e-mail address to one of your clerks, so I'll send it to both and cc both counsel as well." *Id*.

Nevertheless, Mr. Yiannopoulos submitted nothing on August 26, 2020. And when the Court e-mailed him on August 27, 2020 notifying him of his missed deadline, Mr. Yiannopoulos responded that morning as follows: "I anticipate filing my opposition later today or tomorrow at the very latest. I cannot afford a lawyer in this matter and have been doing the very best I can to assemble everything myself outside of work hours. I apologize for the slight delay." Despite representing that he would submit his response by August 28, 2020 "at the very latest," Mr. Yiannopoulos submitted nothing by that date nor did he offer any explanation for missing his own unilaterally extended deadline. Rather, on August 31, 2020, Mr. Yiannopoulos wrote to the Court's clerk stating: "Please apologize to the judge for me and let her know I'll be submitting today. I've been trying to get some legal advice but everyone says opposite things and it's been very difficult to know what to do." Nevertheless, Mr. Yiannopoulos again missed his own self-imposed extended deadline. Tired of Mr. Yiannopoulos' "empty promises," the Court entered an order on September 1, 2020 requiring Mr. Yiannopoulos to submit his papers by 5:00 p.m. or else appear for a conference the day that followed. Dkt. 15. It was only after receiving that order that Mr. Yiannopoulos submitted his response the afternoon of September 1, 2020, six days late.

Despite Your Honor's "hope that as long as we've been at this this morning and this afternoon, [Mr. Yiannopoulos] appreciates the seriousness and the gravity of the issues that are at play," Tr. 70, it is clear that he does not. Respectfully, the Court should not countenance Mr. Yiannopoulos' behavior and deny his request to invoke the journalist's privilege on the simple ground that he has (repeatedly) missed his opportunity to invoke it.

## II.   Mr. Yiannopoulos Offers No Credible Explanation for His Previous Waiver

As discussed in Movants' earlier papers, Mr. Yiannopoulos may not invoke the journalist's privilege unless he can show "unusual circumstances" and provide "good cause" for his months

---

[2] We note that on August 25, 2020, the court in the underlying action adjourned the October 26, 2020 trial date in light of the COVID-19 pandemic. A conference has been ordered for September 14, 2020 at which the parties and the court will discuss potential dates to reschedule the trial. *See Sines v. Kessler*, No. 17-cv-00072, Dkt. No. 844 (W.D. Va. Aug. 25, 2020).

long delay in raising the objection.  Dkt. 1-1 at 14 n.9; *see also* Dkt. 12 at 3.  His attempt to do so is as follows: "I cannot afford a lawyer" and "I did not know I was faced with a ticking clock the second I received the subpoena, and that I had to assert various privileges within that timeframe or lose my right to them."[3]  Ltr. at 3.

With respect, this argument is the height of disingenuity.  As discussed previously, Mr. Yiannopoulos' failure to timely object to the Subpoena had nothing to do with his lack of knowledge that he had to do so within 14 days.[4]  Mr. Yiannopoulos did not object to the Subpoena because he wanted the Plaintiffs to think that he *had no objection* to it, so that he could benefit personally from the subsequent engagement with plaintiffs' counsel.  Mr. Yiannopoulos has been forthright about this deception, both in public and throughout this proceeding.  Specifically, Mr. Yiannopoulos made this very clear in his opening remarks at the July 29, 2020 hearing:

> I messed them around a little bit, because I wanted to find out how bad this situation was for Richard Spencer and the state of the lawsuit and just kind of wanted to find out what was going on and therefore inferred that I had all the information I did, the extent to which that communicates any disrespect to the Court, I sincerely apologize; and to the extent that that communicates disrespect to the idea of the lawyers, I don't.  But that's basically what was happening.  And I just wanted to kind of figure out how bad it was for Richard Spencer.  I have a long history of animosity towards him.

Tr. 8; *see also* Dkt. 5-6 (explaining Mr. Yiannopoulos colorful boasting about his successfully manipulating a meeting with plaintiffs' counsel through the use of lies).

And, when placed under oath, Mr. Yiannopoulos further confirmed this when he was asked to provide more clarity as to what he meant by his post that he was "messing [plaintiffs] about":

> I think what I meant – what I meant by that post was that I think I alluded strongly without saying explicitly that I was almost certainly in possession of material that would assist their lawsuit.  . . .  [T]o the extent I was "messing them around," it was strongly suggesting that I had material that would greatly assist their lawsuit.  And the reason I did that is I wanted to kind of sound out more information about the suit really, and that turned into more aggressive and confrontational kind of situation.  So that didn't pan out for me and I probably shouldn't have done it.  And that's about it.

