UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--- | ---
ELIZABETH SINES, SETH WISPELWEY, MARISSA BLAIR, APRIL MUÑIZ, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, JOHN DOE, and THOMAS BAKER, Movants, -v.- MILO YIANNOPOULOS, Respondent. | 20 Misc. 241 (KPF)  **OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Movants are plaintiffs in a civil rights lawsuit currently pending in the United States District Court for the Western District of Virginia, captioned *Sines* v. *Kessler*, No. 17 Civ. 72 (W.D. Va.) (NKM) (the "Underlying Suit"). (Dkt. #1). Before this Court, they seek to compel Respondent Milo Yiannopoulos to comply with a previously-issued subpoena. Over time, the parties have narrowed the issues in dispute to one: whether Respondent should be compelled to disclose the identity of a confidential source who Respondent says has relevant documents. Respondent, proceeding *pro se*, objects to the subpoena on the ground that the identity of his source is protected by the journalist's privilege, which objection the Court will liberally construe as a motion to quash. For the reasons set forth below, the Court denies without prejudice Movants' motion to compel compliance with the subpoena and denies Respondent's motion to quash as moot. Additionally, the Court will order that certain documents be unsealed.

## BACKGROUND[1]

### A. Factual Background

On October 17, 2017, Movants initiated the Underlying Suit against the principal organizers of the so-called "Unite the Right" rally (the "Rally"), which occurred on August 11 and 12, 2017, in Charlottesville, Virginia. (MTC 3). Movants are individuals who were injured at the Rally and are now plaintiffs in the Underlying Suit. They allege that the defendants conspired to violate their civil rights in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1985(3). (*Id.*).

Respondent Milo Yiannopoulos is a commentator and public speaker who has previously served as an editor for the far-right website Breitbart News Network. (*See* MTC 4-5; Resp. Opp. 3). Respondent states that, since leaving Breitbart, he has worked as a freelance reporter. (Resp. Opp. 3). Evidence submitted by Movants in support of their motion to compel demonstrates that after leaving Breitbart, Respondent continued to produce and publish content

---

[1] The facts recounted herein are drawn from the parties' submissions in connection with the instant motion. For ease of reference, the Court refers to the parties' briefing as follows: Movants' Memorandum of Law in Support of Motion to Compel Milo Yiannopoulos to Comply with Subpoena is referred to as "MTC" (Dkt. #1, Ex. 1); Movants' letter brief in further support of the Motion to Compel is referred to as "Mov. Br." (Dkt. #12); Respondent's letter brief in opposition to the Motion to Compel is referred to as "Resp. Opp." (Dkt. #17); and Movants' reply letter brief in further support of the Motion to Compel is referred to as "Mov. Reply" (Dkt. #20). The transcript of the July 29, 2020 hearing is referred to as "Hr'g Tr." (Dkt. #13); the exhibits attached to the Declaration of Michael L. Bloch in Support of Movants' Motion to Compel are referred to as "Bloch Decl., Ex [ ]" (Dkt. #1, Ex. 2); and the Declaration of Benjamin D. White in Support of Movants' Motion to Compel is referred to as "White Decl. ¶ [ ]" (Dkt. #12, Ex. 2).

online, including content about white supremacists and the far right. (*See, e.g.*, Bloch Decl., Ex. 5, 6, 10).

Movants served Respondent with a subpoena pursuant to Federal Rule of Civil Procedure 45 on November 5, 2019. (Bloch Decl., Ex. 8 (the "Subpoena")). The Subpoena sought the production of, *inter alia*, all documents and communications related to the Rally, as well as documents and communications concerning Richard Spencer, a defendant in the Underlying Suit and one of the purported organizers of the Rally. (*Id.*). Respondent was to produce responsive documents by December 5, 2019. (*Id.*).

Respondent did not produce documents by December 5, 2019, but represented to Movants in an email dated December 6, 2019, that he intended to comply with the Subpoena. (Bloch Decl., Ex. 11). The parties agreed to meet on December 18, 2019, at which meeting Movants agreed to narrow the scope of the Subpoena. (MTC 8-9; *see also* Bloch Decl. ¶ 14; *id.*, Ex. 12). In a letter dated January 9, 2020, at Respondent's request, Movants formalized the narrowed scope of the Subpoena to the following:

> (i) All audio and visual recordings that you have in your possession relating to the Unite the Right event that took place in Charlottesville, Virginia on August 11 and 12, 2017, and which were recorded in Virginia, and
>
> (ii) Any other communications between you and any of the defendants in [the Underlying Suit] that relate to Unite the Right.