---

[3] Mr. Yiannopoulos plainly knew that he was required to respond to Movants' waiver argument.  Recall that at the July 29th hearing, Your Honor specifically informed Mr. Yiannopoulos that Movants were making a waiver argument, to which Mr. Yiannopoulos confirmed: "I'm aware that's the argument they're making."  Tr. 14.

[4] For the avoidance of doubt, the subpoena served on Mr. Yiannopoulos provided him with the text of F.R.C.P. 45(d)(2)(B) which specifies the 14-day period for which to file objections to a subpoena.  *See* Dkt. 1-10.

KAPLAN HECKER & FINK LLP                                                                      4

Tr. 16-17.

Mr. Yiannopoulos's response to receiving Movants' subpoena was a tactical, opportunistic and bad faith attempt – over the course of months – to deceive Movants into believing he had more information than he now claims he has to further his own personal vendetta against Richard Spencer. After his calculated choice to proceed the way he did failed to benefit him in the way he had hoped, he now pleads ignorance. Mr. Yiannopoulos has no credible explanation—other than his bad faith—for his failure to object to the subpoena by the required date (or months thereafter). Mr. Yiannopoulos should not now be permitted to interpose an objection.

**III.   Mr. Yiannopoulos' Intimation That He Might Not Recall the Identity of His Source is Not Consistent with His Sworn Testimony**

Nine months after describing his "source" in detail to Movants' counsel when doing so suited his interests at the time, Mr. Yiannopoulos now conveniently contends that he might not recall exactly who showed him the relevant recordings. Specifically, he claims that he was shown the materials "at a late-night afterparty" where "[t]here was a lot of alcohol consumed," and that although "[t]o the best of [his] recollection [the source over which he is claiming journalist's privilege was] the person who played [him] the recordings," it is "possible that I am mistaken." Ltr. at 1. But this representation directly contradicts Mr. Yiannopoulos' sworn testimony at which he testified without ambiguity that the source in question played him the material:

> Q.   Did you, in fact, tell [Movants' counsel] that you had between 20 and 30 distinct audio recordings ranging in length from ten minutes to two hours?
>
> A.   I told them that those audio recordings do exist but I do not possess them. I had been played portions of them by somebody else and I was unable to acquire them. I represented that I physically possessed files of them, which I did not.
>
> Q.   But have you actually, yourself, been privy or have heard between 20 and 30 audio recordings?
>
> A.   Not the complete recordings. I've seen them – I saw on a screen that it was that number of files, but I did not listen. I was just played a couple of clips.
>
> Q.   Was this by one person or more than one person, sir?
>
> A.   By one person.
>
> Q.   And this is one of the sources to which you referred earlier?
>
> A.   **Yes**. It's the same sources that provided me with other things as well, specifically the second video, the second thing I posted on YouTube. I've been able to get things from this source partially, but this source has withheld I guess the

> stuff that plaintiffs' counsel really wants badly, and which I
> really want badly too. And I continue my efforts to –

Tr. 34-35 (emphasis added).

Apart from calling into further question his credibility, Mr. Yiannopoulos' presently professed inability to recall if the individual in question showed him the materials is otherwise highly relevant. For one, if Mr. Yiannopoulos truly cannot recall who showed him the material, it is difficult to comprehend how Mr. Yiannopoulos can assert that the material was shown to him upon a promise of confidentiality. Relatedly, yet more generally, it is unclear how Mr. Yiannopoulos can refer to this individual as a "source" when he is not confident this person provided him anything at all.

### IV. Mr. Yiannopoulos' Contentions as to the Journalist's Privilege Are Meritless

Milo in effect offers three reasons why he is entitled to invoke a journalist's privilege: (i) he was in fact employed as a professional journalist "[d]uring the timeframe the Plaintiffs are concerned with," Ltr. at 3; (ii) although his motivation *at present* is to further a private feud, he nonetheless "learn[ed] the identity of the source 'in the course of gathering or obtaining news,'" *id.*; and (iii) Movants failed to show that the identity of the source is not available from another source, *id.* at 4. Each argument is both meritless and insufficient.