(*Id.*, Ex. 13). The letter provided a response date of January 17, 2020. (*Id.*). Respondent again failed to comply with the Subpoena, and after some back and forth via email, wherein Respondent provided various excuses for his

failure to comply (*see* Bloch Decl., Ex. 14-15), on February 12, 2020, Respondent told Movants that he had "nothing to produce relevant to the planning of [the Rally]," and that he had been "mistaken" in his belief that he possessed recordings of Richard Spencer. (*Id.* at Ex. 15). Respondent further asserted that:

> I have consulted the source of these recordings, who reminded me that they were played to me, but I did not retain copies of them. Other recordings in my possession do not relate to Unite the Right or the planning of physical violence by any of the named defendants. Regarding anything else I possess tangentially related to your case, such as emails, I am asserting journalistic privilege, which enjoys broad protection in the state of New York.

(*Id.*). However, on April 6, 2020, Respondent published a video on YouTube that was responsive to the Subpoena (*id.*, Ex. 16), and several days later he reposted the video on the social media website Telegram and stated that there was "[m]uch, much more to come" (*id.*, Ex. 17).

On June 13, 2020, Respondent again posted on Telegram that there are "[a] lot more Richard Spencer drops still to come from me. Keep an eye out." (*Id.*, Ex. 18). On June 24, 2020, after Respondent continued to defy the Subpoena, Movants notified Respondent that they intended to pursue a motion to compel compliance with the Subpoena. (Bloch Decl. ¶ 21).

### B. Procedural History

On June 25, 2020, Movants filed the instant motion to compel Respondent's compliance with the Subpoena. (Dkt.#1). On July 29, 2020, the Court conducted a telephonic hearing on the motion. (*See generally* Hr'g Tr.).

While under oath at the hearing, Respondent testified that he did not physically possess responsive documents or files, but that he had personally been shown them by at least one individual, whom he referred to as his source. (*Id.* at 16, 34-40, 47-49, 71).[2]  Respondent indicated that his source had played clips of responsive audio and video files, and shown him a screen where he could see that additional files existed. (*See id.* at 34-35).  Respondent invoked the journalist's privilege to prevent the disclosure of the identity of his unnamed source for the relevant documents, and the Court set a briefing schedule to address Respondent's assertion of the privilege over the identity of his source. (*Id.* at 70-74).

After the hearing, Respondent stated that he attempted to get his source to disclose their identity and/or relevant documents voluntarily to Movants, but was unsuccessful. (*See* Resp. Br. 1-2; *see also* White Decl. ¶ 3).  On

---

[2]  Respondent has equivocated over the total number of unnamed individuals who are Respondent's source or sources, and whose identities are now the target of Movants' Subpoena and the instant motion to compel. (*See, e.g.*, Hr'g Tr. 16, 34-40, 47-49, 71-12; *see also* White Decl. ¶¶ 2-3).  For ease of reference, the Court refers Respondent's source in the singular, although Respondent has since represented to Movants that there is one "main guy" but that there are other sources as well. (*See* White Decl. ¶ 2).

The Court pauses to note that Respondent's equivocation as to the total number of his confidential sources is symptomatic of Respondent's improper behavior in this case.  By changing his position (i) on the number of (and information possessed by) his confidential sources, (ii) the content and importance of documents in his possession, and (iii) the location of relevant documents, Respondent has either overstated or understated his importance to Movants' case at various points.  In this vein, Respondent's decision to "mess about" with Movants in this case — over the documents in his possession, the number of confidential sources, and the timeline of his failure to comply with the Subpoena — has no journalistic benefit.  The Court expects that Respondent's representation to Movants (*see* White Declaration, ¶ 2) will be the final articulation of the total number and relative importance of Respondent's sources.  As ordered below, within one week of the date of this Order, Respondent shall confirm in writing to the Court and to Movants the total number of confidential sources with relevant material.  Further equivocation will not be tolerated.

August 12, 2020, Movants filed their letter brief in further support of their motion to compel (Dkt. #12); on September 1, 2020, Respondent filed his opposition papers (Dkt. #17); and on September 9, 2020, Movants filed a reply (Dkt. #20).