*First*, to the extent relevant, the Court should reject Mr. Yiannopoulos' contention that he was employed as a "senior salaried professional reporter at a well-established news organization", Ltr. at 4, "[d]uring the timeframe the Plaintiffs are concerned with".[5] Ltr. at 3. But that's not accurate, and Movants statement to the contrary was far from "speculation and hope," *id.* at 4—it was widely reported that Mr. Yiannopoulos resigned from the Breitbart News Network, the only "news organization" Mr. Yiannopoulos identifies, in February 2017, nearly six months *before* the Unite the Right events. *See* Dkt. 12 at 7 n.6; *see also* Dkt. 1-1 at 4-5.[6] For the avoidance of doubt, Mr. Yiannopoulos could not have viewed the relevant content from his purported source while at Breitbart because there is virtually no evidence that the Defendants in the underlying action were specifically planning the UTR events as early as February 2017.

*Second*, the Court should lend little credence to Mr. Yiannopoulos' fanciful contention that he "was present at the said 'afterparty' for journalistic purposes" and that his collection of information at that party was "for the purposes of information-gathering and reporting." Ltr. at 4. Just paragraphs earlier, Mr. Yiannopoulos represented that there was so much alcohol consumed at the relevant event that he is unable to even confidently recollect the identity of the person who

---

[5] Mr. Yiannopoulos seemingly raises this contention to support the notion that he is a "professional journalist" for purposes of New York's Shield Law. But, as discussed in Movants' papers, the Shield Law does not apply to this action. Dkt. 12 at 5-8.

[6] Respectfully, the Court should not be moved by Mr. Yiannopoulos' contention that "this process has been extraordinarily burdensome on [him]." Ltr. at 3. Nearly all of the burden imposed on Mr. Yiannopoulos by way of this proceeding is of his own making. Had Mr. Yiannopoulos simply told the truth to the Plaintiffs, and complied in good faith with his subpoena obligations, we would not be in this position. To the contrary, the only parties bearing an undue burden in light of this proceeding are Movants' counsel, their clients, and of course this Court.

showed him the videos. *Id.* at 1. It is thus hard to fathom how Mr. Yiannopoulos can seriously contend that this is "precisely the sort of journalistic activity [that the journalist's privilege] is designed to protect." *Id.* at 4. Further, Mr. Yiannopoulos concedes that his current basis of retaining the relevant information is to "further . . . a private feud." *Id.* Although he summarily contends that he was not motivated by a private feud at the time he was collecting the information, *id.*, that notion is not just *ipse dixit* and facially implausible, it is plainly refuted by Mr. Yiannopoulos' sworn testimony that he "never had information about Unite the Right[]," he "never reported on it," and had "never been in discussion with sources about it." Tr. 53.

*Third*, Mr. Yiannopoulos' contentions as to Plaintiffs' alternative efforts to acquire these materials are baseless. Mr. Yiannopoulos claims that the source at issue showed him these materials at some "late-night afterparty," Ltr. at 1, but he has consistently refused to offer any details about that event (or is incapable of doing so because his memory is clouded due to significant alcohol consumption). Indeed, in Mr. Yiannopoulos' earlier conversations with counsel, he "represented that he could not recall when or where (or even in what state) the afterhours event at which the source showed him the recordings took place. Mr. Yiannopoulos further represented that his recollection of the after hours event is limited to the knowledge that his source showed him the recordings, that the event happened while he was 'on tour,' and that there was at least one other person in the room when his source showed him the recordings." Dkt. No. 12-2 ¶ 3.c. It is due to this lack of almost any details regarding this afterparty that Movants' have suggested that Mr. Yiannopoulos is in a "unique position to know exactly who these individuals are that he met with." Tr. 44. Finally, Mr. Yiannopoulos himself represents that many of the individuals in question have deleted their relevant material,[7] Ltr. at 2, making it of course impossible for Plaintiffs to have acquired that content (let alone the identity of the source that Mr. Yiannopoulos presently seeks to hide).

*     *     *

We continue to be grateful for Your Honor's serious and diligent attention to this important matter, especially in light of Mr. Yiannopoulos' unfortunately cavalier attitude to these proceedings. We look forward to the Court's resolution of this matter.

Respectfully submitted,

*/s/ Benjamin D. White*
Benjamin D. White

Cc:  Respondent Milo Yiannopoulos (by e-mail)

---

[7] At the very least, Mr. Yiannopoulos should be forced to disclose the identities of the individuals that he contends deleted materials. Of course, this information would be highly relevant to the Plaintiffs, especially if these individuals are parties to, or have received a subpoena in, the underlying action.