## DISCUSSION

### A. Applicable Law

The Second Circuit "has long recognized the existence of a qualified privilege for journalistic information." *Gonzales* v. *Nat'l Broad. Co.*, 194 F.3d 29, 32 (2d Cir. 1999). The privilege, rooted in the First Amendment and federal common law, arises from a "concern for the potential harm to the 'paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters.'" *Id.* at 33 (quoting *Baker* v. *F & F Inv.*, 470 F.2d 778, 782 (2d Cir. 1972)). "The privilege may be invoked by an individual "involved in activities traditionally associated with the gathering and dissemination of news, even though he may not ordinarily be a member of the institutionalized press." *von Bulow ex rel. Auersperg* v. *von Bulow*, 811 F.2d 136, 142 (2d Cir. 1987). However, to invoke the privilege, an individual must be acting in "the role of the *independent* press" when "collecting the information in question." *Chevron Corp.* v. *Berlinger*, 629 F.3d 297, 307 (2d Cir. 2011). Furthermore, "the talisman" for invoking "the journalist's privilege is intent to disseminate to the public at the time the gathering of information commences." *von Bulow*, 811 F.2d at 145.

Once established, the federal journalist's privilege is a qualified one and may be overcome. However, the protection accorded by the privilege "is at its highest when the information sought to be protected was acquired by the journalist through a promise of confidentiality." *Chevron Corp.*, 629 F.3d at 307 (internal citation omitted). To protect the "important interest of reporters in preserving the confidentiality of [their] sources," the Court may override the journalist's privilege and order disclosure "only upon a clear and specific showing that the information is: [i] highly material and relevant, [ii] necessary or critical to the maintenance of the claim, and [iii] not obtainable from other available sources." *Schiller* v. *City of New York*, 245 F.R.D. 112, 118 (S.D.N.Y. 2007) (quoting *In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir. 1982)).

Journalistic privilege is also recognized under New York's "Shield Law," N.Y. Civ. Rights Law § 79-h(b), and provides absolute protection for "news obtained under a promise of confidentiality," *Baker* v. *Goldman Sachs & Co.*, 669 F.3d 105, 107 (2d Cir. 2012), including "the identity of a confidential source," *Giuffre* v. *Maxwell*, 221 F. Supp. 3d 472, 476 (S.D.N.Y. 2016). However, "asserted privileges in actions that raise both federal and pendent state law claims are governed by the principles of federal law." *In re McCray, Richardson, Santana, Wise, & Salaam Litig.*, 928 F. Supp. 2d 748, 753 (S.D.N.Y.) ("*In re McCray*"), *report and recommendation adopted*, 991 F. Supp. 2d 464 (S.D.N.Y. 2013).

### B.     The Motion to Compel Is Denied Without Prejudice

Respondent objects to the Subpoena on the ground that Movants fail to overcome the journalist's privilege, both as codified in the New York Shield Law and as articulated by the Second Circuit. (Resp. Opp. 3-4). Movants retort that Respondent has waived his right to assert privilege, that New York's Shield Law does not apply in the instant litigation, and that, in any event, Respondent fails to satisfy the state and federal standards for asserting the journalist's privilege. (*See generally* Mov. Br.; Mov. Reply). Even if Respondent has successfully asserted the privilege, Movants argue, they have established that it is appropriate to override the qualified privilege. For the reasons that follow, the Court finds that Respondent has successfully asserted the federal journalist's privilege, and that Movants may, but have not on this record, established that overriding the privilege is proper.

### 1.     Respondent Has Not Waived the Privilege

While "the failure to serve written objections to a subpoena" within the time specified by Rule 45 "typically constitutes a waiver of such objections," that failure may be "forgiven in unusual circumstances and for good cause." *Homeward Residential, Inc.* v. *Sand Canyon Corp.*, No. 12 Civ. 67 (JFK) (JLC), 2017 WL 4676806, at *17 (S.D.N.Y. Oct. 17, 2017) (quotation marks and citations omitted). Such circumstances exist where: "[i] the subpoena is overbroad on its face and exceeds the bounds of fair discovery, [ii] the subpoenaed witness is a non-party acting in good faith, and [iii] counsel for witness and counsel for subpoenaing party were in contact concerning the

witness' compliance prior to the time the witness challenged legal basis for the subpoena." *Id.* (quoting *Concord Boat Corp.* v. *Brunswick Corp.*, 169 F.R.D. 44, 48 (S.D.N.Y. 1996)).  Ultimately, the Court finds that consideration of these factors, as well as Respondent's *pro se* status, militates against deeming the privilege forfeited.

*First*, although Movants now seek only the disclosure of the identity of a confidential source in possession of relevant documents (*see generally* Hr'g Tr.), previously, the scope of the subpoena was quite broad, seeking all document concerning the Underlying Suit, plus all documents concerning Richard Spencer.  The request concerning Richard Spencer is undoubtably overbroad, as it is not constrained to any time period relevant to the Rally.  *See United States ex rel. Sasaki* v. *New York Univ. Med. Ctr.*, No. 05 Civ. 6163 (LMM) (HBP), 2011 WL 13257693, at *4 (S.D.N.Y. Aug. 23, 2011) (declining to find waiver where subpoena sought discovery from time periods outside the bounds of relevance to the litigation).  And a request seeking simply "all documents concerning the [Underlying Suit]" is quite vague, especially for a *pro se* respondent, who has no idea which documents may have relevance to the Underlying Suit.

*Second*, the Court finds that Respondent is a third party, though it is somewhat less clear that he was acting in "good faith."  Respondent did state on the record at the July 29, 2020 hearing that he was "messing [Movants] around a bit" in delaying in his response to the Subpoena.  (Hr'g Tr. 17).  However, Movants have not been seriously harmed by the delay, as the parties

9

were invited to request extra time to complete discovery in the Underlying Suit if needed with respect to this motion. (*See* Dkt. #10). Nor have Movants asserted that the delay has prejudiced them. (*See generally* Mov. Br.; Mov. Reply). Ultimately, the Court determines that Plaintiff's *pro se* status cautions against finding waiver due to lack of good faith.

*Third*, the parties were in contact regarding Respondent's compliance with the Subpoena. Indeed, they negotiated a revised subpoena to narrow the scope, with a new response date of January 17, 2020. (*See* Dkt. #13). Thus, when Respondent asserted the journalist's privilege in a February email (*see* Bloch Decl., Ex. 15), it was less than a month after the revised response date. *See Israel* v. *Carpenter*, No. 95 Civ. 2703 (DAB) (JCF), 2002 WL 1424594, at *1 (S.D.N.Y. June 28, 2002) (finding that 92-day delay warranted waiver). Further mitigating any potential reason to find waiver is the fact that Respondent is proceeding *pro se* in the instant litigation, and "a court is ordinarily obligated to afford a special solicitude to *pro se* litigants." *Tracy* v. *Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). Accordingly, the Court will address this issue on the merits.

### 2. Federal Law Governs the Assertion of Privilege

To review, Respondent asserts the journalist's privilege under New York's Shield Law as well as federal law. (Resp. Opp. 3-4). The Court agrees with Movants that "in cases presenting federal questions, such as here, discoverability, privileges, and confidentiality are governed by federal law, not state law." *Crosby* v. *City of New York*, 269 F.R.D. 267, 274 (S.D.N.Y. 2010);

10

*see also* Fed. R. Evid. 501.  The Underlying Suit is brought pursuant to a federal statute, 42 U.S.C. § 1985, as well as Virginia state law, but "asserted privileges in actions that raise both federal and pendent state law claims are governed by the principles of federal law."  *In re McCray*, 928 F. Supp. 2d at 753.  The Court "may consider the applicable state law and the policy considerations which underlie it."  *Id.* (citing *von Bulow*, 811 F.2d at 144).  Here, the federal and state policies are "congruent."  *von Bulow*, 811 F.2d at 144.  "Both 'reflect a paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the First Amendment.'"  *Id.* (quoting *Baker*, 470 F.2d at 782).  Thus, Respondent's assertion of privilege will be considered under the Second Circuit's articulation of the journalist's privilege, with consideration of the congruent federal and state policies articulated above.

### 3. The Federal Journalist's Privilege Applies

The Second Circuit has articulated a qualified privilege for information gathered in a journalistic investigation.  *See, e.g.*, *Gonzales*, 194 F.3d at 29; *In re Petroleum Prods. Antitrust Litig.*, 680 F.2d at 7-8; *Baker*, 470 F.2d at 778.  In order to establish that the journalist's privilege applies in the Second Circuit, Respondent must establish that (i) he was acting in "the role of the independent press," (ii) "'at the time the gathering of information commences.'"  *Chevron Corp.*, 629 F.3d at 307 (quoting *von Bulow*, 811 F.2d at 145).  "The primary relationship between the one seeking to invoke the privilege and his

11

sources must have as its basis the intent to disseminate the information to the public garnered from that relationship." *von Bulow*, 811 F.3d at 145.

Movants argue that Respondent cannot assert the journalist's privilege because he was gathering information and cultivating his source in order to pursue a personal feud with Richard Spencer, and was thus not acting in the role of an independent journalist. (Mov. Br. 9). Respondent replies that at the time he "acquired the identity of" his source, he was employed as a professional journalist at Breitbart, and, further, that he "learn[ed] the identity of the source in the course of gathering or obtaining news" — not in pursuing a grudge against Spencer. (Resp. Opp. 3-4 (internal quotation marks omitted)).

The factual record is both thin and slightly muddled. The parties focus their arguments on Respondent's intent at the time he obtained his confidential source, as well as his role while attending an "afterparty" at which the source allegedly showed relevant recordings to Respondent. (*See* Mov. Br. 6-8, 9; Resp. Opp. 3-4; Mov. Reply 4-6). Respondent states that "when [he] acquired the identity of the source and listened to materials and became aware of various facts in the course of reporting, [he] was at the same time a senior salaried professional reporter at" Breitbart. (Resp. Opp. 4). Breitbart is a controversial website with an overt bias, "[b]ut the touchstone is not ... whether the journalistic enterprise was 'unbiased'; by that standard, few, if any, daily newspapers could assert the privilege. Rather, the test is whether the enterprise intended to express its views publicly, or merely to engage in private lobbying." *Schiller*, 245 F.R.D. at 119. Breitbart does not primarily engage in

12

private lobbying, regardless of its editorial vision or the merits of the content that it publishes. *Cf. Chevron Corp.*, 629 F.3d at 308 (declining to find that a reporter commissioned "to serve the objectives of others who have a stake in the subject of the report" is acting in the role of "an independent press"). Respondent asserts he was writing about white supremacy "at the time in question," making conversations with white nationalists "directly relevant to [his] daily work[.]" (Resp. Opp. 3). Thus, to the extent Respondent acquired his source and/or learned about the relevant documents while employed by Breitbart, he has sufficiently invoked the journalist's privilege, even if he later developed a personal grudge against Spencer. *See id.* at 307 (distinguishing between "proper invocation of the privilege, where the purpose to disseminate the information motivated the gathering of the information," and "improper invocation, where the information was gathered for other reasons and the intent to publish arose only later").

Movants further assert that the afterparty at which Respondent was purportedly shown the relevant files happened after Respondent resigned from Breitbart in February 2017. (Mov. Reply 5-6; *see also* Mov. Br. 7 n.6 (citing news article about Respondent's resignation from Breitbart in February 2017)).[3] The timeline is not entirely clear, so the Court next addresses the

---

[3]   Movants argue: "For the avoidance of doubt, [Respondent] could not have viewed the relevant content from his purported source while at Breitbart because there is virtually no evidence that the Defendants in the [Underlying Suit] were specifically planning the [Rally] as early as February 2017." (Mov. Reply 5). This assertion may be true, but the Court cannot rely on Movants *ipse dixit* statements, particularly where the instant motion is predicated on Movants' lack of relevant information.

13

possibility that Respondent cultivated his source and/or obtained relevant information after leaving Breitbart. Respondent asserts that he was not motivated by a personal grudge at the time he cultivated his source, regardless of the timing, and further argues that he attended the afterparty "for journalistic purposes." (Resp. Opp. 3-4). This assertion is supported by the fact that Respondent has been publishing content about white supremacist ideology since he left Breitbart, even if not for a formal media organization and even if published in an unorthodox style. (*See, e.g.*, Bloch Decl., Ex. 5, 6, 10, 16-18). Movants ask the Court to discredit Respondent's assertion that he attended the afterparty with a journalistic intent because Respondent claims to have consumed significant amounts of alcohol at the party. (Mov. Reply 5-6). The Court notes that the consumption of alcohol at a party does not vitiate journalistic intent. Journalists may wish to attend a party in order to gather information, or to meet and cultivate potential sources, any of which goals may be furthered by the consumption of alcohol.

Even if the Court discredits Respondent's representations as to timing, the Court is not convinced that Respondent was motivated only out of a personal grudge against Spencer. Spencer is himself a newsworthy subject, and publishing information about him, even if tinged with personal dislike, can still be motivated by an interest to "disseminate information to the public," *Chevron Corp.*, 629 F.3d at 307, and to promote "debate over controversial matters," *von Bulow*, 811 F.2d at 144. As noted above, after leaving Breitbart, Respondent was still engaged in disseminating information about the far right

14

to the public, through his blog, social media, YouTube, and elsewhere. (*See, e.g.*, Bloch Decl., Ex. 5, 6, 10, 16-18). Respondent's style of disseminating information may be confrontational and biased, but it is not wholly without journalistic content, and protecting even Respondent's muckraking style protects the "public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters." *Baker*, 470 F.2d at 782.

### 4. Movants May, But Have Not on This Record, Established That the Qualified Journalist's Privilege Should Be Overcome

Alternatively, Movants argue the Court should override the qualified journalist's privilege and order Respondent to disclose the identity of his confidential source. The Second Circuit has explained that:

> to protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources, disclosure may be ordered only upon a clear and specific showing that the information is: [i] highly material and relevant, [ii] necessary or critical to the maintenance of the claim, and [iii] not obtainable from other available sources.

*Gonzales*, 194 F.3d at 31 (quoting *United States* v. *Cutler*, 6 F.3d 67, 71 (2d Cir. 1993)); *see also In re Petroleum Products Antitrust Litig.*, 680 F.2d at 7.

The Court agrees with Movants that the content is highly material and relevant. The identity of a source who may possess recordings of the defendants in the Underlying Suit engaged in planning sessions for the Rally (*see* Hr'g Tr. 34), is material and relevant to establishing that these defendants conspired with one another to engage in violence against others motivated by a class-based animus. A claim under Section 1985 requires:

15

> [i] A conspiracy of two or more persons, [ii] who are motivated by a specific class-based, invidiously discriminatory animus to [iii] deprive the plaintiff[s] of the equal enjoyment of rights secured by the law to all, [iv] and which results in injury to the plaintiff[s] as [v] a consequence of an overt act committed by the defendants in connection with the conspiracy.

*Sines* v. *Kessler*, 324 F. Supp. 3d 765, 780 (W.D. Va. 2018). As Movants noted in their initial moving papers, the defendants in the Underlying Suit have already raised intent as a key issue in the litigation, and this will be a critical — if not *the* critical — issue at trial. (MTC 21-22; *see also* Bloch Decl., Ex. 6).

The Court also agrees that the identity of the confidential source, and the relevant recordings at issue, are "necessary or critical to the maintenance of the claim." *Gonzales*, 194 F.3d at 31. Based on Respondent's own descriptions of the recordings, they likely offer strong proof of one of the key elements of the § 1985 claim that Movants advance in the Underlying Suit. (*See* Resp. Opp. 1-2; *see also* Bloch Decl. 14(a); White Decl. ¶ 2(b)). Further, evidence of intent to discriminate is difficult to establish, making these recordings critical to the suit. *See Gallo* v. *Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994) (explaining, in the employment discrimination context, that direct evidence of intent to discriminate is rarely available). Because "the claim for which the information is to be used virtually rises or falls with the admission or exclusion" of the recordings, the identity of their source is critical. In *re Application to Quash Subpoena to Nat'l Broadcasting Co.*, 79 F.3d 346, 351 (2d Cir. 1986).

16

However, on this record, Movants have not yet established that the identity of Respondent's confidential source is unobtainable from other sources. Movants are required to "make a clear and specific showing to the Court that there are no other alternative sources of the identity of the [c]onfidential [s]ource." *In re Pishevar*, 439 F. Supp. 3d 290, 307 (S.D.N.Y. 2020). Here, Movants offer only vague assertions that there are no alternative sources, without proof of any efforts that Movants have undertaken to identify Respondent's confidential source or to obtain the recordings purportedly in the source's possession. (*See* Mov. Br. 11; Mov. Reply 6). For example, Respondent stated that his source wanted to remain confidential because "there were not many people in the room when those conversations happened, and the source was worried about retaliation." (White Decl. ¶ 2.e). If true, Movants may be able to identify this source by deposing and/or subpoenaing all individuals suspected to be at one of these planning meetings. Yet Movants have stated only that they cannot acquire the identity of the confidential source (or obtain the relevant materials allegedly possessed by this source), because Respondent has given them insufficient information to identify the source. (*See* Mov. Br. 11; Mov. Reply 6). Movants have not described any efforts to depose or subpoena individuals suspected of being present at planning meetings for the Rally in order to ascertain the identity of Respondent's source or to locate the recordings Respondent's source allegedly possesses. *See In re Petroleum Prod. Antitrust Litig.*, 680 F.2d at 8-9 (refusing disclosure of a journalist's notes despite the fact that "hundreds of depositions" had been taken and others

17

might be necessary); *In re Pishevar*, 439 F. Supp. 3d at 307 (declining to override privilege where petitioner failed to submit declarations ruling out potential alternative sources); *Persky* v. *Yeshiva Univ.*, No. 01 Civ. 5278 (LMM), 2002 WL 31769704, at *4 (S.D.N.Y. Dec. 10, 2002) (rejecting request to reveal confidential sources where the parties did not provide "an idea of … how many people would likely need to be deposed in order to find out the identity of the sources.").[4]  Movants must provide a "clear and specific" statement showing that they have pursued alternative sources — *i.e.*, sources other than Respondent or information provided by Respondent — to ascertain the identity of the person with the relevant recordings.  At a minimum, Movants have not ruled out that they may be able to identify the source because the source was one of a limited number of attendees of Rally planning meetings, and is therefore presumably a name already known to Movants.  Therefore, Movants' motion to compel is denied without prejudice, with leave to renew upon a more thorough demonstration that Movants have exhausted potential alternative sources.

---

[4]   In their initial moving papers, Movants stated that they have faced considerable obstruction and non-compliance in pursuing discovery in the Underlying Suit, including a court order detaining at least one defendant for civil contempt.  (*See* MTC 4).  However, Movants have not provided any information about the relationship between their discovery efforts in the Underlying Suit and their efforts to ascertain the identity of Respondent's source and/or to obtain the recordings.  To the extent Movants believe they have already exhausted all plausible alternative sources in the normal course of discovery in the Underlying Suit, they must provide a record that explains their efforts to investigate this issue.

### 5. Respondent's Brief in Opposition and Movants' Reply Brief Are Unsealed

By letter filed September 24, 2020, a member of the press requested that the Court unseal certain filings made in relation to the instant motion to compel. (*See* Dkt. #22). Specifically, the Court ordered that Respondent's brief in opposition to the motion to compel be filed under seal due to the sensitive nature of some information contained therein. (Dkt. #16). Because Movants cited extensively to Respondent's sealed brief, the Court granted Movants' request to seal their reply brief. (Dkt. #21). The Court requested that the parties respond to the request to unseal. (Dkt. #22). Movants do not object to the unsealing of the filings in question. (*See* Dkt. #23). Respondent did not respond and in any event has waived any objection by failing to respond to the Court's September 24, 2020 Order. In the interest of transparency and in furtherance of the "presumption of access" to judicial documents and court proceedings, *Bernstein* v. *Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016), the Court will order that Respondent's brief in opposition (*see* Dkt. #17) be unsealed, except that the exhibits to the brief shall remain sealed for the reasons stated in the Court's September 1, 2020 Order (Dkt. #16). Movants' reply brief shall be unsealed in its entirety. (*See* Dkt. #20).

## CONCLUSION

For the reasons stated above, Movants' motion to compel is DENIED WITHOUT PREJUDICE to its renewal on a more detailed record, and Respondent's motion to quash is DENIED as moot. Within one week from the date of this Order, Respondent is ORDERED to submit in writing the total number of confidential sources that he seeks to protect from disclosure by his invocation of the journalist's privilege. Within two weeks of receiving Respondent's submission, Movants are ORDERED to file a supplemental submission on the issue of whether the privilege can and should be overcome, and Respondent is ORDERED to respond to this submission within two weeks of receiving Movants' submission.

Additionally, the Clerk of Court is directed to unseal the filings at docket entries 17 and 20, except that the exhibits to the filing at docket entry 17 shall remain sealed.

SO ORDERED.

Dated: October 14, 2020
New York, New York

KATHERINE POLK FAILLA
United States District Judge

*A copy of this Order was emailed by Chambers to:*

Milo Yiannopoulos at: m@milo.net